**Nos. 23-1398, 23-1416**

# United States Court of Appeals for the Federal Circuit

**IROBOT CORPORATION,**

***Appellant,***

***v.***

**SHARK OPERATING LLC, SHARK MANAGEMENT LLC, SHARK SALES COMPANY,**

***Cross-Appellants.***

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2021-00544

## IROBOT'S NON-CONFIDENTIAL OPENING BRIEF

Lauren A. Degnan
Walter K. Renner
Rosalynd D. Upton
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

Oliver Richards
FISH & RICHARDSON P.C.
12860 El Camino Real
Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

April 28, 2023

*Attorneys for Appellant iRobot Corporation*

## EXEMPLAR CLAIM AT ISSUE ON APPEAL

1. A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a right signal emitter and a left signal emitter, the method comprising:

directing the robotic cleaning device about a room at a first velocity;

detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;

controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;

detecting contact with charging terminals on the base station;

stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station; and

charging a battery of the robotic cleaning device.

Appx86, 19:32-52.

# CERTIFICATE OF INTEREST

Counsel for Appellant iRobot Corporation certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **iRobot Corporation**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None/Not Applicable**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **BlackRock, Inc.**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: Roberto Devoto, Jeremy Monaldo**

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **Yes (*see* iRobot's Certificate of Interest filed at Dkt. 5)**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

Dated: April 28, 2023

*/s/ Lauren A. Degnan*
Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... vi

STATEMENT OF RELATED CASES .......... 1

STATEMENT OF JURISDICTION .......... 2

STATEMENT OF THE ISSUES .......... 3

INTRODUCTION .......... 4

STATEMENT OF THE CASE .......... 6

I. THE ’423 PATENT .......... 6

A. iRobot Pioneered the Home Vacuum Robot, Including the Autonomous Docking Claimed by the ’423 Patent .......... 6

B. The ’423 Patent Describes and Claims iRobot’s Auto-Docking Invention .......... 8

II. THE PRIOR ART .......... 14

A. Jeon Describes Auto-Docking After the ’423 Patent Inventors’ Conception of It, and Fails To Disclose Controlling the Forward Movement of a Robot as Claimed .......... 15

B. Abramson Post-Dates the Conception of the ’423 Patent, and Fails To Disclose Forward Movement as Claimed .......... 17

C. Kim Discloses a Large, Heavy Vacuum Robot .......... 18

D. Everett Discloses a Robot with a Much Different Base Station .......... 20

III. THE PROCEEDINGS BELOW .......... 22

A. Shark’s Petition and the Board’s Decision To Institute .......... 22

B. iRobot's Patent Owner Response Identifies the Deficiencies in Shark's Petition, Including that Neither Abramson nor Jeon Is Prior Art ....................23

C. Despite Challenging Only the Sufficiency of the Corroborating Evidence in Its Briefing, Shark Raised New Arguments Regarding the Sufficiency of the Inventor Declarations at Oral Argument, Which the Board Refused To Allow iRobot To Address ....................27

D. The Board's Final Written Decision ....................29

SUMMARY OF THE ARGUMENT .................... 33

STANDARDS OF REVIEW .................... 35

ARGUMENT .................... 36

I. THIS COURT SHOULD VACATE AND REMAND THE BOARD'S JUDGMENT AS TO CLAIMS 1-4, 6-8, 10, AND 12 ....................36

A. Under a Faithful Application of This Court's Precedent, iRobot Proved Prior Conception as a Matter of Law ....................36

1. Vu and Ozick—inventors of the technology claimed by the '423 patent—provided testimony documenting their complete conception of the disputed limitations .................... 38

2. iRobot provided copious technical documentation corroborating the inventors' testimony, coupled with sufficient expert testimony to explain it .................... 40

3. Testimony from the inventors' co-workers at the time, including an individual with no interest in this case, corroborate the inventors' account .................... 46

4. iRobot's evidence is sufficient to prove conception of claims 1-4, 6-8, 10, and 12 by at least early June 2003 as a matter of law .................... 48

B. The Board's Conception Determination at Minimum Should Be Vacated Because It Rests on Legal and Procedural Errors .......... 50

1. Legal Errors: The Board erroneously required both the inventor and corroborating evidence to use "magic words" exactly parroting the language used in the claims .......... 50

a. The Board legally erred by requiring specific claim language from the inventors .......... 51

b. The Board legally erred by requiring specific claim language in the corroborating evidence .......... 54

2. Procedural Errors: The Board erred by failing to provide iRobot the opportunity to address evidence and arguments raised for the first time at the oral hearing .......... 57

II. THIS COURT SHOULD REVERSE THE BOARD'S JUDGMENT AS TO CLAIMS 13-15, 18-23, 25, AND 26 BECAUSE IT RESTS ON IMPERMISSIBLE HINDSIGHT .......... 60

A. The Board Erroneously Relied on Hindsight in Its Analysis of the Alleged Motivation To Combine Kim and Everett .......... 60

B. The Board Erred in Its Consideration of Objective Indicia—the Guard Against Hindsight .......... 65

C. The Board's Judgment Regarding Claims 13-15, 18-23, 25, and 26 Cannot Stand .......... 69

CONCLUSION .......... 70

ADDENDUM .......... 71

CERTIFICATE OF SERVICE AND FILING .......... i

CERTIFICATE OF COMPLIANCE .......... ii

CERTIFICATE OF CONFIDENTIAL INFORMATION ...................................... ii

The public version of the addendum to iRobot's opening brief redacts highly confidential information describing technical details about iRobot's products. No material has been redacted from the text of the opening brief.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016) ....................61, 64

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................60, 65

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................35, 59

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
725 F.3d 1341 (Fed. Cir. 2013) ....................62

*Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003) ....................40

*Comcast Cable Commn'cs, LLC v. Promptu Sys, Corp.*,
838 F. App'x 555 (Fed. Cir. 2021) ....................63

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)....................35

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ....................37

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ....................59

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ....................60

*Fleming v. Escort Inc.*,
774 F.3d 1371 (Fed. Cir. 2014) ....................55

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
840 F.2d 902 (Fed. Cir. 1988) ....................62

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986) ....................38

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
496 F.3d 1334 (Fed. Cir. 2007) ....................................................................35

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................................................................65

*Knauf Insulation, Inc. v. Rockwool Int'l A/S*,
788 F. App'x 728 (Fed. Cir. 2019) ................................................................63

*Kridl v. McCormick*,
105 F.3d 1446 (Fed. Cir. 1997) ..............................................................40, 55

*Leo Pharm. Prod., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................................................................69

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................................................................62

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ..............................................................41, 42

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
55 F.4th 1354 (Fed. Cir. 2022) ....................................................................48

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................................................................35

*Mycogen Plant Sci. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) ....................................................................51

*Nike, Inc. v. Adidas AG*,
812 F.3d 1326 (Fed. Cir. 2016) ..............................................................61, 64

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ......................................................................59

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................................................................61

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................................................................65

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ....................61

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................70

*REG Synthetic Fuels, LLC v. Neste Oil Oyj*,
841 F.3d 954 (Fed. Cir. 2016) ....................37, 54

*Rodale Press, Inc. v. FTC*,
407 F.2d 1252 (D.C. Cir. 1968)....................59

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) ....................40, 49

*Securus Techs., Inc. v. Global Tel*Link Corp.*,
701 F. App'x 971 (Fed. Cir. 2017)....................63

*Silvestri v. Grant*,
496 F.2d 593 (CCPA 1974)....................51

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2003) ....................37

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
304 F.3d 1256 (Fed. Cir. 2002) ....................38

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ....................2

35 U.S.C. § 102(e) ....................14

35 U.S.C. § 141(c) ....................2

35 U.S.C. § 142....................2

**Other Authorities**

37 C.F.R. § 90.3(a)(1)....................2

Fed. Cir. R. 47.5....................1

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, counsel for iRobot Corporation ("iRobot" or "Appellant") states that the outcome of this appeal may directly affect *iRobot Corp. v. Shark Operating LLC f/k/a Euro-Pro Operating LLC, et al.*, Case No. 1:21-cv-10155, currently pending before the United States District Court for the District of Massachusetts. Counsel is unaware of any other appeals arising from the same proceeding before the United States Patent Office or any other cases that will directly affect or be directed affected by this court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

iRobot appeals from a final written decision of the Patent Trial and Appeal Board ("PTAB"), issued November 14, 2022. Appx1-62. iRobot timely filed its notice of appeal with the PTAB on January 12, 2023, within the 63-day deadline set by the applicable statutes and regulations. *See* Appx8631-8698; 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court thus has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Whether iRobot proved, as a matter of law, conception of the invention claimed by claims 1, 3, 4, 6-8, and 12 of U.S. Patent No. 9,884,423 ("the '423 patent") by at least the first week of June 2003, where iRobot furnished: (a) testimony from two inventors of the '423 patent attesting to conception; (b) testimony from others corroborating the conception; (c) contemporaneous technical documents evidencing conception; and (d) source code implementing the conceived inventions.

2. Whether the Board legally erred in requiring both the inventor and corroborating evidence to recite "magic words" corresponding to the words used in the claims to show conception.

3. Whether the Board violated the Administrative Procedure Act in refusing iRobot the opportunity to respond to new arguments made first at the oral hearing, where those arguments formed the basis of the Board's decision.

4. Whether the Board impermissibly relied on hindsight in finding a motivation to combine references found to render claims 13-15, 18-23, 25, and 26 of the '423 patent unpatentable.

5. Whether the Board's determinations regarding objective indicia were infected by hindsight and contrary to this Court's precedent.

# INTRODUCTION

This case presents a hornbook example of the kind of documentation and detail sufficient to support an inventor's attempt to swear-behind prior art. iRobot furnished testimony from two inventors of the '423 patent detailing the conception and reduction to practice of claims asserted to be unpatentable over two prior art references that post-dated that conception. In addition to inventor testimony, iRobot furnished: testimony from co-workers corroborating the inventors' testimony; contemporaneous technical documents evidencing the inventions; source code samples where the inventors implemented their inventions; and even an independent expert's testimony to decode all of the technical material for the Board.

Despite this abundance of testimony and evidence, and contrary to this Court's caselaw, the Board found iRobot had not sufficiently proved conception of all claimed features because the inventor testimony and corroboration did not exactly parrot the language used in the claims. Compounding this error, the Board's ultimate decision rests on arguments made for the first time at the oral hearing—which the Board refused iRobot the opportunity to address in supplemental briefing. These errors merit this Court's attention and correction.

This case also illustrates how hindsight can infect an obviousness analysis. The Board ignored significant differences between the two prior art references and

clear indications that a person of ordinary skill in the art (“POSITA”) would not have pursued their combination, using the map provided by the ’423 patent to guide its motivation to combine analysis. With respect to the objective indicia, the Board again resorted to searching for “magic words” parroting the language of the claims in the user manuals, videos, and other evidence presented by iRobot that its commercial products practiced the claims alleged to be unpatentable. These errors, too, require correction.

# STATEMENT OF THE CASE

## I. THE '423 PATENT

U.S. Patent No. 9,884,423 (Appx63-87) describes and claims foundational technology underlying robotic vacuum systems with which the public has come to associate iRobot's name. More specifically, the '423 patent covers iRobot's invention whereby a robot autonomously finds and docks with a base station, allowing the robot to charge and return to work without the need for human intervention. *See* Appx63, Abstract. iRobot first implemented this technology in its popular Roomba 2—released in 2004. Appx6800-6802. Largely due to the technology covered by the '423 patent, the Roomba 2 sold millions of units and spawned a whole industry of copycat products—including those made by Shark whose IPR petition initiated this appeal. *See, e.g.*, Appx7532-7542; Appx7543-7551; Appx7552-7556; Appx7572-7575.

### A. iRobot Pioneered the Home Vacuum Robot, Including the Autonomous Docking Claimed by the '423 Patent

iRobot was founded in Burlington, Massachusetts in 1990 by MIT roboticists Colin Angle, Helen Greiner, and Rodney Brooks. *See* Appx8120. Though founded in 1990, iRobot's first "widely successful domestic robot"—the Roomba 1—was released in 2002, the result of twelve years of hard work and innovation. *See id.* The Roomba 1 was an immediate commercial success—"selling upwards of a million units in 2004." Appx7552. The original innovations

of the Roomba 1 are covered by U.S. Patent No. 6,883,201—filed in 2002.

Not content to sit on its laurels, iRobot continued improving the Roomba robot's abilities. One area of improvement involved the Roomba 1's need to be plugged in directly to the wall when the battery was depleted. *See, e.g.*, Appx7407-7408, ¶9. Therefore, shortly after the Roomba 1's release, the iRobot team investigated how the Roomba could find its own way back to a dock and recharge itself. *See id.*

In at least early June 2003, Clara Vu, together with the other inventors of the '423 patent, conceived of automatically docking the Roomba 2 with a base station using a process that was inspired by her sailing experiences. *See* Appx7409, ¶12. As Vu explained, sailors employ red and green colored buoys to steer their sailboats into harbor. *Id.* Specifically, "[w]hen navigating a sailboat into a harbor, a sailor steers the sailboat toward the harbor in such a way that keeps a set of red buoys on the right side of the sailboat and a set of green buoys on the left side of the sailboat." *Id.* Applying these sailing concepts to the Roomba 2, Vu explained that she and her co-inventors "developed an idea of emitting two uniquely coded signals from the base station, representing the green and red buoys." Appx7409-7410, ¶14. To enable the Roomba 2 to align its charging contacts precisely with the corresponding charging contacts on the base station while auto-docking, Vu recounted how the inventors additionally conceived of slowing down the Roomba

2 as it followed the red/green buoy-like signals. *Id.*, ¶15.

These (and other) innovations made their way into the Roomba 2, released in 2004. Like its predecessor, the Roomba 2 became an immediate success. Led by revenue from the Home Robot division, of which Roomba sales were the primary contributor, iRobot grew to $307.6 million in total revenue by 2008. Appx7534. iRobot claimed auto-docking (and other features) in U.S. Patent Application No. 10/762,219, filed January 21, 2004, to which the ’423 patent traces its lineage. Appx64.

To this day, iRobot has continued to innovatively incorporate other features described in the ’423 patent into its later robots, including the Roomba 900. *See, e.g.*, Appx7518; *see also, e.g.*, Appx7526; Appx7560-7561. iRobot remains the leading consumer brand in both sales and customer satisfaction in the United States and throughout the world. *See* Appx7552-7553; Appx7559-7561; Appx7565-7566; Appx7586.

### B. The ’423 Patent Describes and Claims iRobot’s Auto-Docking Invention

iRobot’s ’423 patent describes and claims the innovations pioneered by Vu and her colleagues relating to the development of the Roomba 2. As the specification explains, the ’423 patent provides a solution to limitations associated with “charging stations and methods used by robots in finding or docking with them.” Appx77, 1:62-63. Although “[a] base station that emits a beam or beacon

to attract the robotic device" for auto-docking purposes was "desirable," *id.*, 2:6-7, such systems "require[d] additional safeguards to ensure proper mating between the robot and base station" to guarantee "safe and effective charging," *id.*, 2:9-12. Such safeguards, the '423 patent explains, involved components that "can increase the size of the base station while decreasing the aesthetics," which were "important considerations for automated robots directed at the consumer market." *Id.*, 2:15-18. Additionally, "existing base stations generally lack[ed] the ability to protect themselves from contact with the robot during operation, increasing the likelihood of damage to either the station or robot, or dislocation of the base station." *Id.*, 2:21-24.

The '423 patent solved both of these problems. Figure 1 depicts a base station fitted with specially sized metal plates (called "[e]lectrical charging contacts") for electrically contacting corresponding metal plates on the bottom of the robotic vacuum unit to supply the robot with power. *See* Appx79, 5:33-34; *see also id.*, 5:44-50.




FIG. 1

Appx65 (annotated).

As for proper mating, Figure 5 shows the ’423 patent’s base station and robotic device in a docked (i.e., mating) position:




FIG. 5

Appx72 (annotated); Appx79, 5:22. In this position, the robot’s charging contacts are in good contact with those of the base station, which allows the robot to recharge. Appx80, 8:3-9; Appx84, 16:52-67. After cleaning an area and detecting the need to recharge its battery, the robot returns to this mating position using the

auto-docking to replete the battery charge. *See* Appx83, 13:67-14:2; *see also* Appx78, 4:36-46.

Figure 4A depicts the auto-docking process:




FIG. 4A

Appx69 (annotated); Appx83, 14:60-61. Just as Vu described in terms of the red/green buoy system used for sailing, the '423 patent explains how the robot orients itself in relation to the analogous red/green signals emitted by the base station: "the detector 50 is in the green or left signal 64 field, and thus the robotic device 40 will move towards the right in direction $M_R$ in an effort to keep that green signal 64 to the left of the robot 40." Appx83, 14:61-64; *see also* Appx70 (depicting how the robot will move left to keep the red signal 64 to the right of detector 50). As shown below in Fig. 4C, once detector 50 encounters zone 66 (i.e.

the overlap of red/green right/left signals, *see* Appx84, 15:3-5), it will move forward directly towards the base station 10:




FIG. 4C

Appx71 (annotated); Appx83, 14:51-53; Appx84, 15:3-5. While moving forward, the ’423 patent’s robot avoids colliding with the base station by “slow[ing] its speed of approach . . . to ensure trouble-free docking.” Appx84, 15:6-8.

The ’423 patent contemplates several methods for completing the auto-docking process. *See id.*, 15:13-32. Relevant to this appeal, one of those methods involves “stop[ping] the robot 40 when its electrical contacts touch the electrical contacts 16 on the base station 10.” Appx84, 15:22-24. “This would guarantee that the robot 40 is moving over the contacts 16 [on the base station 10], providing a wiping action that cleans the contacts 16 and improves the electrical integrity of

the connection." *Id.*, 15:24-27. "Circuitry within the base station 10 detects the presence of the robot 40 and then switches on the charging voltage to its contacts 16. The robot 40 then detects the presence of the charging voltage and then switches on its internal transistor power switch to allow current flow into the battery." *Id.*, 16:53-59.

The '423 patent also describes a navigational control system that "enhance[s] the cleaning efficiency" of the robot. Appx82, 11:34-61. This system "controls the movement of the robotic device 40," *id.*, 11:38, and "monitors the movement activity of the robot device 40" in terms of "position history" and "instantaneous position," *id.*, 11:46-51.

Claim 1 of the '423 patent is generally representative for purposes of this background discussion. It reads, with limitations at issue on appeal shown in emphasis:

> 1. A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a right signal emitter and a left signal emitter, the method comprising:
>
>> directing the robotic cleaning device about a room at a first velocity;
>>
>> detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;
>>
>> controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first

velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;

***detecting contact with charging terminals on the base station;***

***stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station***; and

charging a battery of the robotic cleaning device.

Appx86, 19:32-52.[1]

## II. THE PRIOR ART

Before the Board, Shark challenged the patentability of claims 1-4, 6-10, 12-15, 18-23, 25, and 26 over various combinations of four references it claimed were prior art: U.S. Patent Publication No. 2004/0178767 ("Jeon"); U.S. Patent Publication No. 2005/0010330 ("Abramson"); U.S. Patent No. 5,440,216 ("Kim"); and a textbook entitled *Sensors for Mobile Robots* ("Everett"). *See generally* Appx99. iRobot disputed that Jeon and Abramson qualify as prior art under 35 U.S.C. § 102(e) based on the '423 patent's inventors' conception and diligent reduction to practice of the Roomba 2. Appx292-318. iRobot further disputed that the proposed combinations of prior art render the challenged claims unpatentable. *See generally* Appx319-355.

[1] All emphasis is added unless noted otherwise.

### A. Jeon Describes Auto-Docking After the '423 Patent Inventors' Conception of It, and Fails To Disclose Controlling the Forward Movement of a Robot as Claimed

Jeon (Appx780-790) was published on September 16, 2004, and claims a priority date of June 23, 2003—after Vu and her colleagues conceived of the auto-docking implemented in the Roomba 2. *See* Appx780. Jeon describes an "automatic charging system of a robot cleaner." *Id.*, Abstract. As shown in the figure below, Jeon describes "a charging unit 403 for charging the battery 301 of the robot cleaner; and first and second infrared ray generators 401 and 402 positioned at left and right sides of a charge terminal of the charging unit 403." Appx787, ¶45. Infrared ray receiving units 304 and 305 sit atop a rotating plate 306 mounted to the body of Jeon's robot cleaner. *Id.*, ¶¶50, 58.

FIG. 3




Appx783.

A "remaining battery capacity detecting unit 302 of the robot cleaner checks a remaining capacity of the battery 301 installed in the robot cleaner." Appx787, ¶55. A microcomputer within the cleaning robot causes the plate 306 to rotate if the remaining battery capacity falls below a certain value. Appx787-788, ¶¶58-59. This rotation allows infrared ray receiving units 304 and 305 to detect infrared rays emitted by infrared ray generators 401 and 402, *id.*, and the microcomputer to move the robot cleaner to charging unit 403, Appx788, ¶67. Notably, unlike the invention claimed in the '423 patent, which moves forward ***and*** orients its

trajectory in relation to the red/green buoy-like signals while auto-docking, *see* Appx86 (19:42-46), Jeon's robot merely moves forward towards the base station, Appx788 (¶¶65-67).

### B. Abramson Post-Dates the Conception of the '423 Patent, and Fails To Disclose Forward Movement as Claimed

Abramson (Appx1350-1378) was published on January 13, 2005, and claims a filing date of July 11, 2003. Appx1350. Abramson describes "[a]n autonomous robot [that] is designed for docking in a docking station." *Id.*, Abstract. To auto-dock, Abramson describes how "the apparatus 20 performs a seek for the docking beam" in which the apparatus "operate[s] in accordance with a random scan pattern" until its sensor detects a "docking beam 120." Appx1373, ¶43. Once Abramson's apparatus "confirm[s] that [] at least one signal for the docking station has been located," it "move[s] the robot towards the docking station" and "cease[s] robot movement once the robot has docked in the docking station and a docking contact between the robot and the docking station is established." Appx1371-1372, ¶10.

Abramson additionally describes an "alignment phase" in which "the apparatus 20 positions itself to be in alignment with the docking station 100." Appx1375, ¶66. During this phase, "the apparatus 20 rotates approximately 90 degrees to the left, such that its docking contacts 68 [at its rear] align with the docking contacts 110 of the docking station 100" and then "a reverse sequence is

performed" where "the apparatus 20 performs a short reverse movement, typically moving about 6 cm [], during which it is determined if there is a docking contact." *Id.*, ¶¶68-69. To the extent Abramson discloses stopping movement in response to detecting contact with the charging terminals, it does not disclose stopping ***forward*** movement as required by the '423 patent.

### C. Kim Discloses a Large, Heavy Vacuum Robot

Kim (Appx1636-1666) dates from 1993—more than 10 years before the earliest filing date of the '423 patent. *See* Appx1636. In stark contrast to the '423 patent's space-saving robot, Kim's robot cleaner reflects the state of the art at its time, namely, very large robots that were designed to clean spacious, open areas. *See* Appx1637 (Fig. 1); Appx1650 (Fig. 14); Appx1559-1620; Appx1621-1635; Appx1636-1652; Appx6695-6697, ¶¶143-144.

Kim describes "a self-moving robot cleaner which is capable of moving to an automatic charging means to charge its battery when a charging voltage of the battery is decreased to below a predetermined level during a cleaning operation and then returning to the interrupted cleaning position to again carry out the cleaning operation." Appx1653, 1:7-13. Due to the large size of Kim's robot cleaner, its charger is correspondingly sizeable:

FIG. 10




Appx1646.

As shown in the above figure, Kim's robot cleaner must travel up a ramp, onto a bottom panel 29, and over a holding rail 158 of the charger to charge its battery. Appx1656, 8:6-25. Further, as shown in the figures below, Kim uses magnets to precisely locate and align the charging prong of its robot cleaner with the charger:




Appx339 (annotated Kim Figure 11 (Appx1647)); *see also* Appx1656, 8:63-9:6 ("[M]icroprocessor 2 outputs a driving control signal to the driving means 5 in response to the magnetic signal to cause the robot cleaner 1 to be moved in the direction of arrow 'S' of FIG. 11a, so that the robot cleaner 1 is precisely located in order to permit the bat[t]ery 26 of the robot cleaner 1 to be cha[r]ged as shown in FIG. 11b.").

### D. Everett Discloses a Robot with a Much Different Base Station

Everett is an excerpt from a textbook entitled "Sensors for Mobile Robots." *See* Appx791. Everett reflects the state of the art of robot cleaners in 1995, which is just shy of a decade before the earliest filing date of the '423 patent. Appx794.

As can be seen in the picture below, Everett's robot ("ROBART II") is much smaller than the robot cleaner disclosed in Kim, as is its charger:




Appx336 (annotated Everett Fig. 15-10 (Appx1240)); Appx6699-6700, ¶146. Everett's charger consists of a homing beacon supported by a metal pipe and cylindrical housing on an aluminum base plate. Appx1239-1240. Unlike Kim's charger, ROBART II's charger "could be placed anywhere in the room" and approached by the robot from any direction. Appx1241.

Unlike the '423 patent's robot, ROBART II does not disclose mechanisms for accurately aligning the robot with the charger, as it relies on bumper impact to stop. Appx1241. As a function of its bumper impact system, ROBART II reduces its speed while approaching the charger. *Id.* ("The robot relies on this optical

tracking system to control heading while closing on the charger and reduces speed as a function of stand-off distance . . . .”).

## III. THE PROCEEDINGS BELOW

### A. Shark’s Petition and the Board’s Decision To Institute

Shark petitioned for IPR of claims 1-4, 6-10, 12-15, 18-23, 25, and 26. Appx98. Shark asserted five invalidity grounds in its petition, relying on a motley crew of decades-old references and published patent applications that became public ***after*** the inventions described in the ’423 patent had been conceived and reduced to practice. Appx99. Relevant to this appeal, Shark contended that a POSITA would have been motivated to combine Everett with Jeon and Abramson—two references that do not even qualify as prior art to the ’423 patent—to arrive at claims 1-4, 6-10, and 12. *Id*. Shark also argued that a POSITA would have been motivated to combine the gargantuan, 90’s-era floor cleaners described in Kim and Everett to arrive at the compact Roomba 2 described in claims 13-15, 18-23, 25, and 26. *Id*.

iRobot challenged Shark’s petition solely on discretionary grounds, arguing that identical invalidity issues were actively being litigated in parallel International Trade Commission (“ITC”) and district court proceedings. Appx248. The Board initially denied institution, *id.*, but later instituted IPR, following Shark’s request for rehearing. *See* Appx277. The IPR proceeded on the following grounds:

| Ground | Claims |
|---|---|
| Jeon in view of Everett | 1-4, 6-10, 12 |
| Jeon in view of Everett and Abramson | 1-4, 6-10, 12 |
| Jeon in view of Everett and Jones | 9 |
| Jeon in view of Everett, Abramson, and Jones | 9 |
| Kim in view of Everett | 13-15, 18-23, 25, 26 |

Appx99; Appx252.

### B. iRobot's Patent Owner Response Identifies the Deficiencies in Shark's Petition, Including that Neither Abramson nor Jeon Is Prior Art

In its patent owner response, iRobot first disputed whether Jeon and Abramson qualify as prior art to claims 1, 3, 4, 6-8, and 12 of the '423 patent. Appx292-318. As iRobot explained, the inventors had conceived of the inventions covered by these claims by at least the first week of June 2003, and had subsequently diligently reduced them to practice. *Id.*

To document the earlier conception and diligent reduction to practice, iRobot furnished declarations from two inventors of the '423 patent's auto-docking features, including: (1) a 32-page declaration from inventor and firmware developer Clara Vu (Appx7404-7435) detailing her conception, reduction to practice, and detailed explanations of source code she helped develop to implement

the claimed features; and (2) a 36-page declaration from inventor and co-firmware developer Daniel Ozick (Appx7436-7471) detailing his participation in the conception and reduction to practice of the claimed features.

iRobot verified these inventor declarations with a wealth of corroborating evidence, including declarations from both current and former iRobot employees who worked alongside Vu and Ozick during Roomba 2's development, including:

- A 25-page declaration from Michael Halloran who worked closely with the inventors on the firmware for the Roomba 2. Appx7472-7496.

- An 8-page declaration from Matthew Cross, who shared an office with Ozick at the time of his conception and reduction to practice of the '423 patent invention, and worked closely with Vu and Ozick. Appx7497-7504.

- An 8-page declaration from Scott Miller, a former iRobot employee no longer associated with the company who was exposed to the inventors' earliest ideas for auto-docking and who drafted various technical documents documenting the inventors' ideas, *see* Appx7505-7512, including a "Technical Summary" dated April 1, 2003, *see* Appx6712-6720.

iRobot further buttressed the testimony of the inventors with detailed technical summaries of the inventors' ideas, source code files evidencing the implementation of those ideas, and metadata proving when these files were last saved. This corroborating evidence includes:

- An April 1, 2003 "Technical Summary" (Appx6712-6720 relating to the development of the Roomba 2, detailing the inventors' conception of the Roomba's following right and left infrared signals emitted by a charger for "drive-on charging."

- Numerous source code files evidencing the early implementation of these ideas (Appx6721-6727 (“global.tl”); Appx6728-6734 (“color.tl”); Appx6735-6744 (“user.tl”); Appx6745-6759 (“virtual-sensors.tl”); and Appx6760-6764 (“docking.tl”)).

- A “Roomba 2 System Design Strategies” document (Appx6765-6766), dated June 5, 2003, that describes the Roomba 2’s capabilities of automatically docking with the base station and detecting “good contact” between the charging contacts on the robot and the charging contacts on the base station. *Id.*

- A June 6, 2003 “Roomba 2 System Specification” (Appx6775-6776) that details system specifications for, *inter alia*, the “Drive-On Charger” and the “Intelligent Charge Control.”

- Numerous other documents evidencing the development timeline for the Roomba 2. *See* Appx6767-6768 (meeting notes); Appx6769-6771 (July 2003 Task List and Schedule); Appx6772-6774 (Roomba 2 Requirements); Appx6777 (October 2003 Meeting Notes); Appx6778-6779 (October 2003 Task List); Appx6780-6782 (November 2003 Revision of Roomba 2 Requirements); Appx6783-6785 (December 2003 Revision of Roomba 2 Requirements); Appx6786-6787 (December 2003 Task List); Appx6788-6794 (December 2003 Meeting Notes); Appx6795-6797 (January 2004 Meeting Notes); Appx6798-6799 (Technical document regarding “Safe Contact” between the charging contacts on the robot and base station).

To accompany these technical documents, Halloran provided a detailed accounting of the “Last Saved” date evidenced by metadata associated with each file, in addition to an explanation of each file’s contents. *See* Appx7478-7495, ¶¶12-48. These technical files—including the source code—were also discussed by iRobot’s other declarants, including the inventors who described in detail the

functionality programmed by the code. *See, e.g.*, Appx7411-7413, ¶¶17-18; Appx7413-7423, ¶¶20-43; Appx7443-7446, ¶¶15-18.

Given the very technical nature of the material, and given that the source code is written in a coding language invented by the developers of the Roomba 2 called "Toy Language" (*see* Appx7407, ¶8; Appx7413, ¶20), iRobot also furnished a declaration from an independent technical expert with a PhD in Robotics and Automation from the University of Texas and two decades of engineering experience—Dr. Richard Hooper. *See* Appx6619-6704; Appx6706-6711. To assist the Board's understanding of this material, Dr. Hooper carefully reviewed the technical material in detail, providing an element-by-element analysis comparing the evidence of conception and reduction of practice to the claims challenged by Jeon and Abramson. *See* Appx6640-6653, ¶¶39-67.

iRobot also disputed the grounds set forth in Shark's petition on their technical merits. As relevant to this appeal, iRobot contended that a POSITA would not have combined Kim and Everett to arrive at claims 13-15, 18-23, 25, and 26. Appx333-339. iRobot challenged, for example, Shark's assertion that a POSITA "would have found it obvious to combine []Kim with Everett because of their similarities"—given the vast differences (including in size and type of "base station") between the two robots. *Id.* iRobot additionally pointed to strong objective evidence of non-obviousness, including that its commercial products

embodying the claimed inventions had been enormously successful, won numerous industry prizes, and had been widely copied. *See* Appx339-353.

### C. Despite Challenging Only the Sufficiency of the Corroborating Evidence in Its Briefing, Shark Raised New Arguments Regarding the Sufficiency of the Inventor Declarations at Oral Argument, Which the Board Refused To Allow iRobot To Address

In its reply, Shark challenged iRobot's claim that Jeon and Abramson are not prior art, contending that iRobot failed to prove earlier conception of claim 1. *See* Appx356; Appx361-369. However, Shark's challenges were limited. Shark focused entirely on two limitations of claim 1 (those shown in emphasis in the discussion of the '432 patent above, referred to as [1d] and [1e] before the Board) relating to "detecting contact with charging terminals on the base station" (element [1d]) and "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station" (element [1e]). *See generally* Appx361-369. Even then, Shark attacked only the corroborating evidence iRobot offered—contending that it does not evidence conception of these elements. *See, e.g.*, Appx365-366.[2]

iRobot addressed Shark's challenges to the corroborating evidence as to elements [1d] and [1e] in its Patent Owner Sur-Reply. *See generally* Appx389-

[2] Shark's reply also challenges diligence (Appx369-373), but as the Board declined to make a determination regarding diligence (Appx10 n.11), Shark's diligence arguments need not be addressed here.

428. iRobot highlighted the wealth of corroborating evidence—including the testimony from iRobot's declarants—demonstrating conception of the challenged elements. Appx402-408. iRobot also highlighted Dr. Hooper's testimony confirming, based on his review and ample experience, that the corroborating evidence addresses the challenged elements. *See id.*

Despite the briefing's addressing only the corroborating evidence, at the oral hearing, Shark attacked—for the first time—iRobot's ***inventor testimony*** rather than its ***corroborating evidence***. For example, Shark characterized iRobot's inventor testimony as "high level," contending that "[i]t doesn't actually discuss the . . . actual claim limitations." Appx437, 9:17-18.

Shark's then-new attacks on iRobot's inventor testimony (rather than corroborating evidence) are exemplified in Shark's discussion of slide 9, Appx8567, from iRobot's oral hearing demonstrative. *See also* Appx436-438 (discussion of slide 9). This slide highlights paragraphs from Vu's and Ozick's inventor declarations. *See id.* In discussing slide 9, Shark described paragraph 43 of the Vu declaration as "exemplif[ying] a problem that pervades a lot of iRobot['s] arguments, which is that they say they conceived of high level problems. They conceived of the goal of knowing that the charger is available. They conceived of [] that auto docking process. That's not what's claimed." Appx437-438, 9:21-10:5.

Following the hearing, iRobot moved to supplement the record as Shark's briefing had never raised these issues and, as such, iRobot did not have the opportunity to adequately address them. Appx507-518. Namely, iRobot sought to supplement the record with a short, additional declaration from Vu to address Shark's attack regarding the content of her original declaration. *Id.* Shark opposed, contending, *inter alia*, that iRobot should have guessed that Shark's challenge to the sufficiency of the inventor testimony was coming because of developments in the parallel ITC case. Appx521-522. In reply, iRobot highlighted the necessity for procedural fairness at the PTAB. Appx526-531.

The Board denied iRobot's motion. Appx532-547. In the Board's view, and in its overly-narrow reading of Vu's first declaration (discussed further below), "the Second Vu Declaration contains new testimony not found in the Original Vu Declaration and contradicts her deposition testimony"—and thus should not be allowed. Appx538. The Board also determined that, because Shark had challenged generally iRobot's evidence of the conception of elements [1d] and [1e] and had cited Vu's declaration in its discussion, iRobot should have moved to supplement the record earlier. Appx541-542.

### D. The Board's Final Written Decision

Ultimately, the Board found claims 1-4, 6-8, 10, and 12 unpatentable over a combination of Jeon, Everett, and Abramson; found claims 13-15, 18-23, 25, and

26 unpatentable over Kim and Everett; but found Shark had failed to prove unpatentability of challenged claim 9. *See* Appx61.

As to grounds involving Jeon and Abramson, the Board found that the inventors of the ’423 patent had not conceived of the invention prior to the publication dates of either reference—despite all the evidence put forward by iRobot. Among the reasons for the Board’s finding were the reasons first advanced by Shark at the oral hearing. Namely, the Board faulted Vu’s and Ozick’s declarations for not using the ***exact*** same language as claim limitations 1[d] and 1[e] to describe the invention. Appx15. Indeed, the Board went so far as to discount ***all*** the inventor testimony, *see* Appx20, except ***one sentence*** from Ozick’s declaration that did mimic the claim language, claiming it was “the only testimony by the inventors that refers to the charging contacts (or charging terminals) of the base station.” Appx17 (citing Appx7449, ¶27). However, because this sentence did not also contain testimony concerning “detecting contact with the charging terminals or stopping movement of the robot in response to detecting contact with the charging terminals,” the Board found it insufficient to establish conception. Appx20.

The Board also disqualified the corroborating evidence. The Board faulted a source code file (Exhibit 2013 below, Appx6735-6744), for not reciting the exact language as claim limitations 1[d] and 1[e]. *See* Appx17-18 (“There is no explicit

reference to the charging contacts (or charging terminals) of the base station . . . .”). The Board rejected a “System Design Strategies” document (Exhibit 2016 below, Appx6765-6766) for the same reason. Appx18 (rejecting the document because it fails to “specifical[ly] reference . . . the charging terminals of the base station”).

Notably, nowhere in the Board’s discussion of conception—including its consideration of source code written in a coding language invented by the ’423 patent’s inventors—does the Board discuss or even cite to the testimony of iRobot’s expert.

As to the Kim and Everett ground, the Board found that Kim teaches all the elements of the challenged claims except the “control[ling] forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity” limitation recited in independent claims 13 and 21. *See* Appx29. The Board agreed with Shark that a POSITA would have been motivated to combine these references “because of their similarities” “[r]egardless” of the differences “of size or weight” between the robots. Appx55; Appx56-57. The Board reasoned that this combination would “achieve a predictable, desired result (avoiding collision and/or increased robot maneuverability for accurate alignment with the base station).” *Id.*

Finally, the Board discounted iRobot’s objective evidence of non-

obviousness. Appx27-34. As to commercial success, the Board found that iRobot had not demonstrated that its commercial embodiments were co-extensive with the claimed inventions because the numerous user manuals and videos cited by iRobot did not parrot the language of the claims. Appx29-30. Similarly, despite advertising and praise for iRobot's auto-docking, the Board found no nexus because, in the Board's view, the "highlighted or emphasized features" did not "relate to the subject matter of the claims." Appx29-31.

iRobot now appeals.

## SUMMARY OF THE ARGUMENT

The Board's determination that iRobot failed to demonstrate conception of claims 1-4, 6-8, 10, and 12 prior to June 23, 2003 should be reversed and these claims should be remanded for a determination on the contested issue of diligence (which the Board did not address in its final written decision). iRobot adduced more than ample evidence showing conception of the inventions covered by these claims by at least the first week of June 2003, including lengthy, detailed testimony from the inventors; testimony from other current and former iRobot employees who worked with the inventors, and hundreds of pages of technical documentation—complete with expert testimony explaining it. On this record, there can be no doubt iRobot proved conception as a matter of law. At minimum, the Board's determination should be vacated and these claims remanded to correct the Board's erroneous (1) requirement that the inventor's testimony and corroborating evidence parrot the language of the claims and (2) decision to refuse iRobot the ability to address new arguments made at the oral hearing.

The Court should also reverse the Board's determination regarding claims 13-15, 18-23, 25, and 26 because it is hopelessly infected by hindsight. The Board performed only a cursory analysis of motivation to combine—concluding that a POSITA would have been motivated to combine Kim and Everett simply because of their similarities. Compounding the Board's error, the Board improperly

discounted iRobot's objective evidence of non-obviousness because iRobot's cited user-manuals and videos demonstrating nexus fail to mimic the language of the claims. As this Court has explained, rigorous analysis of motivation to combine and careful consideration of objective indicia are necessary protections against hindsight. When the evidence is evaluated under the proper legal standards, the record does not contain substantial evidence of unpatentability, making reversal appropriate.

## STANDARDS OF REVIEW

This Court reviews the legal determinations made by the Board de novo and the factual determinations of the Board for substantial evidence. *See, e.g., In re Mouttet*, 686 F.3d 1322, 1330 (Fed. Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). However, the substantial evidence standard must also include a review of the record as a whole, including evidence that does not support the ultimate determination. *E.g., Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007). ("The rule that a jury verdict is reviewed for support by 'substantial evidence' does not mean that the reviewing court must ignore the evidence that does not support the verdict."). Indeed, on review for substantial evidence, a court must not only "give credence to the evidence favoring" the conclusion, but also consider contrary evidence "that is uncontradicted and unimpeached." *Id.*

This Court reviews both ***what*** the Board concluded and ***how*** the Board reached those conclusions. The Board must comply with the requirements of the Administrative Procedures Act ("APA"). At minimum, the Board must give a patent owner "notice of and a fair opportunity to meet the grounds of rejection" before the Board cancels a patent's claims. *See, e.g., Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015).

# ARGUMENT

## I. THIS COURT SHOULD VACATE AND REMAND THE BOARD'S JUDGMENT AS TO CLAIMS 1-4, 6-8, 10, AND 12

This Court should vacate the Board's judgment as to claims 1-4, 6-8, 10, and 12 and reverse or, at minimum, vacate the Board's determination regarding conception.[3] iRobot proved conception of as a matter of law and the Board's determination was riddled with legal and procedural errors.

### A. Under a Faithful Application of This Court's Precedent, iRobot Proved Prior Conception as a Matter of Law

iRobot submitted more than enough evidence showing that the inventors conceived of claims 1-4, 6-8, 10, and 12 at least as of early June 2003.[4] This evidence includes declarations from two inventors, declarations from other employees who worked with the inventors, and contemporaneous technical documentation including source code. iRobot additionally obtained testimony from an independent expert with years of experience in robotics, who reviewed the corroborating evidence and mapped that evidence to the limitations of each of the claims. On this record, this Court should reverse the Board's determination that

---

[3] If this Court reverses the Board's determination as to conception, a remand will be required as to diligence because the Board did not address that issue. Appx10 n.11.

[4] A determination that the inventors conceived of the inventions in these claims before the first week of June 2003 is all that is required to resolve the dispute in this case. iRobot reserves the right, in any future proceedings, to provide additional evidence and seek to prove an earlier conception date.

iRobot failed to prove conception of claims 1-4, 6-8, 10, and 12 before the priority dates of Jeon and Abramson.

This Court can and should address this issue as a legal matter. "Priority of invention and its constituent issues of conception and reduction to practice are questions of law predicated on subsidiary factual findings." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003). On appeal from the Board, this Court "review[s] de novo the Board's legal conclusions with respect to priority, conception, and reduction to practice." *Id.; see also, e.g., REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 958 (Fed. Cir. 2016). Although the Board's subsidiary factual determinations are reviewed for substantial evidence, the Board did not purport to resolve any factual differences in its determination—finding only that the evidence iRobot provided was insufficient to show conception. Shark provided no contrary evidence, and the only question is a legal one—one this Court can and should address now on appeal. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-02 (Fed. Cir. 2017) ("[W]here only one answer is supported by substantial evidence and there is neither a request nor an apparent reason to grant a second record-making opportunity, reversal is warranted.").

iRobot unquestionably adduced evidence about each limitation of each claim—as is detailed in its Patent Owner Response (Appx294-306) and in the declaration from iRobot's expert Dr. Hooper (Appx6640-6653, ¶¶39-68). Because

Shark's reply before the Board and the Board's determination focus entirely on two elements from claim 1 (elements [1d] and [1e]), the discussion that follows largely focuses on the same.

### 1. Vu and Ozick—inventors of the technology claimed by the '423 patent—provided testimony documenting their complete conception of the disputed limitations

iRobot provided declarations from two inventors of the '423 patent (Vu and Ozick), both of which sufficiently explain conception of each disputed limitation as of at least June 2003. "Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (citations and internal quotation marks omitted). Under this Court's controlling precedent, all Vu and/or Ozick had to do to demonstrate conception is describe "with particularity" their conception of the disputed limitations. *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1263 (Fed. Cir. 2002). Vu's and Ozick's declarations undoubtedly meet this standard.

As for claim 1[d] ("detecting contact with charging terminals on the base station"), both inventor declarations describe the conception of a "charger-available?" function "that outputs an indicator of whether a battery charger, such as a base station, is electrically connected to the Roomba 2 and thus capable of charging the Roomba 2." Appx7416, ¶27; Appx7449-7450, ¶27. The "'charger-

available' identifier" parallels the "detecting" step of the claim language, as both verify whether the cleaner is in contact with the base station. Indeed, the only way the Roomba 2 can charge from a base station is if the robot's electrical charging contacts are electrically connected to the charging contacts on the base station. And, "a base station [being] electrically connected to the Roomba 2" mirrors the "contact with the charging terminals" portion of the claims, as both describe the auto-docked position that the Roomba 2 assumes once it begins charging. *See* Appx84, 15:22-24. Vu and Ozick, thus, described "with particularity" claim 1[d].

Regarding claim 1[e] ("stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station"), Ozick describes another aspect of the source code as follows:

> The behavior "user-charge" at lines 33-50 is initiated if a charger is available. If the charger is available, this behavior at line 37 sets the state of the Roomba 2 to "charging." . . . The behavior "user-charge" would be activated ***if the Roomba 2 is connected to the charging contacts*** of the base station and ***would stop movement of the Roomba 2*** and initiate the charging process. Because stopping Roomba's movement when it is connected to the base station for charging takes precedence over other behaviors, the behavior "user-charge" takes priority over other behaviors.

Appx7450, ¶27; *see also* Appx7416, ¶27 (Vu describing the same functionality). The portion of Ozick's testimony explaining that, "if the Roomba 2 is connected to the charging contacts of the base station," the "user-charge" behavior activates and "stop[s] movement of the Roomba 2 [to] initiate the charging process" parallels

claim 1[e]'s stopping forward movement of the robot in response to detecting contact with the charging terminals. Further, "the charging contacts of the base station" almost exactly mirrors claim 1[e]'s recitation of charging terminals of the base station. *See* Appx20 (the Board finding that this portion of Ozick's testimony discloses the claimed charging terminals). Thus, Ozick described claim 1[e] "with particularity."[5]

**2. iRobot provided copious technical documentation corroborating the inventors' testimony, coupled with sufficient expert testimony to explain it**

Inventor testimony alone is not enough to prove conception, however. "[A] party claiming his own prior inventorship must proffer evidence corroborating his testimony." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). Unlike inventor declarations, which must detail conception of every claim limitation, *see Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997), "the purpose of corroboration . . . is to prevent fraud, by providing independent confirmation of the inventor's testimony," *Chen v. Bouchard*, 347

[5] Although Vu's declaration does not include these exact sentences that appear in Ozick's declaration, Appx7416, ¶27, this concept was present. *Id.*; *see also infra* Section I.B.1.a. Vu confirmed that her declaration was "intended to include the concept of the Roomba 2 cleaning robot detecting contact with the charging terminals of the base station and stopping forward movement of the Roomba 2 cleaning robot in response to detecting contact with the charging terminals of the base station," and cited paragraphs 27 and 43 as disclosing these concepts. Appx517-518.

F.3d 1299, 1309 (Fed. Cir. 2003) (internal quotations omitted). The corroboration requirement, therefore, does not include a rigid limitation-by-limitation analysis. Rather, this Court has prescribed a "rule of reason analysis" when evaluating corroborating evidence, "under which ***all pertinent evidence is examined*** when determining the credibility of an inventor's testimony." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006).

Here, iRobot adduced more than sufficient evidence to corroborate the testimony of Vu and Ozick. For example, iRobot produced contemporaneous versions of the source code itself, verifying that the functions described by the inventors were present in the source code as of at least early June 2003. iRobot produced, for instance, a source code file last edited in April 2003 entitled "user.tl." Appx6735-3744; Appx7482, ¶16. The "charger-available?" function described by Vu is called throughout the code in this file, including on lines 16, 34, and 57. *See* Appx6735-6736; *see also* Appx7416, ¶27. The "user-charge" behavior described by Ozick relating to stopping the forward movement of the robot when it comes into electrical contact with the base station appears in lines 33-50 of this file. Appx6735-6736; *see also* Appx7450, ¶27.

Although Shark speculated that perhaps the "charger-available?" function had not yet been written at the time (*e.g.*, Appx363-365), this function is repeatedly called in a file last edited in April 2003, which unquestionably demonstrates that it

was ***conceived*** by that date—the only question at issue here. In any event, for the "user.tl" file to have even compiled and/or run, the "charger-available?" function must have existed at the time, otherwise calls to it would have resulted in an error.

Of course, iRobot did not leave the Board to itself to attempt to read the source code—especially as the code is written in a language invented by the iRobot engineers. *See* Appx7407, ¶8. iRobot asked an independent robotics expert, Dr. Hooper, to review the code and summarize its functionalities. Dr. Hooper's review confirmed that the source code did what the inventors say it did. Namely, Dr. Hooper explained that "the code file user.tl defines a behavior 'user-charge' with a start condition 'charger-available?' that outputs an indicator of whether a battery charger, such as a base station, is electrically connected to the Roomba and thus capable of charging the Roomba." Appx6648, ¶56 (citing lines 14-50 of Appx3735-6736). As Dr. Hooper further explained: "If the charger is available, the Roomba's state is set to 'charging,' and a 'stop-all' function is called, which stops all motors, and thus forward movement, of the Roomba." *Id.* Shark, on the other hand, did not submit an expert declaration with its reply, nor did it apparently ask an expert to review the source code at all. Dr. Hooper's testimony, thus, stands unrebutted.

Other contemporaneous source code files also corroborate the inventors' testimony that they conceived of detecting electrical contact between the robot and

the base station by at least early June 2003. For example, iRobot produced a source code file entitled "color.tl," also last edited in April 2003. Appx6728-6734; Appx7482, ¶15. As Vu explained, this file contains a function entitled "robot-state-charging" that changes the color of the LED on the robot when charging. *See* Appx6734; Appx7415, ¶26. Because the only way for the robot to charge on a base station is through electrical contact, this LED color change necessarily involves detecting such contact. Similarly, iRobot produced a source code file from April 2003 called "virtual-sensors.tl" (Appx6745-6759) that, as Vu explained, contains functionality that checks for a condition of whether the robot state is charging—functionality that depends on detecting electrical contact between the robot and the base station. Appx6752, Appx7482, ¶17, Appx7416-7417, ¶28. Importantly, iRobot did not leave the Board to figure out these additional source code files on its own. Dr. Hooper reviewed each of these files and described their functionality. *E.g.* Appx6649, ¶59. This testimony stands unrebutted as the only independent expert testimony regarding the source code.

In addition to the source code, iRobot produced other contemporaneous technical documents. For example, iRobot provided a "Technical Summary" (Appx6712-6720) dated and last edited in April 2003 that discusses a "Drive-On Charger" and "Drive On Charging"—confirming the accuracy of the inventors' recollection as to the timing of the development of this functionality. *See*

Appx6712 (explaining that the "Drive-On Charger" is "[a]n AC powered recharge station that the robot can autonomously locate, navigate to and dock"); Appx6719-6720 (discussing "Drive-On Charging"); *see also* Appx7411-7412, ¶17; Appx7485, ¶21. This document further confirms the use of electrical contacts on the base station for charging—as shown in the figure from the document below:



Appx6719 (excerpt) (charging contacts are shown as small gold rectangles).

iRobot provided a document entitled "Roomba 2 System Design Strategies" (Appx6765-6766) detailing "ideas and development relating to auto-docking processes on the Roomba 2," dated and last edited on June 5, 2003. *See* Appx7485, ¶22. The Board made much of whether this document (Exhibit 2016 before the Board) refers to the claimed electrical contacts of claims 1[d] and 1[e] or the other two auto-docking embodiments mentioned in the '423 patent's specification. *See* Appx18. This document explains, however, that "dock[ing] at

the charger" involves "a logic input tell[ing] the robot when the external charger is available (that is, ***when good contact has been made***)." Appx6765. It further describes that "charg[ing] the battery" involves the "Roomba and the charger recogniz[ing] that docking has been achieved." *Id.* Dr. Hooper reviewed this document, and, in unrebutted testimony, explains: "This description indicates that the Roomba would stop its forward movement to dock at the charger when it detects contact with the charging terminals on the base station." Appx6648, ¶57.

These examples are far from the only technical documents iRobot provided. Indeed, given the plethora of documentation, there cannot be any serious question that, according to Vu and Ozick's conception and development, ***how*** the robot charges on a base station is by (1) ***detecting contact*** between the charging contacts on the robot and the charging contacts on the base, and (2) having the robot stop to charge—exactly as they testified. *See, e.g.*, Appx6767-6768 (describing communications in which the robot and base station engage when they "observe contact"); Appx6769-6770 (a software development schedule, listing "Making/detecting contact" as an item under "Drive-On Charging").

### 3. Testimony from the inventors' co-workers at the time, including an individual with no interest in this case, corroborate the inventors' account

iRobot also adduced testimony from three of Vu's and Ozick's co-workers during the Roomba 2's development, including an individual who no longer has any association with iRobot.

For example, iRobot sought testimony from Scott Miller, who began working for iRobot in December 2001, and who managed the development of the Roomba starting in early 2003. *See* Appx7507, ¶¶4-5. Miller is the author of the "Technical Summary" (Appx6712-6720) discussed in the previous section, and was personally involved in meetings and other conversations where Vu, Ozick, and the other inventors on the '423 patent communicated their conception of the inventions claimed by the patent. Appx7508-7509, ¶7; Appx7509-7510, ¶8. Miller is not currently an employee of iRobot, does not have any ongoing involvement in the robotic cleaning device business, has no stake in the outcome of this or other disputes between iRobot and Shark, and was not offered compensation for his testimony. Appx7506-7507, ¶3. In other words, Miller is an ideal candidate for the role of a neutral bystander with no incentive to remember things in any particular way. Yet, when asked, his testimony unquestionably corroborates the story of Vu and Ozick.

Specifically, Miller explained that, "[a]s part of the auto-docking processes, the Roomba 2 ***detected when it was connected*** to the base station, detected that its battery was being charged, and monitored an amount of charge on the battery both while the battery was being used and while the battery was being charged." Appx7511-7512, ¶12. In other words, according to Miller's unrebutted, disinterested testimony, the invention conceived and developed involved "detecting" and monitoring electrical contact between the robot and the base station—exactly as claimed.

iRobot also adduced testimony from Matthew Cross—an iRobot employee since August 2003 who shared an office with Ozick. Appx7499-7500, ¶¶5-6. Although Cross was not at iRobot at the initial conception of the invention, he "worked closely with Vu and Ozick" and would certainly have been aware of the timeline concerning the development of the Auto-Docking features of the Roomba 2. Cross's testimony echoes Miller's in corroborating that the conception and development of auto-docking involved detecting electrical contact between the base station and the robot. *See* Appx7502-7503, ¶11.

Lastly, iRobot sought testimony from Michael Halloran, another iRobot employee who began working at iRobot in December 2003. *See* Appx7474-7475, ¶¶3, 5. Halloran was "personally involved in firmware development" related to the Roomba 2, and would thus also be familiar with the timeline for its invention and

development. Appx7475, ¶6. In addition to reviewing and testifying about the metadata associated with the many files provided by iRobot in the IPR below, Halloran testified as to his recollection of the features conceived and developed, and his testimony mirrors that of the other witnesses: auto-docking involves detecting electrical contact between base station and robot. Appx7476-7477, ¶10.

#### 4. iRobot's evidence is sufficient to prove conception of claims 1-4, 6-8, 10, and 12 by at least early June 2003 as a matter of law

The ***only*** evidence of record here comes from iRobot's witnesses and documents. Shark did not, for example, seek out other former iRobot employees and provide countervailing testimony or evidence. Nor did Shark even seek testimony from an expert after reviewing the source code and technical documentation iRobot provided. In other words, the only question was (and now is) whether iRobot's evidence is sufficient to meet its burden of showing conception. Given the plethora of evidence iRobot presented, there can be no serious question that it did.

Indeed, iRobot's evidence far exceeds that in other conception cases reviewed by this Court. In *Mosaic Brands, Inc. v. Ridge Wallet LLC*, for example, this Court considered a grant of summary judgment based on an inventor's purported failure to show conception. 55 F.4th 1354, 1364 (Fed. Cir. 2022). As this Court explained, the "rule-of-reason analysis" employed in evaluating

corroborating evidence "does not require every aspect of an inventor's testimony to be explicitly corroborated with a source independent of the inventor." *Id.* at 1363. Rather, the standard requires sufficient evidence "to determine whether the inventor's story is credible." *Id.* (internal quotation marks omitted). Because the inventor in *Mosiac* had provided "documentary evidence . . . made contemporaneously with the events requiring corroboration"—evidence of the type this Court has described as "the most reliable"—this Court vacated the adverse summary judgment on the inventor's priority claim. *See id.* (internal quotation marks and alterations omitted). Here, iRobot provided not only "the most reliable" kind of corroboration—contemporaneous technical documentation—but also other evidence, including testimony from a disinterested former iRobot employee. Indeed, the only documentary or testimonial evidence before the Board supports the inventors' conception story.

Similarly, the evidence adduced by iRobot here far exceeds that considered by this Court in *Sandt*, 264 F.3d at 1351. There, this Court considered whether a district court had properly ruled that corroborating evidence supporting an inventor's testimony regarding the conception and development of a piece of prior art was sufficient as a matter of law. *See id.* Noting that the party seeking to prove the date of the art had provided contemporaneous documentation—"the most reliable proof"—this Court affirmed. *Id.* iRobot provided far more here.

### B. The Board's Conception Determination at Minimum Should Be Vacated Because It Rests on Legal and Procedural Errors

This Court can and should determine, on the record put before the Board, that iRobot proved conception as a matter of law. However, at minimum, the Board's conception determination should be vacated because it rests on a legally erroneous approach to conception evidence and the Board unfairly limited iRobot's ability to respond to new arguments raised at the oral hearing.

#### 1. Legal Errors: The Board erroneously required both the inventor and corroborating evidence to use "magic words" exactly parroting the language used in the claims

The Board reached an incorrect determination because it asked the wrong legal question. Rather than considering the evidence as a whole under a "rule of reason," the Board refused to engage in any reasoning at all and simply looked for language aligning exactly with the claim limitations. This approach constitutes legal error.

The Board was explicit on this point. With respect to the inventor testimony as to what was conceived, the Board found: "there is no ***specific*** reference to charging terminals of the base station, detecting contact with the charging terminals, or stopping forward movement of the robot in response to detecting contact with the charging terminals." Appx15. With respect to the corroborating evidence, the Board similarly found fault: "[t]here is no explicit reference to the charging contacts (or charging terminals) of the base station, detecting the charging

contacts (or charging terminals) of the base station, or stopping the forward movement of the robot device in response to detecting contact with the charging contacts (or charging terminals) of the base station . . . ." Appx17-18.

However, an inventor does not need to articulate the conception of each limitation of the asserted claims *verbatim*. *See, e.g., Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1335 (Fed. Cir. 2001). There is no such requirement because "[t]he invention is not the language of the [claims] but the subject matter thereby defined." *Silvestri v. Grant*, 496 F.2d 593, 599 (CCPA 1974). The Board was required to look at the subject matter conceived by the inventors and the corroborating evidence and make a reasoned attempt to compare it to the claimed subject matter. Instead, the Board looked for an exact recitation of the claim language when evaluating the inventors' declaration and corroborating evidence.

**a. The Board legally erred by requiring specific claim language from the inventors**

First, the Board used an erroneous "magic words" approach to inventor testimony. In considering paragraphs 27, 41, and 42 of Vu's declaration, the Board found that they "do[] not state that Ms. Vu or any of the inventors of the '423 patent conceived of detecting the charging contacts of the base station or stopping forward motion of the robot upon detecting those contacts." Appx15. Contrary to the Board's assertion, Vu specifically discussed how the device detects contact

with charging terminals on the base station by referencing that the "chargeravailable?" routine indicates whether the Roomba 2 is ***electrically connected*** to the base station, as required for the base station to charge the Roomba 2's battery. Appx7416, ¶27; *see also* Appx7410, ¶15 (describing how the Roomba 2 "align[s] its charging contacts with corresponding charging contacts on the base station"); Appx7421, ¶38 (same).

Vu further explained that this indicator was used to stop forward movement of the Roomba 2, as required by element 1[e] ("stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station") because lines 33-50 of the "user-charge" routine are initiated if a charger is available—i.e., when "chargeravailable?" returns an indicator that the Roomba 2 and base station are electrically connected via the two sets of charging contacts. Within this routine, line 37 specifically sets the state of the Roomba 2 to "charging" and line 38 calls the "stop-all" function, which "stops all motors of the Roomba 2, thereby stopping forward movement of the Roomba 2" device. Appx7416, ¶27. Although the Board faulted Vu for not specifically mentioning "charging contacts of the base station," Appx15, Vu plainly described both the Roomba 2 and base station as having "charging contacts" and her explanation that the two devices are "electrically connected" indisputably refers to these charging contacts being the means of connection. Appx7416, ¶27;

Appx7410, ¶15 (describing how the Roomba 2 "align[s] its charging contacts with corresponding charging contacts on the base station"). Indeed, in context, the declaration discloses no other means for the two devices to be electrically connected. Therefore, paragraph 27 of Vu's declaration addresses elements 1[d] and 1[e] substantively.

Vu's declaration further explains that the Roomba 2 "dock[s] with the base station to charge the battery of the Roomba 2." Appx7422-7423, ¶43. Because the plain and ordinary meaning of "docking" requires the Roomba 2 to be coupled to the base station, use of the term "docking" conveys that the Roomba 2's forward movement ceases upon docking with the ***stationary*** base station. Vu also explained that the Roomba 2 docks with the base station after detecting whether a charger (called "the drive-on charger" or "base station" in the documentation[6]) is available to charge the Roomba 2's battery. *Id.*; Appx7422, ¶42 (describing the functionality of "Determine whether the charger is present" and "Dock at the charger"). This discussion of docking at the charger/base station shows Vu's conception of stopping the forward movement of the robotic cleaning device in response to detecting the base station. Although paragraph 43's discussion does not specifically reference engagement by the Roomba 2's "charging contacts"

[6] *See* Appx6712 (referring to "Drive-On Charger"); *see also* Appx7422, ¶41 (referring to the "drive-on charger" as the base station).

(described in paragraph 27) with those of the base station, the declaration did not have to repeat subject matter previously introduced. In any event, its discussion of detecting whether the charger is present is additional support for Vu's earlier statements about the conception of element 1[d]. *See also* Appx517-518, ¶1. Therefore, paragraph 43 of Vu's declaration addresses elements 1[d] and 1[e] substantively.

The Board's treatment of Ozick's declaration highlights its erroneous requirement for Vu's declaration to include specific claim language. Specifically, the Board noted that Ozick's declaration, which states "[t]he behavior 'user-charge' would be activated if the Roomba 2 is connected to the charging contacts of the base station and would stop movement of the Roomba 2 and initiate the charging process," Appx7449, ¶27, is "the ***only testimony*** by the inventors that refers to the charging contacts (or charging terminals) of the base station," Appx17. This analysis plainly ignores Vu's earlier discussion of the charging contacts of the base station and how the Roomba 2 electrically connects to the base station.

#### b. The Board legally erred by requiring specific claim language in the corroborating evidence

The Board applied this same error in its consideration of the corroborating evidence. Although "conception must include every feature or limitation of the claimed invention," *REG*, 841 F.3d at 958, "the corroboration requirement has

never been so demanding," *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014). "[T]here is no final single formula that must be followed in proving corroboration. . . . Rather, the sufficiency of corroborative evidence is determined by the rule of reason," which involves "a tribunal [] mak[ing] a reasonable analysis of all of the pertinent evidence to determine whether the inventor's testimony is credible." *Kridl*, 105 F.3d at 1450 (internal quotations and citations omitted). The Board's insistence that iRobot's corroborating evidence follow a particular formula (i.e., contain verbatim references to the claims) constitutes reversible legal error.

As an initial matter, the Board considered only a fraction of the corroborating evidence iRobot supplied. For example, the Board considered only ***some*** of the contemporaneous source code files. Even then, the Board appears to have attempted to read them on its own, ignoring entirely the expert testimony of Dr. Hooper interpreting them. This approach violates this Court's mandated "rule of reason" approach.

Even as to the evidence the Board considered, the Board engaged in an erroneous approach. For example, the Board found that Exhibits 2010, 2013, and 2016 do not corroborate Vu's or Ozick's inventor testimony about conception because "[t]here is no explicit reference to the charging contacts (or charging terminals) of the base station, detecting the charging contacts (or charging

terminals) of the base station, or stopping the forward movement of the robot device in response to detecting contact with the charging contacts (or charging terminals) of the base station . . . ." Appx17-18 (discussing Ex. 2013); Appx17 n.16 (discussing Ex. 2010); Appx18 (discussing Ex. 2016). In other words, the Board faulted iRobot's corroborating evidence for not reciting the claim limitations *ipsis verbis*. However, corroborating evidence does not need to parrot the language of the claims.

Indeed, in considering what these documents are, the Board's search for specific claim language is plainly absurd. Exhibit 2013 is a ***source code*** file made of instructions that a computer can compile to execute a program. Appx6735-6744. It should have been considered for the functionality it programs—not whether it contains words mirroring the claim language. Exhibits 2010 and 2016 are early design documents, drafted long before the claims of the '423 patent. Appx6712-6720; Appx6765-6766. Why the Board believed this evidence must contain the exact language recited by claims written years later, it did not say. The Board should have considered these documents for their substance—not for the presence of specific claim language.

Fundamentally, rather than engage in the analysis this Court's precedent requires, and consider the substance of the testimony from the inventors and the functionality taught by the technical documents the Board did consider, the Board

looked for language mirroring that recited in the claims. This legal error alone merits vacatur.

### 2. <u>Procedural Errors</u>: The Board erred by failing to provide iRobot the opportunity to address evidence and arguments raised for the first time at the oral hearing

This Court should vacate the Board's conception determination because the Board violated fundamental fairness principles of administrative procedure in reaching that determination.

In its pre-hearing briefing, Shark focused entirely on whether iRobot had produced sufficient evidence corroborating the testimony of Vu and Ozick. For example, Shark challenged whether the "(charger available?)" function of Exhibit 2013 (Appx6735-6744) supports earlier conception of elements [1d] and [1e] because, in its view, iRobot failed to explain how this function works. Appx363-366. Similarly, Shark challenged whether Exhibit 2016 (Appx6765-6766) corroborates the inventors' testimony—making similar arguments. Appx367-368. Nowhere in its reply did Shark argue that the inventors' testimony itself was insufficient.

At the oral hearing, however, Shark shifted course. For the first time, Shark attacked iRobot's conception testimony rather than its corroborating evidence. Shark characterized iRobot's inventor testimony as "high level," contending that "[i]t doesn't actually discuss the . . . actual claim limitations." Appx437, 9:17-18;

*see also* Appx437-438, 9:21-10:5 (discussing paragraphs in Vu and Ozick's declaration in reference to one of iRobot's demonstratives). Shark asserted that "a problem that pervades a lot of iRobot's arguments . . . is that they say they conceived of high level problems. They conceived of the goal of knowing that the charger is available. They conceived of . . . [an] auto docking process. That's not what's claimed." Appx438, 10:1-5. Shark additionally criticized Vu's and Ozick's inventor testimony for not describing Exhibit 2028 (another corroborating document) as "show[ing] that we were detecting contact with the charging terminal. They weren't willing to go that far"—another argument Shark never previously raised. Appx445, 17:16-17.

The Board denied iRobot the opportunity to meaningfully respond to these newly-raised arguments. Namely, iRobot moved to supplement the record, given "Shark['s] pivot[] during the oral hearing to focus on the inventor testimony instead of the corroborating evidence." Appx510. To respond, iRobot sought to supplement with another declaration from Vu responsive to Shark's new arguments—as it should have been entitled to do had the arguments been raised in a timely fashion. *Id.* This new declaration addresses many of the concerns raised in the Board's final written decision, as Vu clarified how her original testimony corresponds to the words recited in the claims. *See* Appx517-518. Yet, rather than allow and consider this evidence, the Board denied the motion and made its

findings on the original record, which (as discussed above) the Board erroneously found incomplete. Appx532-546.

In a formal administrative adjudication like an IPR, the APA "requires the PTO to timely inform a patent owner of the matters of fact and law asserted in an inter partes review of its patent, . . . to give all interested parties opportunity for [] the submission and consideration of facts and arguments[,] . . . to permit a party to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." *Belden*, 805 F.3d at 1080 (internal quotation marks, citations, and alterations omitted). This Court has found an APA violation when the Board relies on newly-introduced evidence that the parties have not discussed fully in their briefs. *See Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293 (Fed. Cir. 2016); *see also In re NuVasive, Inc.*, 841 F.3d 966, 972 (Fed. Cir. 2016). "[A]n agency may not change theories in midstream without giving respondents reasonable notice of the change" and "the opportunity to present argument under the new theory." *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256-57 (D.C. Cir. 1968); *see also Belden*, 805 F.3d at 1080 (citing and quoting from *Rodale*).

That is exactly what the PTAB did here. During briefing, the IPR proceeded on one theory relating to the sufficiency of iRobot's corroborating evidence. At the oral hearing and in the final written decision, however, Shark pursued another

theory relating to the sufficiency of the inventor testimony itself. Because the Board improperly denied iRobot the ability to meaningfully respond and present rebuttal evidence to this theory, its decision should be vacated and remanded with instructions to allow a full hearing on a full record.

## II. THIS COURT SHOULD REVERSE THE BOARD'S JUDGMENT AS TO CLAIMS 13-15, 18-23, 25, AND 26 BECAUSE IT RESTS ON IMPERMISSIBLE HINDSIGHT

The Board erroneously relied on impermissible hindsight in concluding that a POSITA would have combined Kim and Everett in the manner claimed by Shark. The Board compounded this error by failing to consider adequately iRobot's objective indicia—which "guard against slipping into the use of hindsight" and discipline courts "to resist the temptation to read into the prior art the teachings of the invention in issue." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc).

### A. The Board Erroneously Relied on Hindsight in Its Analysis of the Alleged Motivation To Combine Kim and Everett

First, the Board legally erred by failing to analyze the motivation to combine Kim and Everett rigorously as this Court's precedent requires. "[T]he best defense against hindsight-based obviousness analysis is the rigorous application of the requirement for a showing of a teaching or motivation to combine the prior art references." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000). Linked to motivation is reasonable expectation of success, which also must

be rigorously applied to avoid hindsight. *See, e.g.*, *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019) (noting "[i]t is only with the benefit of hindsight that a person of skill in the art would have had a reasonable expectation of success in view of the asserted references").

Here, the Board gave both motivation to combine and reasonable expectation of success short shrift. Indeed, apart from reciting the parties' various arguments, the final written decision has little to say about either issue. *See, e.g.*, Appx55 (the Board simply stating "Petitioner's reasoning is sound"); *see also* Appx56 (the Board making conclusory statements that Kim's robot would benefit from certain improvements without explaining why).

A proper motivation to combine analysis requires an articulated reason ***why*** a POSITA would have been motivated to address a problem identified in the prior art by applying the teachings of a prior art reference to arrive at the claimed invention in question. *See, e.g.*, *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1337 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017); *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016). This Court has overturned the Board for failing to provide these articulated reasons adequately. *See, e.g.*, *In re Nuvasive, Inc.*, 842 F.3d 1376, 1384 (Fed. Cir. 2016); *see also id.* at 1383 (collecting cases). It should do so again here.

Rather than analyzing whether a POSITA would have been motivated to make the changes needed, the Board appears to have used iRobot's invention as a map to guide the skilled artisan, improperly applying hindsight. Although the Board did not say that it was relying on hindsight (nor would it), its reasoning illustrates otherwise. *See Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) (noting need to "avoid[] . . . even a hint of hindsight"). Certainly, the Board did not take the kind of appropriate "[c]are" that this Court has said must be taken "to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988).

Even if the Board were credited with adopting the reasoning Shark proposed in its petition, the analysis is still insufficient, as Shark's motivation to combine analysis is merely conclusory. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements."). Kim purportedly teaches every claim limitation except a slower "second velocity" and Shark asserted that Everett cured Kim's deficiency by teaching "reduce[d] base station approach velocity." Appx55. Shark's petition devotes only five sentences to the subject,

however. Appx149; Appx160. First, Shark asserted that a "skilled artisan would have found it obvious to combine [Kim] with Everett because of their similarities." Appx149. The similarity of two references, without more, is not a reason they would be combined. *See, e.g., Knauf Insulation, Inc. v. Rockwool Int'l A/S*, 788 F. App'x 728, 732 (Fed. Cir. 2019) ("The apparent similarity between the prior art references, upon which the Board relied to motivate their combination, is an illusion built upon hindsight bias."); *Securus Techs., Inc. v. Global Tel*Link Corp.*, 701 F. App'x 971, 976-77 (Fed. Cir. 2017) (conclusory assertion that references are in the same field is "not enough"); *see also Comcast Cable Commn'cs, LLC v. Promptu Sys, Corp.*, 838 F. App'x 555, 557 (Fed. Cir. 2021) (affirming the Board's finding of no motivation to combine where petitioner proffered "conclusory, threadbare arguments," including that "the references came from the same field of study and address the same problem").

Alternatively, Shark asserted that "[a] skilled artisan would have been motivated to reduce base station approach velocity as taught by Everett in [Kim]'s robot to achieve a predictable, desired result (avoiding collision and/or increased robot maneuverability for accurate alignment with the base station)." Appx160. Critically, relying on only this conclusory assertion, the petition does not explain ***how*** or ***why*** such a combination would be made—key ingredients in a motivation to combine analysis. The petition is also silent as to expectation of success.

When examined closely, any possible reasons to combine the references evaporates. As iRobot argued to the Board,

> The problems Everett attempts to solve by reducing the robot's speed are not present in Kim's system. . . . Kim's robot cleaner is a large machine designed to clean floors and thus travels at a slow speed to clean effectively. . . . In Kim, there is little risk of the charger being displaced or tipped over when the robot docks with the charger. . . . Thus, a POSITA would have had no reason to make any such change to Kim based on Everett.

Appx336-337. Far from being an "insufficient bodily incorporation argument," as the Board held (without ever explaining), Appx56, iRobot's contentions here are rooted in a proper motivation to combine analysis. Following this Court's precedent in *Nike* and *Allied Erecting*, iRobot sought to refocus the Board's attention on Shark's failure to articulate why a POSITA would have been motivated to address a problem in Kim by applying Everett's teachings to arrive at the contested '423 patent claims. Because there was, in fact, no problem identified in Kim pertaining to the need for a reduced "second velocity," iRobot rightfully argued that a POSITA would have had no motivation to combine this reference with Everett.

When the evidence is evaluated without relying on hindsight, the record does not contain substantial evidence of a motivation to combine Kim and Everett.

### B. The Board Erred in Its Consideration of Objective Indicia—the Guard Against Hindsight

That the Board applied hindsight is unsurprising given its treatment of the objective evidence of nonobviousness, which protects against the kind of hindsight analysis engaged in by the Board here. *Apple*, 839 F.3d at 1052. Indeed, objective indicia "may often be the most probative and cogent evidence in the record" because it provides an "unbiased indication" as to "how the patented device is viewed in the marketplace, by those directly interested in the product"—rather than trying to piece together whether an invention is obvious after all of the work of invention has been done based on a "battle of scientific experts." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1370 (Fed. Cir. 2012); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Yet, here, the Board erroneously dismissed iRobot's evidence on hyper-technical grounds that merit this Court's correction.

First, iRobot presented evidence that the Roomba 900 series of vacuums, which embody at least claims 13 and 21 of the '423 patent, was highly successful in the market—showing that the real-world market thought it was an innovative and needed product.

To demonstrate that the Roomba 900 series embodied claims 13 and 21, iRobot's Patent Owner Response charted the elements of these claims against user manuals and videos associated with the Roombas. *See* Appx342-346. For

example, iRobot cited diagrams and text descriptions from the Roomba 900 series user manual showing that the robot has an undercarriage, a motive system consisting of wheels, and a lithium ion battery (i.e., the first three elements of claim 21). *See* Appx343-344; *see also* Appx7513-7525 (user manual). In addition to text descriptions from the user manual, iRobot cited videos of the Roomba 900 series in operation, taken by journalists at the Consumer Electronics Show ("CES"), to show how the navigational control system controls the robot's operation (i.e., the last portion of claim 21). *See* Appx8552.[7]

The Board rejected any evidence as to commercial success because, in its view, this evidence was insufficient to demonstrate that the Roomba 900 series was co-extensive with the claims. In reaching this conclusion, the Board applied the same kind of "magic words" analysis that plagued its consideration of iRobot's conception evidence. For example, the Board faulted the user manual for not explicitly stating that the robot approached the docking station at a "second velocity less than the first velocity." Appx29-30. Notably, iRobot had specifically pointed to the CES video as showing the robot slowing down as it approached—but the Board discounted this video because, in the video, the return to the base station was initiated by the demonstrator using a mobile phone application

[7] The paper filing serves as a placeholder for a video produced natively, available on YouTube at https://www.youtube.com/watch?v=QEbYmhKhtaU (accessed Feb. 3, 2022). *See* Appx290.

(presumably because it would have been tedious for the audience to wait until the robot ran out of power). Appx30; *see also* Appx345.

Fundamentally, the Board's errors resulted from its decision to look for claim language rather than consider the substance of this evidence. The Board concluded, for example, that both the user guide and the video discuss features that "do[] not highlight or emphasize the subject matter of the claims." Appx30-31. To be sure—both the user manual and the video highlight auto-docking. *See, e.g.*, Appx7518 ("If its battery gets low before finishing a cleaning cycle, Roomba returns to the Home Base to recharge."); Appx8852 (CES video), 4:49-4:56 (explaining "if it does need a battery charge, it'll return to its dock and charge for up to 90 minutes and go back out and clean – complete the job"). That these user-facing materials do not delve into every technical auto-docking detail or use claim language does not (as the Board concluded, *see* Appx31) mean that iRobot fails to consider these features important or valued by its customers. Substantial evidence does not support the Board's decision to the contrary.

The Board criticized iRobot for purportedly failing to explain when the charted product were released or sold. Appx28-29. iRobot's response explicitly states that the charted product was released "[i]n September 2015." Appx347. The Board also criticized iRobot for not tying the product to evidence of commercial success. Appx29. However, iRobot provided more than sufficient evidence on

this point. iRobot detailed how introducing the patented features in iRobot's robots lead to incredible financial growth for the company, and even cites a 2016 paper from the Shark's expert acknowledging that the Roomba was "highly successful." Appx346-348; Appx7733. In any event, these criticisms regarding commercial success do not explain the Board's failure to appropriately consider the other objective evidence, discussed next.

iRobot introduced significant evidence of industry praise—including by the petitioner. For example, iRobot cited testimony from Shark's own witnesses who testified at the ITC that certain features claimed by the '423 patent, specifically, the ability to automatically recharge, were important innovations. Appx351; Appx7881, 899:6-20; Appx7901, 943:13-22 (discussing ("Recharge and Resume")). iRobot cited Shark's prominent advertising of the patented features (Appx7898-7899, 940:23-941:17), as well as numerous articles from press praising Roomba's auto charge and resume functionality. *See* Appx349-351; *see also, e.g.*, Appx7653 ("[P]erhaps the coolest (or at least the most convenient) feature yet, it self docks when it needs to be recharged."); Appx7729 (touting Roomba's ability to "sense when it's low on batteries and not only find its charging station, but the Roomba will dock itself as well"); Appx7697 ("This robot does a great job of docking.").

The Board gave this evidence short shrift because the praise did not come in the form of mimicking the claim language. Appx33-34. For example, despite acknowledging (Appx33) that there was praise of "auto charge and resume functionality," the Board found the evidence irrelevant because auto charge and resume is "not recited in independent claims 1, 13, and 21." The Board ignored that these claims ***are*** directed to iRobot's invention of a way for robots to automatically charge, which allows the robot to resume cleaning without needing human intervention. That the praise came for what the technology enables rather than mimicking the claim language is unsurprising.

Because the Board legally erred in discounting the objective evidence of non-obviousness, the Board never conducted the proper inquiry as to whether the objective evidence of non-obviousness prevents a finding of unpatentability.

### C. The Board's Judgment Regarding Claims 13-15, 18-23, 25, and 26 Cannot Stand

As explained above, when the evidence is evaluated without relying on hindsight, the record does not contain substantial evidence of a motivation to combine Kim and Everett. For this reason, this Court should reverse the Board's judgment regarding claims 13-15, 18-23, 25, and 26. *See, e.g., Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1354-55 (Fed. Cir. 2013).

At a minimum, however, the Court should vacate the Board's judgment and instruct the Board to analyze, in accordance with this Court's precedent, whether

(1) there is a sufficient basis to combine Kim and Everett without the benefit of hindsight, and (2) the objective indicia of non-obviousness overcome any *prima facie* showing of obviousness. *See, e.g.*, *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068 (Fed. Cir. 2018).

## CONCLUSION

For the reasons set forth above, this Court should vacate or reverse the Board's judgments of unpatentability as discussed with respect to each judgment above.

Dated: April 28, 2023

Respectfully submitted,

*/s/ Lauren A. Degnan*

Lauren A. Degnan
W. Karl Renner
Rosalynd D. Upton
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

Oliver Richards
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

***Attorneys for Appellant iRobot Corporation***

# ADDENDUM

PUBLIC VERSION

Trials@uspto.gov
571-272-7822

Paper 73
Date: November 16, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SHARKNINJA OPERATING LLC,
SHARKNINJA MANAGEMENT LLC,
and SHARKNINJA SALES COMPANY,
Petitioner,

v.

IROBOT CORPORATION,
Patent Owner.

---

IPR2021-00544
Patent 9,884,423 B2

---

Before BARRY L. GROSSMAN, TERRENCE W. McMILLIN, and JASON W. MELVIN, *Administrative Patent Judges.*

McMILLIN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Granting Motions for Protective Order and to Seal
*35 U.S.C. § 318(a)*

PUBLIC VERSION

# I. INTRODUCTION

## *A. Background and Summary*

SharkNinja Operating LLC, SharkNinja Management LLC, and SharkNinja Sales Company ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–4, 6–10, 12–15, 18–23, 25, and 26 (the "challenged claims") of U.S. Patent 9,884,423 B2 (Ex. 1001, the "'423 patent") pursuant to 35 U.S.C. § 311 *et seq*. Paper 1 ("Petition" or "Pet."). A Decision Granting Institution of *Inter Partes* Review was entered on November 17, 2021. Paper 13 ("Dec."). iRobot Corporation ("Patent Owner") filed a Response. Paper 25 ("Response" or "Resp."). Petitioner filed a Reply. Paper 46 ("Reply"). Patent Owner filed a Sur-reply. Paper 51 ("Sur-reply"). Oral argument was heard on August 24, 2022, 2021, and a transcript was entered into the record. Paper 62 ("Transcript").[1]

We have jurisdiction to conduct this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–4, 6–8, 10, 12–15, 18–23, 25, and 26 of the '423 patent are unpatentable and has not shown claim 9 of the '423 patent is unpatentable.

---

[1] The parties filed confidential unredacted and public redacted versions of certain papers (e.g., Response, Reply, Sur-reply). A number of exhibits were also filed as confidential. As discussed below (*see* Section IV. *infra*), we grant the Motion to Enter Protective Order (Paper 23) and the Motions to Seal (Papers 22, 45, 52, 60, 65, 67, 68). As a result, certain parts of the record are confidential and non-public (e.g., Transcript) and public and non-public versions of this Final Written Decision will be entered.

*B. Related Matters*

The parties identify the following related proceedings: *In the Matter of Certain Robotic Floor Cleaning Devices and Components Thereof*, Inv. No. 337-TA-1252[2] (US International Trade Commission); and *iRobot Corp. v. SharkNinja Operating LLC*, Case No. 1:21-cv-10155 (Mass.). Pet. 80; Paper 4, 2.

*C. The '423 Patent*

The '423 patent is titled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods." Ex. 1001, code (54). The patent relates "to auto-docking and energy management systems for autonomous robots." *Id.* at 1:35–37. The patent describes "a need for a robot and base station that can ensure proper mating regardless of location of the base station. Moreover, a system that can prevent inadvertent dislocation of the base station by eliminating collisions between the station and robot is desirable." *Id.* at 2:30–34.

The '423 patent describes "an autonomous system including a base station, that includes charging terminals for contacting external terminals of [a] robotic device, and a first signal emitter and a second signal emitter," where in some embodiments, "the first signal emitter transmit[s] a base station avoidance signal and the second signal emitter transmit[s] a base station homing signal." *Id.* at 3:35–42. The patent also discloses "a robotic device for performing a predetermined task, the robotic device having at least one energy storage unit with an external terminal for contacting the charging terminal, and at least one signal detector." *Id.* at 3:47–51.

---

[2] Petitioner refers to this as 337-TA-3530, but the ITC website indicates 3530 is the docket number, not the investigation number. *See* https://pubapps2.usitc.gov/337external/3979.

Robotic device 40 "uses a variety of behavioral modes to vacuum effectively a working area," where a "microprocessor is operative to execute a prioritized arbitration scheme to identify and implement one or more dominant behavioral modes for any given scenario, based upon inputs from the sensor system," and "also operative to coordinate avoidance, homing, and docking maneuvers with the base station 10." *Id.* at 8:35–43.

Figure 5, annotated by Petitioner (Pet. 3) and reproduced below, shows an isometric view of a base station and robotic device.




FIG. 5

Figure 5 depicts robotic device 40 completely docked with base station 10. *Id.* at 15:29–30.

The '423 patent issued on February 6, 2018, from an application filed April 19, 2017, and claims the benefit through a series of applications to an application filed on January 21, 2004. *Id.* at codes (22), (45), (60), 1:5–31.

*D. Challenged Claims*

Petitioner challenges claims 1–4, 6–10, 12–15, 18–23, 25, and 26 of the '423 patent. Pet. 1. Claim 1 is reproduced below.

> 1. A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a

right signal emitter and a left signal emitter, the method comprising:

directing the robotic cleaning device about a room at a first velocity;

detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;

controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;

detecting contact with charging terminals on the base station;

stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station; and

charging a battery of the robotic cleaning device.

Ex. 1001, 19:32–52.

### *E. The Asserted Grounds*

Petitioner challenges claims 1–4, 6–10, 12–15, 18–23, 25, and 26 of the '423 patent based on the grounds set forth in the table below.

| Claim(s) Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–4, 6–10, 12 | 103[3] | Jeon[4], Everett[5] |
| 1–4, 6–10, 12 | 103 | Jeon, Everett, Abramson[6] |

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102 and 103 effective March 16, 2013. Because the challenged patent claims priority to applications filed before March 16, 2013, we refer to the pre-AIA versions of §§ 102 and 103.

[4] US 2004/0178767 A1, published Sept. 16, 2004 (Ex. 1003).

[5] H. R. Everett, "Sensors for Mobile Robots: Theory and Application," ISBN 1-56881-048-2, 1995 (Ex. 1004).

[6] US 2005/0010330 A1, published Jan. 13, 2005 (Ex. 1006).

| Claim(s) Challenged | 35 U.S.C. § | References |
|---|---|---|
| 9 | 103 | Jeon, Everett, Jones[7] |
| 9 | 103 | Jeon, Everett, Abramson, Jones |
| 13–15, 18–23, 25, 26 | 103 | Kim[8], Everett |

# II. ANALYSIS

## *A. Legal Principles*

A patent claim is unpatentable as obvious if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics,*

---

[7] Joseph L. Jones, et al., "Mobile Robots: Inspiration to Implementation," ISBN 1-56881-097-0, 1998 (Ex. 1007).

[8] US 5,440,216, issued Aug. 8, 1995 (Ex. 1009).

*Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

*B. Level of Ordinary Skill in the Art*

With regard to the level of ordinary skill in the art, Petitioner contends, "[a] skilled artisan would have had at least a four-year degree in mechanical or electrical engineering, or a closely related field and at least one year's experience in the design and implementation of robotics and embedded systems. Additional education could substitute for professional experience and vice-versa." Pet. 3–4 (citing Ex. 1012 ¶¶ 45–47). Patent Owner does not address the level of ordinary skill in the art. *See generally* Resp.

Petitioner's undisputed contention is consistent with the technology described in the Specification and the cited prior art. In considering the arguments and evidence, we adopt and apply Petitioner's proposed level of skill in the art.

*C. Claim Construction*

Claim construction in this proceeding is governed by 37 C.F.R. § 42.100(b), which provides:

> In an *inter partes* review proceeding, a claim of a patent, or a claim proposed in a motion to amend under §42.121, shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

Under the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc), claim terms are given their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as this own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification of during prosecution." *Id.* at 1365. There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

We are guided by the principle that we only construe claim terms if, and to the extent that, it is necessary for the purpose of the proceeding. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

The Petition states, "no terms need construction because the claims encompass the prior-art mappings under any construction consistent with *Phillips*." Pet. 4. Patent Owner does not address claim construction. *See generally* Resp. To the extent that we need to interpret claim language, we address that language below in the context of the prior art. We give the

claim terms their ordinary and customary meanings, without express construction.

*D. Discussion of Prior Art Status of Jeon and Abramson*

Patent Owner contends that Jeon and Abramson do not qualify as prior art to claims 1, 3, 4, 6–8, and 12 of the ’423 patent because the claimed invention was conceived before the filing dates of Jeon (June 23, 2003 (Ex. 1003, code (22))) and Abramson (July 11, 2003 (Ex. 1006, code (22))) followed by reasonable diligence to reduction to practice. Resp. 1–15. Petitioner contends that Jeon and Abramson are prior art under 35 U.S.C. § 102(e).[9] Pet. 8, 11. Petitioner contends that the evidence presented does not support that the inventions claimed in claims 1, 3, 4, 6–8, and 12 of the ’423 patent were conceived by the inventors prior to the filing dates of Jeon and Abramson. Reply 1–9. Specifically, Petitioner argues that Patent Owner "does not provide evidence of . . . earlier conception of detecting the charging contacts of the base station or stopping forward motion upon detecting those contacts."[10] *Id.* at 1. Thus, as a threshold issue, to determine whether Jeon and Abramson are prior art under § 102(e), we first determine whether Patent Owner's evidence establishes a conception of the inventions in the challenged claims prior to June 23, 2003, the filing date of Jeon and

---

[9] In pertinent part, pre-AIA 35 U.S.C. § 102(e) provides, "[a] person shall be entitled to a patent unless . . . the invention was described in . . . an application for patent, published under section 122(b), by another filed in the United States before the invention of the applicant for patent."

[10] Independent claim 1 recites, "detecting contact with charging terminals on the base station" (designated as element [1d] by the parties (Pet. 20; Resp. 12)) and "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station" (designated as element [1e] by the parties (Pet. 23; Resp. 12)). Ex. 1001, 19:47–51. Claims 3, 4, 6–8, and 12 depend from claim 1.

the date argued by Patent Owner. *See, e.g.*, Resp. 3 ("[t]he invention was conceived prior to June 23, 2003").

For the reasons below, we determine that Petitioner has shown that Jeon and Abramson are § 102(e) prior art.

*1. Applicable Law*

A patentee can establish prior invention by showing "an earlier conception followed by a diligent reduction to practice."[11] *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). Patent Owner has the burden of proving that the challenged claims are entitled to a priority date earlier than the filing dates of Jeon and Abramson. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375–76 (Fed. Cir. 2016) ("[I]n the context of establishing conception and reduction to practice for the purposes of establishing a priority date, . . . a patent challenger has the burden of producing evidence to support a conclusion of unpatentability under § 102 or § 103, but *a patentee bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference*.") (emphasis added) (citing *Dynamic Drinkware,* 800 F.3d at 1379.

Conception is "the formation, in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Kolcraft Enterprises, Inc. v. Graco*

[11] The parties dispute whether the alleged prior invention was diligently reduced to practice. *See* Resp. 15–27 (Patent Owner contending reasonably diligent reduction to practice); Reply 9–13 (Petitioner arguing Patent Owner does not demonstrate reasonable diligence in reducing to practice the alleged prior invention). However, we do not reach this issue as we determine that the preponderance of the evidence does not show conception of the claimed invention prior to the filing dates of Jeon and Abramson.

*Children's Products, Inc.*, 927 F.3d 1320, 1324 (Fed. Cir. 2019) (citing *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) (emphasis omitted) (quoting *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985))). A conception must encompass all limitations of the claimed invention, and "is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000) (quoting *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)).

Inventor testimony of conception must be corroborated by other, *independent* information. *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293, 1295 (Fed. Cir. 2018) ("It is well established, however, that when a party seeks to prove conception through an inventor's testimony the party must proffer evidence, 'in addition to [the inventor's] own statements *and documents*,' corroborating the inventor's testimony." (quoting *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (emphasis added, alteration in original))). The requirement of *independent* knowledge remains key to the corroboration inquiry. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). "One consequence of the independence requirement is that testimony of one co-inventor cannot be used to help corroborate the testimony of another." *Id.* at 1171 (citing *Lacks Indus. v. McKechnie Vehicle Components USA, Inc.,* 322 F.3d 1335, 1350 (Fed. Cir. 2003) (holding that the Special Master rightly refused to accept cross-corroboration of oral testimony as being adequate)). Also, an inventor's unwitnessed laboratory notebooks, emails, and drawings, without other independent evidence, cannot corroborate an inventor's testimony. *Kolcraft*, 927 F.3d at 1325–26 (photos and sketches in Exhibits A–H of inventor

Declaration, which were undated and lacked any showing of authorship, "failed to independently corroborate inventor testimony of prior conception."); *Apator Miitor*, 887 F.3d at 1297 ("an unwitnessed laboratory notebook, alone, cannot corroborate an inventor's testimony of conception. . . . Mr. Drachmann's unwitnessed emails and drawings, alone, cannot corroborate his testimony of conception.") (citing *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 998-99 (Fed. Cir. 2009) (laboratory notebook that "was unwitnessed and was not corroborated by any other evidence" could not corroborate inventor testimony of conception)); *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002) ("The Board did not err in holding that an inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts.").[12] Notwithstanding this clear guidance, the law also recognizes that a notebook entry or other writing that has not been promptly witnessed does not necessarily disqualify it in serving as corroboration of conception under a rule of reason analysis. *See Apator Miitor*, 887 F.3d at 1297 (summarizing cases that permitted unwitnessed notebook entries and other writings to aid in corroborating witness testimony alongside other, more persuasive, evidence).

The requirement for corroboration of testimonial evidence is based on a need to ensure credibility of inventor testimony. As explained in

---

[12] The Court in *Brown* also noted the distinction between testimonial evidence and documentary evidence. *Brown*, 276 F.3d at 1335 ("Brown's *physical evidence*, such as Dr. Reiss' notebooks and autoradiographs, *do not require corroboration to demonstrate the content of the physical evidence* itself, namely that FT assay experiments took place on September 20 and 25, 1989. *Conversely, however, the physical evidence in this case may not single-handedly corroborate Dr. Reiss' testimony*.") (emphases added).

*Mahurkar*, corroboration of "conception through the oral testimony of an inventor . . . arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar*, 79 F.3d at 1577 (citation omitted). The Court also recognized that "[w]hile perhaps prophylactic in application given the unique abilities of trial court judges and juries to assess credibility, the rule provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates." *Id.*

The clear guidance of the need for independent testimony and documents to corroborate inventor testimony has been tempered by a "rule of reason" analysis. A rule of reason analysis requires "an evaluation of all pertinent evidence . . . so that a sound determination of the credibility of the inventor's story may be reached." *NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1372 (Fed. Cir. 2017) (citing *Singh*, 317 F.3d at 1341 (quoting *Price*, 988 F.2d at 1195)). Controlling case law does not require that evidence have a source independent of the inventors on every aspect of conception and reduction to practice; "such a standard is the antithesis of the rule of reason." *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1077 (Fed. Cir. 2019) (quoting *Knorr v. Pearson,* 671 F.2d 1368, 1374 (CCPA 1982)). The law requires only that the corroborative evidence, including circumstantial evidence, support the credibility of the inventors' story. *Id.* (citing *NFC Tech.*, 871 F.3d at 1372).

As succinctly stated by Judge Rich, the "rule of reason" ensures that "[i]n the final analysis, each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Berges v. Gottstein*, 618 F.2d 771, 776 (CCPA 1980).

**THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB**

Against this background, we review the evidence of conception on which Patent Owner relies.

### 2. *Analysis of Evidence of Conception*

For evidence of conception of the disputed elements of claim 1 ("detecting contact with charging terminals on the base station" (element [1d]) and "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station" (element [1e]) (Ex. 1001, 19:47–51)), Patent Owner cites declaration testimony of two inventors of the '423 patent (*see id.* at code (72)), Clara Vu (Ex. 2063, ¶¶ 27, 41–42) and Daniel M. Ozick (Ex. 2064, ¶¶ 27, 41–42). Resp. 12. The cited paragraphs of the Vu Declaration state:

27. [redacted]

* * *

THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB

[redacted]

[redacted]

Ex. 2063, ¶¶ 27, 41–42. This testimony does not state that Ms. Vu or any of the inventors of the '423 patent conceived of detecting the charging contacts of the base station or stopping forward motion of the robot upon detecting those contacts. In this testimony, there is no specific reference to charging terminals of the base station, detecting contact with the charging terminals, or stopping forward movement of the robot in response to detecting contact with the charging terminals.

The cited paragraphs of the Ozick Declaration state:

27. [redacted]

[13] In deposition testimony in the ITC case referenced above (*see* Section I.B.), Ms. Vu testified [redacted], 5:16–17, 131:1–13.

**THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB**

[redacted]

* * *

[redacted]

[14] In deposition testimony in this proceeding, Mr. Ozick testified [redacted] Ex. 1048, 78:15–80:22.

[15] In deposition testimony in the ITC case referenced above (*see* Section I.B.), Mr. Ozick testified [redacted] Ex. 1053, 4:20, 66:19–68:16.

THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB

[redacted]

Ex. 2064, ¶¶ 27, 41–42 (boldface added). This testimony by Mr. Ozick is identical in all respects to the testimony by Ms. Vu except for the highlighted two sentences. The sentence in paragraph 27 of the Ozick Declaration that states, [redacted] *See* Resp. 12; Ex. 2063 ¶¶ 27, 41–42; Ex. 2064 ¶¶ 27, 41–42; *see also* Sur-reply 4 ("the inventors' conception of elements [1d] and [1e] before June 23, 2003 is corroborated by numerous pieces of evidence, including [redacted]

16 [redacted]

**THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB**

is no explicit reference to the charging contacts (or charging terminals) of the base station, detecting the charging contacts (or charging terminals) of the base station, or stopping the forward movement of the robot device in response to detecting contact with the charging contacts (or charging terminals) of the base station in Exhibit 2013.

The only pertinent portion of Exhibit 2016 is shown below.

Ex. 2016, 1. [redacted] But, here again, there is no specific reference to the charging terminals of the base station and [redacted] And, there is no reference in Exhibit 2016 to stopping the robot in response to detecting contact with the charging terminals of the base station or otherwise. [redacted]

In the Specification of the ’423 patent, there are alternative methods disclosed for determining that the robot has docked. The Specification of the ’423 patent states:

> Various methods are contemplated for ensuring that the robot 40 correctly docks with base station 10. For example, the

**THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB**

> robot 40 can continue to move toward the base station 10 (within the yellow zone 66) until the bumper 48 is depressed, signaling the robot 40 that it has contacted the base station 10. Another embodiment overlaps the homing signals 62, 64 such that the yellow zone 66 terminates at a point calibrated such that the robot 40 will contact the charging contacts 16 upon reaching the termination point. Other embodiments simply stop the robot 40 when its electrical contacts touch the electrical contacts 16 on the base station 10.

Ex. 1001, 15:13–24. Thus, the '423 patent discloses determining that the robot has docked by bumper depression and overlap of the homing signals as well as by detecting contact with the electrical contacts on the base station. And, in its Sur-reply [redacted]

[redacted]

[redacted]

---

[redacted] we do not find corroboration that the inventors conceived of "detecting contact

**THIS PAGE CONTAINS MATERIAL REDACTED BY THE PTAB**

Thus, of the evidence cited in this section of the Response as "Evidence of Conception" of these elements, the only possible evidence of conception of "detecting contact with charging terminals on the base station" (element [1d]) and "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station (element [1e]) as recited in claim 1 of the '423 patent [redacted] do not specifically show conception of detecting contact with the charging terminals or stopping movement of the robot in response to detecting contact with the charging terminals. Moreover, this purported evidence of prior conception fails because it is not corroborated by independent evidence of conception of the relevant elements of the claimed invention.[18]

---

with charging terminals on the base station" or "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station" prior to that date.

[18] In addition to the evidence cited by Patent Owner in the section of the Response relating to conception (*see* Resp. 12), Patent Owner contends that the Declaration of Scott Miller (Ex. 2067), a former employee, "corroborates the testimony of the inventor's conception" (*see* Resp. 3). Patent Owner does not expound on or explain this contention. Nonetheless, we considered the testimony of Mr. Miller in Exhibit 2067. Exhibit 2067 does not corroborate that the inventors conceived of detecting contact with the charging terminals or stopping movement of the robot in response to detecting contact with the charging terminals prior to June 23, 2003.

For the above reasons, and applying the rule of reason analysis, we find that Patent Owner fails to establish conception of the inventions of independent claim 1 and dependent claims 3, 4, 6–8, and 12 of the '423 patent on the basis that the claimed inventions were conceived before the filing dates of Jeon and Abramson. Based on the arguments and evidence related to this issue, we find that Jeon and Abramson qualify as § 102(e) prior art to the challenged claims.

### *E. Summary of Cited Art*

#### *1. Jeon (Ex. 1003)*

Jeon is titled, "Automatic Charging System and Method of Robot Cleaner." Ex. 1003, code (54). In Jeon, a "power supply unit 400 includes a charging unit 403 for charging the battery 301 of the robot cleaner; and first and second infrared ray generators 401 and 402 positioned at left and right sides of a charge terminal of the charging unit 403." *Id.* ¶ 45. Jeon discloses a "robot cleaner 500" that performs a cleaning operation in a specific region. *Id.* ¶ 54. Infrared ray receiving units 304 and 305 are mounted on rotating plate 306 mounted to the body of Jeon's robot cleaner. *Id.* ¶¶ 50, 58, Fig. 3.

In Jeon, a "remaining battery capacity detecting unit 302 of the robot cleaner checks a remaining capacity of the battery 301 installed in the robot cleaner." *Id.* ¶ 55. If remaining battery capacity is below a reference value, microcomputer 303 of Jeon's robot causes plate 306 to rotate, allowing infrared ray receiving units 304 and 305 to detect infrared rays emitted by infrared ray generators 401 and 402. *Id.* ¶¶ 58–59. Microcomputer 303 moves the robot cleaner to the charging unit 403, along a center between the detected directions of the infrared rays, where "the robot cleaner is connected to the charge terminal of the charging unit 403 and performs a battery charging operation." *Id.* ¶¶ 66, 69–71.

Jeon is U.S. Patent Application Publication 2004/0178767 A1, published on September 16, 2004, and based on an application filed on June 23, 2003. Ex. 1003, codes (10), (22), (43). Jeon qualifies as prior art under 35 U.S.C. § 102(e).

*2. Everett (Ex. 1004)*

Everett is an excerpt from "a textbook on sensors for autonomous mobile robots, including cleaning robots." Pet. 11. Everett discloses a mobile robot capable of detecting a near-infra-red homing beacon emitted by a base station and using that beacon to travel towards the base station. Ex. 1004, 449–451.[19] "Once the battery monitor circuit on the robot detects a low-battery condition," a scheduler "activates the homing beacon on the recharging station." *Id.* at 450. Everett's mobile robot moves towards the charging station and "reduces speed as a function of standoff distance based on sonar range measurements." *Id.* at 451. Everett discloses detecting electrical contact between the battery on its robot and the charging station using a low-current source that continuously energizes the station's contacts and measuring a drop in a sense voltage. *Id.* at 450.

The textbook from which Everett was excerpted was published in 1995 and cataloged and publicly available from the University of Wisconsin-Madison Libraries as of June 6, 1999. Ex. 1005, 2, 5. Patent Owner does not challenge the prior art status of Everett. Everett qualifies as prior art under 35 U.S.C. § 102(b).

[19] Everett has two sets of page numbers. We refer to the page numbers in the bottom left corner of each page (e.g., "Page 449 of 543"). "Page 449 of 543" corresponds to original page 434 (*see* upper left corner) of Everett.

*3. Abramson (Ex. 1006)*

Abramson is titled, "Autonomous Machine for Docking with a Docking Station and Method for Docking." Ex. 1006, code (54). Abramson "is directed to autonomous machines, such as robots, these robots typically designed to perform tasks such as vacuum cleaning, lawnmowing, floor weeping and maintenance" and, particularly, "to methods and systems for docking these autonomous machines in docking stations." *Id.* ¶ 1. Abramson discloses performing a "seek for the docking beam 120," during which the robot "operat[es] in accordance with a random scan pattern" until "docking beam 122" is detected by a sensor on the robot. *Id.* ¶¶ 43, 47. Abramson discloses "confirming that the at least one signal for the docking station has been located," "moving the robot towards the docking station," and "ceasing robot movement once the robot has docked in the docking station and a docking contact between the robot and the docking station is established." *Id.* ¶ 10.

Abramson is U.S. Patent Application Publication 2005/0010330 A1, published on January 13, 2005, and based on an application filed on July 11, 2003. Ex. 1006, codes (10), (22), (43). Abramson qualifies as prior art under 35 U.S.C. § 102(e).

*4. Jones (Ex. 1007)*

Jones is a textbook about the "design and construction of mobile robots." Ex. 1007, 8.[20] Jones discloses building systems, including a microprocessor and software to manage a large number of sensors. *Id.* at 2–3. Jones discloses that "[f]orce sensors can be used to determine when the

[20] Our citations to Jones use the branded page numbers at the bottom of the exhibit, which totals 242 pages.

robot is in contact with another object and where that object is in relation to the robot" and that "[s]uch information allows the robot to maneuver away from collisions." *Id.* at 80. An excerpt from Jones's Figure 5.21 is reproduced below.




*Id.* Figure 5.21 depicts one approach to implementing a full-coverage, force-detecting bumper on a cylindrical robot, using three microswitches on the robot's perimeter to contact a movable skirt around the robot. *Id.*

Jones was published in 1999 and cataloged and publicly available from the University of Wisconsin-Madison Libraries as of June 8, 2000. Ex. 1008, 2, 5. Patent Owner does not challenge the prior art status of Jones. Jones qualifies as prior art under 35 U.S.C. § 102(b).

*5. Kim (Ex. 1009)*

Kim is titled, "Robot Cleaner." Ex. 1009, code (54). Kim relates to "a self-moving robot cleaner which is capable of moving to an automatic charging means to charge its battery when a charging voltage of the battery is decreased to below a predetermined level during a cleaning operation and then returning to the interrupted cleaning position to again carry out the cleaning operation." *Id.* at 1:7–13. Figure 10 of Kim is shown below.

FIG. 10




Figure 10 of Kim depicts, "the robot cleaner which has been moved to the automatic charging means." *Id.* at 7:67–68.

Kim's robot initially moves about and uses sensors to "memorize[] a structure and a size of the room." *Id.* at 10:4–9. Figure 13 of Kim is reproduced below.

FIG. 13



Figure 13 depicts this initial operation of the robot cleaner. *Id.* at 9:55–56. After mapping the room, Kim's robot compares data regarding the room's size and structure to stored data to determine a path for cleaning the room. *Id.* at 10:3–14, 11:62–65. Kim's robot uses mirrors and sensors to ensure that it turns and moves precisely. *Id.* at 13:14–38. Figure 14 of Kim is reproduced below.

FIG.14




Figure 14 depicts a path along which the robot performs cleaning operations. *Id.* at 12:12-15.

Kim is U.S. Patent No. 5,440,216, issued on August 8, 1995. Ex. 1009, codes (11), (45). Patent Owner does not challenge the prior art status of Kim. Kim qualifies as prior art under 35 U.S.C. § 102(b).

*F. Asserted Objective Evidence of Nonobviousness*

Patent Owner argues that "extensive evidence establishing objective indicia of non-obviousness supports patentability." Resp. 48–49. In response, Petitioner argues that Patent Owner's secondary considerations arguments and evidence do not establish nonobviousness. Reply 20–25. As explained below, Patent Owner has not shown any commercial product is within the scope of the challenged claims. Patent Owner also has not established that the evidence it submits relates to the inventions claimed in the '423 patent. Without such proof, we consider this evidence, but adjudge it is entitled to little or no weight in determining whether the challenged claims are non-obvious.

For objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)). A patentee is entitled to a presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC,* 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000))). "[T]he purpose of the coextensiveness requirement is to ensure that nexus is only presumed when the product tied to the evidence of secondary considerations '*is* the invention disclosed and claimed.'" *Id.* at 1374 (quoting *Demaco Corp. v. F. Von Langsdorff*

*Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). "[T]he degree of correspondence between a product and the patent claim falls along a spectrum. At one end of the spectrum lies perfect or near perfect correspondence. At the other end lies no or very little correspondence." *Id.* "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.* at 1375.

Patent Owner does not provide an analysis demonstrating that its evidence or products are coextensive (or nearly coextensive) with the challenged claims. Patent Owner presents a chart purporting to show that its "Roomba Vacuuming Robot 900 Series" products are within the scope of claims 13 and 21 of the '423 patent.[21] *See* Resp. 51–55. The evidence relied upon in this chart is an "iRobot® Roomba® Vacuuming Robot 900 Series Owner's Guide" (Ex. 2068 ("Roomba Guide")) and "CES 2017 | iRobot Roomba 980 WiFi Robot Demonstration | 900 Series Robotic

[21] Patent Owner also contends that its Roomba products embody claim 1, but this contention is not supported. Patent Owner's Response states that the "Roomba robotic cleaning devices embody claim 1, as demonstrated in Section II [of the Response]." Resp. 50. Section II of the Response is headed, "Jeon and Abramson are not prior art to claims 1, 3, 4, 6-8, and 12 of the '423 patent." *Id.* at 1 (capitalization in heading omitted). Section II is the section of the Response in which Patent Owner presents its case as to conception and reduction to practice in an effort to establish that Jeon and Abramson are not prior art. *Id.* at 1–27. Although sometimes referring to the "Roomba 2, released in **July 2004"** (*id.* at 2), Patent Owner relies on a constructive reduction to practice of the invention based on a filing of a patent application on January 21, 2004 (*id.* at 27). Patent Owner does not argue or present a showing that the Roomba 2 or any product it sold embodies claim 1 of the '423 patent. The evidence and arguments in Section II of the Response will not support a finding that all (or even any) of Patent Owner's Roomba products embody claim 1 of the '423 patent.

Vacuum | Smart Review" (Ex. 2105 ("Roomba video")). There are several problems with this evidence. First, Patent Owner provides no evidence (or argument) that the products to which these exhibits relate are representative of its products or when these products were sold. Exhibit 2068, the Roomba Guide bears a copyright date of 2017 but is otherwise undated. Ex. 2068, 13. Patent Owner does not provide any argument as to when the products to which Exhibit 2068 relate were sold. Exhibit 2105, the Roomba video, is labelled as being from a trade show (CES) in 2017 and the narrator states that the product that is demonstrated (Roomba 980) was launched in September, 2015. But for what period of time this product was sold (or how many),[22] Patent Owner does not say.[23]

Second, these exhibits do not show that the products embody any claim of the '423 patent and are coextensive with any claim of the '423 patent. For example, independent claims 13 and claim 21 recite: "control forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity . . . in response to detecting a need to charge the energy storage unit." Ex. 1001, 20:47–51, 22:1–4. In an attempt to show

[22] The narrator of the video describes the Roomba 980 as its top-of-the-line product and as selling for $899 and compares it to the other product shown in the video (but not demonstrated or well-described), the Roomba 960 which the narrator said "starts at $699." Ex. 2105. Patent Owner provides no showing that the Roomba 960 embodies any claim of the '423 patent or the period of time in which the Roomba 960 was sold or the relative sales volume of the Roomba 980 versus the Roomba 960 or any other of Patent Owner's products.

[23] Patent Owner's Exhibit 2069 (with a copyright date of 2022 (Ex. 2069, 3)) includes a consumer comment indicating that Patent Owner has abandoned the "980" and that, due to a firmware update from Patent Owner, the device does not return to the home base to recharge. Ex. 2069, 3.

Exhibit 2068 embodies these claim elements, the Response states, "Roomba Guide describes 'If its battery gets low before finishing a cleaning cycle, Roomba returns to the Home Base to recharge.'" Resp. 54 (citing Ex. 2068, 6).[24] In this passage in Exhibit 2068, there is no reference to "a second velocity less than the first velocity." Patent Owner does not direct our attention to any description of "a second velocity less than the first velocity" in Exhibit 2068 and we can find none.

Patent Owner contends that Exhibit 2105 shows the robot slows downs as it approaches the base station. Resp. 54. The Response states the "Roomba video shows the Roomba being autonomously controlled to move forward toward the Home Base and to slow down as it approaches the home base." *Id.* However, in the video, the robot returns to the home base in response to a command sent using a cell phone app and not "in response to detecting a need to charge the energy storage unit" as recited in claims 13 and 21. Patent Owner fails to establish that any of its products embody any of the claims of the '423 patent.

Third, Patent Owner does not argue or show that Exhibit 2068 or Exhibit 2105 highlight or emphasize the elements set forth in the claims of the '423 patent. Exhibit 2068, the Roomba Guide, does not highlight or

[24] For these elements, Patent Owner also cites Exhibit 2069, a "Roomba webpage" and states the "Roomba webpage describes 'The robot automatically returns to the Home Base® charging station to recharge at the end of a cleaning cycle or when the battery is running low.'" Resp. 54 (citing Ex. 2069, 2). In Exhibit 2069, there is no reference to "a second velocity less than the first velocity." In addition, Exhibit 2069 includes a consumer comment that indicates that, due to a firmware update from Patent Owner, the robot does not automatically return to the charging station to recharge at the end of a cleaning cycle or when the battery is running low. Ex. 2069, 3.

emphasize the subject matter of the claims. In Exhibit 2105, the Roomba video, many features of the products are discussed but none of the highlighted or emphasized features relate to the subject matter of the claims. To the contrary and even if the products discussed in these exhibits embodied the claims and were coextensive with them, both of these exhibits show that Patent Owner did not consider the elements of the claims to be important or attractive features of these products.

Fourth, Patent Owner's website identifies the '423 patent as one of ninety issued U.S. utility and design patents relating to its "Roomba® 900 Series Robot and Robot System" with "Other patents pending." Ex. 1041, 1. Patent Owner does not discuss how this large number of other patents relates to the functionality of these products. We, therefore, find that a presumption of nexus is inappropriate.

However, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1375. "To the contrary, the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011) (emphasis in original). On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial

weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* Ultimately, the fact finder must weigh the secondary-considerations evidence presented in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan. *Id.* at 1331–32. As shown above, in this case, Patent Owner's arguments and evidence do not show a nexus to either the unique characteristics of the invention or the claimed combination as a whole. *See* Resp. 50–55.

Patent Owner contends that "Roomba, which embodies at least claims 1, 13, and 21, was a commercial success." Resp. 55. But, Patent Owner uses "Roomba" to designate a number of products over a long period of time (about 2002 until today) (*see id.* at 55– 58 (arguments and exhibits cited in section of Response discussing commercial success)) and, as shown above, Patent Owner has failed to establish any of these products, much less all of these products, embody claims 1, 13, and 21. As discussed above, Patent Owner has failed to establish a nexus between the invention claimed in the '423 patent and any of its products.[25] To be clear, we do not find that Patent Owner's Roomba products were not commercially successful. We do find

---

[25] "If commercial success is due to an element in the prior art, no nexus exists." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011). "[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp. v. AlignTechnology, Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). "[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art." *J.T. Easton & Co., Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

that Patent Owner has failed to show that any commercial success is objective evidence of the nonobviousness of the claimed invention due to a lack of nexus. There is insufficient evidence to show that the invention of the challenged claims of the '423 patent has been a commercial success.

Patent Owner also argues that "Roomba was recognized, praised, and copied by others." Resp. 58. But, here again, the evidence is of broad scope relating to Roomba and not shown to be related to the claimed invention due to a lack of nexus. In addition, Patent Owner links the arguments and evidence in this section of the Response to "auto charge and resume functionality" which is not recited in independent claims 1, 13, and 21 for which Patent Owner contends there is a nexus between its secondary considerations evidence and the claimed invention. *See id.* at 58–62 (repeatedly referring to "auto charge and resume functionality"). In response to these arguments, Petitioner argues:

> [Patent Owner] equates its claimed invention to "auto-recharge and resume functions." POR, 49–62. [Patent Owner] cannot dispute, however, that auto-recharge and resume is only recited in dependent claim 23; claim 1 recites no such functionality and claims 13 and 21 recite only auto-charging, not resuming. And [Patent Owner] cannot dispute that auto-charge and resume functionality was taught in the prior art, POR, 27–42. EX1055, 2, 32-44 (invalidating claims of US 9,550,294, reciting auto-recharge and resume functionality). [Patent Owner] also did not dispute that during original prosecution. Indeed, after the Examiner found [Patent Owner]'s claims reciting auto-recharge and/or resume functions obvious or anticipated by prior art, [Patent Owner] amended them to include the "controlling forward movement" and reduced velocity limitations and argued that those new features distinguished the claims from the prior art. EX1002, 89–90, 69-72.
>
> [Patent Owner] fails to establish a nexus between its secondary considerations evidence and what it contended was

> novel, namely the claimed "controlling forward movement" and reduced velocity limitations. None of [Patent Owner]'s evidence mentions the Roomba's control of forward movement while docking, much less any reduced velocity. POR, 48–62. Because [Patent Owner] links its purported evidence of recognition, praise, and copying to other features of the Roomba, i.e., auto-charge and resume functionality known in the prior art, its argument should not be accorded any weight. *See, e.g.*, *South Alabama Medical Science Foundation v. Gnosis S.P.A.*, 808 F.3d 823, 827, (Fed. Cir. 2015) ("substantial evidence supports the Board's finding that the praise was particularly directed to the use of L-5-MTHF, an element already known in the prior art.").

Reply 22 –23. We agree with Petitioner that the alleged recognition, praise, and copying is directed to features not recited in claims 1, 13, and 21. Patent Owner has failed to establish any recognition, praise, or copying of the inventions recited in claims 1, 13, and 21 of the '423 patent. There is insufficient evidence to show that this purported objective evidence of the nonobviousness relates to the challenged claims of the '423 patent.

In summary, we find that the evidence proffered by Patent Owner in an effort to establish that there is objective evidence of the nonobviousness of the invention claimed in the '423 patent is weak and has not been shown to relate to the specific inventions recited in the challenged claims. However, we have considered all the proffered evidence of objective indicia of nonobviousness relied upon by Patent Owner in our determination as to obviousness.

### G. *Asserted Obviousness of Claims 1–4, 6–10, and 12 in View of Jeon and Everett or Jeon, Everett, and Abramson*[26]

#### 1. *Discussion of Claim 1*

We begin our discussion of the challenge to the claims of the ’423 patent with a consideration of Petitioner’s allegation that claim 1 would have been obvious in view of the combinations of Jeon and Everett and of Jeon, Everett, and Abramson. *See* Pet. 5, 12–26.

> *A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a right signal emitter and a left signal emitter, the method comprising:*

Petitioner does not take a position as to whether the preamble of claim 1 is limiting. Pet. 12 (“If the preamble is limiting, [ ]Jeon/Everett discloses it.”) (citing Ex. 1012 ¶¶ 62–64). Petitioner relies on Jeon in support of its contentions relating to the preamble of claim 1. *Id.* at 12–13. The Petition contains an annotated Figure 3 of Jeon, reproduced below.

[26] In the Petition, Petitioner presented its arguments and evidence relating to the Jeon-Everett combination and the Jeon-Everett-Abramson combination together. *See* Pet. 8–46. In order to follow the presentation in the Petition, we consider the showing as to these combinations together.

FIG. 3




*Id.* at 13. Annotated Figure 3 depicts, "infrared sensors of the automatic charging system of a robot cleaner." Ex. 1003 ¶ 37. The Petition states:

> [ ]Jeon discloses "an automatic charging system and method of a robot cleaner." [ ]Jeon, ¶ [0002]. [ ]Jeon discloses "a power supply unit 400" (base station) including "a charging unit 403 for charging the battery 301 of the robot cleaner; and first and second infrared ray generators 401 and 402 positioned at left and right sides of a charge terminal of the charging unit 403" and outputting signals to guide robot 500 to charging unit 403. *Id.*, ¶¶ [0044]-[0045], Fig. 3. [ ]Jeon's "infrared ray generators 401 and 402" correspond to the claimed left or right signal emitters, respectively. Likhachev, ¶ 64.

Pet. 12–13. Petitioner's contentions relating to the preamble of claim 1 are supported by Jeon.

Patent Owner does not take a position as to whether the preamble of claim 1 is limiting or dispute Petitioner's showing that the cited art teaches the elements of the preamble of claim 1. *See generally* Resp.

Because Petitioner has shown sufficiently that the recitations in the preamble are satisfied by the cited art, we need not determine whether the

preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803. We find that, even if the preamble is limiting, Petitioner has shown that the cited art teaches all the elements of the preamble of claim 1.

> *directing the robotic cleaning device about a room at a first velocity;*

Petitioner relies on Jeon as teaching all the elements of this limitation. Pet. 14 (citing Ex. 1012 ¶¶ 65–67). Petitioner cites the following passages in Jeon: "the robot cleaner includes . . . a microcomputer for moving the robot cleaner" and "robot cleaner 500 performs a cleaning operation according to a user's command in a specific region." *Id.* (citing Ex. 1003 ¶¶ 46, 54). Petitioner contends:

> Because [ ]Jeon's robot performs cleaning in a specific region (room), and includes a microcomputer to control its movements, [ ]Jeon directs its robot about a room. Likhachev, ¶ 65.
>
> The term "first velocity" only appears in the '423 patent claims, but the specification does not describe this term. '423 patent, claims 1, 13, 21. Thus, any velocity used by [ ]Jeon's robot during cleaning corresponds to the first velocity. Likhachev, ¶ 66-67.

*Id.* The cited passages in Jeon support these contentions.

Patent Owner does not dispute that Jeon teaches this limitation. *See generally* Resp.

We find that the cited art teaches this limitation.

> *detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;*

Petitioner relies on Jeon as teaching all the elements of this limitation. Pet. 14–16 (citing Ex. 1012 ¶¶ 68–69). In support, the Petition includes an annotated Figure 3, reproduced below.

FIG. 3




*Id.* at 15. This annotated Figure 3 depicts, "robot cleaner 500, base station component 403, left and right signal emitters 401 and 402, and sensor(s) 304, 305." *Id.* The Petition states:

> [ ]Jeon's robot has "a rotating plate 306 mounted at a main body." [ ]Jeon, ¶ [0046]. In charge mode, [ ]Jeon's microcomputer 303 causes rotation of the rotating plate 306. [ ]Jeon, ¶ [0058]. [ ]Jeon's "first and second infrared ray receiving units 304 and 305 mounted at the rotating plate 306 are rotated accordingly." *Id.* [ ]Jeon explains that "first and second infrared ray receiving units 304 and 305 of the robot cleaner receive first and second infrared signals respectively outputted from the first and second infrared ray generators 401 and 402." *Id.*, ¶ [0059], [0065]. [ ]Jeon discloses that plate 306 may have only one sensor. *Id.*, ¶ [0060]. Receiving units 304 and 305 or the one sensor on plate 306 correspond to the claimed sensor. Likhachev, ¶ 68.

*Id.* at 14–15. Jeon supports Petitioner's showing as to this limitation.

Patent Owner does not dispute that Jeon teaches this limitation. *See generally* Resp.

We find that Jeon teaches this limitation.

> *controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;*

Petitioner relies on Jeon as teaching elements of this limitation. Pet. 16–19 (citing Ex. 1012 ¶¶ 70–83). With regard to "controlling forward movement of the robotic cleaning device toward the base station . . . while orienting the robotic cleaning device in relation to the right signal and the left signal," Jeon teaches:

> [T]he microcomputer 303 of the robot cleaner detects a direction of the charging unit 403 on the basis of the first and second infrared signals received from the first and second infrared ray generators 401 and 402, and moves the robot cleaner in the detected direction. That is, the robot cleaner is moved in the direction that the first and second infrared ray signals are generated. . . .
>
> [T]he microcomputer 303 moves the robot cleaner 500 along the center between the detected direction in which the first infrared signal is generated and the detected direction in which the second infrared signal is generated.
>
> As the robot cleaner 500 keeps moving to the direction that the first and second infrared signals are generated, it eventually reaches the charging unit 403.

Ex. 1003 ¶¶ 64, 66, 67.

Petitioner acknowledges that Jeon "does not explicitly state a velocity of its robot as it moves toward the charging unit," but contends "a skilled artisan would have found it obvious that [ ]Jeon's robot would approach the charging unit at a second velocity lower than its cleaning velocity (first velocity)." Pet. 17 (citing Ex. 1003 ¶¶ 72–78). Petitioner supports this obviousness contention with two arguments. *Id.* at 17–19. Petitioner argues:

> [A] skilled artisan would understand that because [ ]Jeon's robot approaches and docks with the charging unit for charging its battery, the robot must come to a stop at the charging unit. [Ex. 1003] ¶ 72. Moreover, to ensure [ ]Jeon's robot stops, its microcomputer must reduce the robot's velocity from its initial cleaning velocity (first velocity) until the velocity becomes zero. *Id.*
>
> A skilled artisan would recognize that a robot traveling at a higher velocity would require a longer stopping distance. *Id.*, ¶ 73. To timely stop the robot and prevent it from colliding with the charging station, a skilled artisan would have been motivated to reduce the robot's velocity towards the charging unit. *Id.*, ¶ 74.

*Id.* The second of Petitioner's arguments is:

> [T]o charge the robot's battery, electrical connections on [ ]Jeon's robot must align with and engage terminals on [ ]Jeon's charging unit (base station). Likhachev, ¶ 75. As Dr. Likhachev explains, "it takes time for a robot to turn and if the robot is traveling forward too fast, there may be insufficient time to turn the robot," for example, to align it with charging terminals on the base station. *Id.* A robot traveling at a lower speed can follow an intended path more accurately, making it easier to turn, maneuver, and align the robot's electrical contacts with those of the charging unit. *Id.*, ¶ 76. A skilled artisan would recognize that it is essential to dock the robot accurately and accurate placement is easier and more likely achieved at lower speeds. *Id.* . . .
>
> A skilled artisan would understand that maneuvering near a base station may require making sharp turns, at small radii of curvature, which would be easier at low speeds. *Id.*, ¶ 77. Reducing the speed of a robot when maneuvering in tight spaces was well known. . . Likhachev, ¶ 77. Accordingly, it would have been obvious to a skilled artisan that [ ]Jeon's robot cleaner would move towards the base station at a second, slower velocity than the first velocity to achieve known, predictable results (avoiding collision with and/or increased maneuverability for accurate alignment with the base station). *Id.*

*Id.* at. 17–19.

Petitioner additionally cites Everett as "disclos[ing] a mobile robot capable of detecting a near infra-red homing beacon emitted by a base station and traveling towards it to recharge its battery" and as "teach[ing] that it was well known for a robot to travel to its docking station at a second velocity lower than a first velocity while using a homing beacon to adjust its heading." *Id.* at 19 (citing Ex. 1004, 449–451; Ex. 1012 ¶¶ 80–81). Everett states, "[t]he robot relies on [an] optical tracking system to control heading while closing on the charger and reduces speed as a function of stand-off distance based on sonar range measurements." Ex. 1004, 451.

With regard to combining the relevant teachings of Jeon and Everett relating to this limitation, the Petition states:

> It would have been obvious to combine this well-known, reduced base station approach velocity with [ ]Jeon . . . Doing so is nothing more than substituting a known feature (e.g., Everett's reduced base station approach velocity) in an existing system ([ ]Jeon's robot cleaner) according to known methods (e.g., function of stand-off distance) to achieve a predictable result (avoiding collision with and/or increased maneuverability for accurate alignment with the base station). *Id.*; *KSR*, 550 U.S. at 416-418.
>
> Selecting a reduced base station approach velocity is a known, obvious, trivial selection from a limited number of options (increasing, decreasing, or maintaining velocity). Likhachev, ¶ 82. Given the benefits of reducing the velocity (e.g., avoiding collision and/or increased maneuverability), to the extent not already understood from [ ]Jeon and the knowledge of a skilled artisan, a skilled artisan would have found it obvious to try reducing the base station approach velocity of [ ]Jeon's robot cleaner as taught by Everett. *Id.*; *KSR*, 550 U.S. at 421.

Pet. 19–20. We find that Petitioner provides sufficient rationale for combining the relied upon teachings of Jeon and Everett.

Patent Owner argues that this limitation "requires both 'forward movement' and 'orienting . . . in relation to the right and the left signals,' which are two different requirements" and "there is no disclosure that Jeon's robot cleaner does more than just move forward towards the base station, much less that the robot ***re***-orients or changes its direction in relation to the signals." Resp. 36 (emphasis added). This argument is not supported by the language of the claim as this limitation requires "orienting" not ***re***-orienting and Jeon teaches "orienting . . . in relation to the right and the left signals" as recited in claim 1.[27] Petitioner cites paragraphs 64, 66 and 67 of Jeon (quoted above) in support of its contention that Jeon teaches these elements. *See* Pet. 16. Paragraph 64 of Jeon states:

> [T]he microcomputer 303 of the robot cleaner detects a direction of the charging unit 403 on the basis of the first and second infrared signals received from the first and second infrared ray generators 401 and 402, and moves the robot cleaner in the detected direction. That is, the robot cleaner is moved in the direction that the first and second infrared ray signals are generated.

Ex. 1003 ¶ 64. We have considered the passages cited by both parties in Jeon and find Jeon teaches "forward movement" and "orienting . . . in relation to the right and the left signals." Indeed, Patent Owner acknowledges that "Jeon discloses that after the infrared ray receiving units detect the infrared ray signals, the robot cleaner moves in their direction

---

[27] Patent Owner does not argue that "orienting . . . in relation to the right and the left signals" should be construed in a way that would support this argument. *See* Resp. 36–37.

toward the charging unit and '***keeps moving to the direction*** that the first and second infrared signals are generated' until it 'eventually reaches the charging unit.'" Resp. 36 (citing Ex. 1003 ¶¶ 65–67). And, in response to this argument, Petitioner contends "[a] POSITA[28] would understand that by moving the robot forward from its initial travel direction to the center direction between the right and left signals, [ ]Jeon's microcomputer controls the robot's forward movement while orienting it relative to those signals, as claimed." Reply 13 (citing Pet. 16; Ex. 1012 ¶¶ 70–71). We agree with Petitioner.

We find that, based on the preponderance of the evidence, Petitioner has shown that the cited art teaches this limitation.

*detecting contact with charging terminals on the base station;*

Petitioner cites Jeon as teaching this limitation. Pet. 14–16 (citing Ex. 1012 ¶¶ 68–69). Petitioner cites this passage from Jeon: "as the power terminal of the robot cleaner and the charge terminal of the charging unit 403 are connected to each other, the remaining battery capacity detecting unit 302 outputs a docking complete signal to the microcomputer 303." *Id.* at 21 (citing Ex. 1003 ¶ 72). Petitioner contends that, "[a] skilled artisan would understand that [ ]Jeon's robot detects contact with charging terminals on the base station based on transmission of the docking complete signal." *Id.* (citing Ex. 1003 ¶¶ 84–86). Jeon supports Petitioner's showing for this limitation.

Petitioner also cites Everett as teaching this limitation. Pet. 21–22 (citing Ex. 1012 ¶¶ 88–92). The Petition states, "Everett provides a solution

---

[28] POSITA is an acronym commonly used in patent proceedings to refer to a person of ordinary skill in the art.

for confirming the robot's contacts are connected to the charging terminal['s contacts] by detecting a change in the sense voltage." *Id.* at 22 (citing Ex. 1012 ¶ 89). Everett states that, "[t]his 'sense' voltage (about 20 volts DC) allows the robot to know when a valid electrical connection has been established with the recharger." Ex. 1004, 450. Everett supports Petitioner's contentions.

With regard to combining the relevant teachings of Jeon and Everett as related to this limitation, the Petition states:

> A skilled artisan would recognize that if charging current cannot flow to [ ]Jeon's battery to charge it, the very purpose for which [ ]Jeon's robot returns to the base station would be defeated. Likhachev, ¶ 90. A skilled artisan would, therefore, have been motivated to combine Everett's method of confirming connection between the contacts of [ ]Jeon's robot and the base station charging terminals to ensure the robot's battery can receive charging current. *Id.* Implementing a method of detecting contact with the charging terminals on [ ]Jeon's robot in view of Everett would have improved the robot's ability to ensure its battery can be charged by the charging unit. *Id.* Doing so would have simply combined a known feature (Everett's sense-voltage monitoring) in [ ]Jeon's robot to achieve a predictable result (ensuring charging current can flow from the charging unit to the robot battery). *Id.*; *KSR*, 550 U.S. at 416-418.
>
> A skilled artisan would have been able to make this modification and reasonably expect success. Likhachev, ¶ 91. Everett teaches a sense voltage drop indicates connection of the robot's battery as a load across the base station charging terminals. Everett, 435. [ ]Jeon's charging unit already includes charging terminals for engaging contacts on [ ]Jeon's robot. [ ]Jeon, ¶¶ [0071]-[0074]. A skilled artisan would therefore have reasonably expected that implementing Everett's sense voltage measurement on [ ]Jeon's robot would allow it to confirm contact between its power terminal and the base station charge terminals. Likhachev, ¶¶ 91-92.

Pet. 22–23. We find that Petitioner provides sufficient rationale for combining the relied upon teachings of Jeon and Everett.

Patent Owner does not dispute that the cited art teaches this limitation. *See generally* Resp.

We find that the cited art teaches this limitation and Petitioner has provided a sufficient rationale to combine the references' teachings.

*stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station; and*

Petitioner acknowledges that Jeon does not teach this limitation but argues a skilled artisan would have been motivated to implement it. Pet. 23–24. The Petition states:

> [ ]Jeon/Everett discloses this (Ground 1A). Likhachev, ¶ 94. [ ]Jeon discloses an ultrasonic signal generator that generates a stop signal when the robot is adjacent to the charging station. *See* Section VII.E.5; [ ]Jeon, ¶¶ [0046], [0068], [0069]. A skilled artisan would, however, understand that stopping [ ]Jeon's robot near the charging station would not guarantee electrical connection of the robot's battery with the charging station. Likhachev, ¶ 94. [ ]Jeon itself recognizes this possibility. [ ]Jeon, ¶¶ [0071], [0073] (disclosing docking error signal); Section VII.E.5; Likhachev, ¶ 94. A skilled artisan would, therefore, have been motivated to implement a better way of ensuring the power terminal of [ ]Jeon's robot always connects to the charging station connector when the robot returns to the charging station. Id. A skilled artisan would recognize that a simple way to do so would be to stop forward movement of [ ]Jeon's robot upon detecting that the robot's battery is electrically connected to the charging terminal connector. *Id.* Indeed, such techniques were well known. Abramson, ¶¶ [0066], [0074]. Moreover, doing so would have produced predictable results (ensuring that the power terminal of [ ]Jeon's robot is connected to the charging terminals of the charging unit). Likhachev, ¶ 94; *KSR*, 550 U.S. at 416-418.

*Id.* We do not find this argument persuasive.[29] Petitioner suggests that stopping forward movement of the robot upon detecting electrical contact with the charging terminal connectors was "better," "simple," and "well known," but provides only a very thin explanation.[30] *See id.* at 23–24. We find these arguments to be poorly supported and largely conclusory.[31]

Patent Owner contends that "Jeon fails to disclose that the robot cleaner 'stops forward movement' in response to 'detecting contact with the charging terminals' of its dock." Resp. 37. Instead, Patent Owner argues "Jeon discloses that movement ceases when the robot cleaner is close to the charging unit, but not when any connection to a charging terminal of the charging unit has been made." *Id.* We agree with Patent Owner and find that Jeon does not teach or suggest this limitation.

Petitioner, however, also relies on a combination with Abramson for "disclos[ing] stopping forward movement in response to detecting contact

---

[29] Petitioner cites to paragraph 94 of the Likhachev Declaration in support of this argument. Pet. 23–24 (citing Ex. 1012 ¶ 94). We have considered this testimony, but it is substantially the same as the argument in the Petition with the addition of "in my opinion." *See* Ex. 1012 ¶ 94. We find this testimony to be conclusory with inadequate supporting evidence. This testimony is entitled to little or no weight. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

[30] Petitioner cites, without explanation, only two paragraphs in Abramson in support of its statement that "such techniques were well known." Pet. 23 (citing Ex. 1006 ¶¶ 66, 74).

[31] "To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil*, 829 F.3d at 1380.

with the charging terminals on the base station." Pet. 24 (citing Ex. 1012 ¶¶ 95–97). Petitioner refers to the detailed description of Figure 12, reproduced below, of Abramson. *Id.*




FIG.12

Figure 12 is "a flow diagram detailing the end game or final docking phase" of an autonomous robot. Ex. 1006 ¶ 22. The detailed description of Figure 12 provides:

> [O]nce a contact, between docking contacts 110 of the docking station 100 and docking contacts 68 of the apparatus 20, is detected by the control system 40 (through voltage sensors 69 in the power system 52) of the apparatus 20 (at block 224, and equivalent blocks 404 and 410), the apparatus 20 stops, at block 430. This stop is for a period of approximately 2 seconds . . . With the stop or rest period expired, the voltage on the docking contacts 68 of the apparatus 20 is measured, at block 432.
>
> If a rise in the voltage is present, such as a rise in voltage to at least a predetermined voltage level, for example, approximately 20 volts, as sensed by the voltage sensors 69 electrically coupled to the docking contacts 68 (as detailed above), a docking contact (between the docking contacts 68 of the apparatus 20 and the docking contacts 110 of the docking station 100) is present, and the process moves to block 230 ["STOP—DOCKING SUCCESSFUL END"]. With an

> established docking contact (for example, at or above the predetermined level, here, 20 or more volts), the process is complete, as the apparatus 20 is charging.

*Id.* ¶¶ 74–75. Based on these teachings, we find that Abramson teaches this element.

Patent Owner argues that Abramson fails to teach this limitation, because as part of an "alignment phase," Abramson teaches performing "***a short reverse movement***, typically moving about 6 cm." Resp. 40 (citing Ex. 1006, ¶¶ 68–69, Figure 10). We have considered Patent Owner's argument and find it unavailing. Patent Owner is correct to the extent that Abramson includes various procedures including the "alignment phase" (see Ex. 1006 ¶¶ 67–69) and a "wiggle sequence" (*id.* ¶¶ 70–71 (with reverse movements of "approximately 1 cm or less"))[32] for ensuring that the robot docks properly in order that it may recharge. However, the small reverse movements described in these passages do not detract from the teachings in Abramson that the movement of the robot is generally forward movement towards the docking station. *See id.* at Figs. 7, 9, 11, 13. The process relied on by Petitioner is the "end game or final docking phase" described in Abramson, in which it is determined that the docking process is considered complete, and all movement of the robot is stopped in response to detecting contact with the charging terminals on the base station. *See id.* ¶¶ 22, 73–77, Figure 12 (reproduced above).[33]

---

[32] Claims 43 and 52 of Abramson recite, "wherein moving the robot ***toward*** the docking station includes: the robot performing at least one wiggle movement ***toward*** the docking station." Ex. 1006, claims 43, 52 (emphasis added); *see also id.* at claims 13, 31.

[33] We recognize that the "end game or final docking phase" described in Abramson can also include a short reverse movement of about 1 cm. *See*

With regard to combining the relevant teachings of Jeon, Everett, and Abramson, the Petition states:

> A skilled artisan would have been motivated to combine Abramson's teaching of stopping forward movement of the robot upon detecting contact with [ ]Jeon. Likhachev, ¶ 98. Doing so would help prevent collision of [ ]Jeon's robot with the base station, and confirm the robot's battery is electrically connected to [ ]Jeon's charging unit, ensuring uninterrupted flow of charging current to the robot's battery. *Id.* The combination of Abramson's teaching with [ ]Jeon would be nothing more than substitution of one element (stopping based on an ultrasonic sensor) with another (stopping in response to detecting electrical contact) to produce a predictable result (ensuring charge current can flow to the robot battery). *Id.*; *KSR,* 550 U.S. at 416-418. Because [ ]Jeon/Everett discloses detecting contact of [ ]Jeon's robot with the base station, a skilled artisan would have been able to implement Abramson's teaching of stopping forward movement upon detecting such contact without undue burden or dramatic alteration to the design and purpose of [ ]Jeon's robot. Likhachev, ¶ 99.

Pet. 24–25. We find that Petitioner provides sufficient rationale for combining the relied upon teachings of Jeon, Everett, and Abramson.

We find that Petitioner has not established that the Jeon-Everett combination teaches or suggests this limitation. However, we find that the Jeon-Everett-Abramson combination teaches this limitation and that a motivation to combine the relevant teachings existed.

*charging a battery of the robotic cleaning device.*

Petitioner relies on Jeon as teaching all the elements of this limitation. Pet. 25–26 (citing Ex. 1012 ¶¶ 101–102). In support, the Petition includes an annotated Figure 4, reproduced below.

---

Ex. 1006 ¶ 76 ("This reverse movement, at block 434 [of Figure 12], is, for example, a short movement, of approximately 1 cm.").

FIG. 4




*Id.* at 26. Annotated Figure 4 depicts, "a flow chart of an automatic charging method of a robot cleaner." Ex. 1003 ¶ 38. Petitioner also cites this sentence in Jeon: "[t]he docking mode in this connection is a mode for connecting the power terminal of the robot cleaner and the charge terminal of the charging unit 402 in order to charge the battery 301 of the robot cleaner." Pet. 25 (citing Ex. 1003 ¶ 70). We find that Jeon teaches charging a battery of a robotic cleaning device.

Patent Owner does not dispute that Jeon teaches this limitation. *See generally* Resp.

We find that the cited art teaches this limitation.

*Summary as to Claim 1*

Considering all the arguments and evidence relating to claim 1, including objective evidence of nonobviousness, we conclude that a preponderance of the evidence establishes that claim 1 of the '423 patent would have been obvious in view of the combined teachings of Jeon,

Everett, and Abramson, but Petitioner has not shown that claim 1 would have been obvious in view of the combined teachings of Jeon and Everett.

*2. Claims 2–4, 6–8, 10, and 12*

Petitioner also contends that claims 2–4, 6–10, and 12 which depend from claim 1 would have been obvious in view of the Jeon-Everett combination and in view of the Jeon-Everett-Abramson combination. *See* Pet. 5, 26–46. In support of these contentions, Petitioner provides a detailed showing that each of the elements of the additional limitations recited in these dependent claims is taught by the cited art. *See id.* at 26–46. Except for claim 9, which Patent Owner discusses separately (*see* Resp. 27–35), Patent Owner does not separately argue these claims (*see id.* at 35–42). We consider dependent claim 9 separately below. *See* Section II.H. *infra*. For the remainder of these claims, the undisputed showing in the Petition as to the additional limitations recited in these claims supports findings that all the elements of these claims are taught or suggested by the cited art and that a skilled artisan would have been motivated to combine them in the manner recited in these claims. We, therefore, accept and adopt Petitioner's showing as to claims 2–4, 6–8, 10, and 12.

With regard to claims 2–4, 6–8, 10, and 12, we conclude that Petitioner has failed to establish that these claims would have been obvious in view of Jeon and Everett for the reasons discussed above with regard to independent claim 1 from which these claims depend. *See* Section II.G.1. *supra* (Petitioner failed to establish that all the limitations of claim 1 were taught or suggested by the combination of Jeon and Everett); *see also* Resp. 50 ("And because claims 2-4, 6-10, and 12 depend from claim 1, they necessarily include all limitations of claim 1."). With regard to claims 2–4, 6–8, 10, and 12 and the Jeon-Everett-Abramson combination, we conclude

that these claims are unpatentable as obvious.

### *H. Asserted Obviousness of Claim 9*

Petitioner contends that dependent claim 9 of the '423 patent would have been obvious in view of the following four combination of references: (1) Jeon-Everett; (2) Jeon-Everett-Abramson; (3) Jeon-Everett-Jones; and (4) Jeon-Everett-Abramson-Jones. *See* Pet. 5. Patent Owner argues that all of Petitioner's challenges to claim 9 fail. *See* Resp. 27–35. For the reasons discussed below, we conclude that claim 9 is not unpatentable as obvious.

Claim 9 depends from claim 1 and recites:

> *9. The method of claim 1, further comprising avoiding, by the robotic cleaning device, the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level.*

Ex. 1001, 20:20–24.

With regard to the asserted combinations of references that do not include Abramson (Jeon-Everett and Jeon-Everett-Jones), we conclude that claim 9 has not been shown unpatentable, because the combination of Jeon-Everett does not teach or suggest all the limitations of claim 1 from which claim 9 depends for the reasons discussed above with regard to claim 1. *See* Section II.G.1. *supra.*

With regard to the Jeon-Everett-Abramson combination (and the Jeon-Everett combination), Petitioner argues that because Jeon's infrared receiving units do not attempt to detect the infrared signals from the base station, the robot is "avoiding" the signals as recited in claim 9. *See* Pet. 42–43. Petitioner argues, "[a] skilled artisan would recognize that [infrared ray] receiving units [of the robotic cleaning device] ***do not attempt to detect (i.e. avoid)*** infrared signals transmitted by [ ]Jeon's base station when [ ]Jeon's

robot is not in charge mode." *Id.* at 42 (citing Ex. 1012 ¶¶ 143–144) (emphasis added). In response, Patent Owner argues that "[c]onsistent with the description in the'423 patent specification, the plain meaning of 'avoid' is to 'keep away from.'" Resp. 28. Although neither party proposed that we should explicitly construe "avoiding" or any other part of the additional limitation in claim 9, we conclude that the plain and ordinary meaning of "avoiding" in the context of the Specification of the '423 patent requires more than not attempting to detect the signals. In the Specification of the '423 patent, when "avoidance" is discussed, it refers to the robot moving away from the base station or altering its course to avoid the base station. *See* Ex. 1001, 2:55–57, 3:65–4:1, 6:17–22, 11:62–12:21. The description of "avoidance" in the Specification comports with the ordinary and customary meaning. We find that the Jeon-Everett-Abramson combination (and the Jeon-Everett combination) does not teach or suggest the limitation recited in dependent claim 9.

With regard to the Jeon-Everett-Abramson-Jones combination, Petitioner relies on the disclosure of an "Avoid" behavior in Jones. *See* Pet. 47–49. However, this "Avoid" behavior is based on detecting reflections of IR signals from the robot off of obstacles and not right and left signals from emitters on the base station. Ex. 1007, 169. The Petition states:

> Jones discloses that "using [the robot's] infrared (IR) detector, its robot's 'Avoid' behavior determines if any obstacles are in the robot's path." *Id.*, 314. Avoid "check[s] to see if the IR detectors have sensed a reflection from the obstacle." *Id.*, 316. If so, Avoid "arbitrarily decides to turn left" or right and "computes a motion command only during the time the IR sensors detect a reflection." *Id.*

Pet. 47 (alterations in original). Petitioner argues that implementing Jones' teachings regarding its "Avoid" behavior into the method disclosed in Jeon would achieve a predictable result and would "conserve energy, save time, and avoid accidental collisions with the base station." *Id.* at 48–49. In response, Patent Owner argues, "nothing in Jones suggests triggering an avoid behavior in response to an infrared ray emitted from any obstacle, much less a charging base station" and "Petitioner cites no disclosure in Jones or any prior art reference that describes a robot detecting and avoiding an infrared signal emitted by a charging base station." Resp. 31. We agree with Patent Owner. We find that Jones does not teach or suggest this limitation. And, we find Petitioner's argument for incorporating Jones' "Avoid" behavior into Jeon to be too general and conclusory and the combination would still not include all the elements recited in claim 9, such as, avoiding signals emitted from the base station.

We, therefore, conclude that claim 9 has not been shown to be unpatentable.

### *I. Asserted Obviousness of Claims 13–15, 18–23, 25, and 26 in View of Kim and Everett*

Petitioner contends that claims 13–15, 18–23, 25, and 26 would have been obvious in view of a combination of the teachings of Kim and Everett. Pet. 5, 49–80. Patent Owner argues that "a POSITA would not have been motivated to combine Kim and Everett to control movement of the 'cleaning robot' toward the base station 'at a second velocity less than the first velocity,'" but does not otherwise dispute Petitioner's showing as to these claims. *See* Resp. 42 (capitalization in quoted heading omitted). As motivation to combine is the only disputed issue as to the challenge to these claims, we take up that issue first.

In the Kim-Everett combination, Petitioner relies on Kim for teaching all the elements of the challenged claims, except for the "second velocity" as recited in claims 13, 20, 21, 25, and 26. *See* Pet. 49–80. For disclosing the "second velocity" as recited, Petitioner relies on Everett. *See id.* at 63, 76.[34] With regard to combining the relevant teachings of Kim and Everett, Petitioner first generally argues that a skilled artisan would have found it obvious to do so because of their similarities. *Id.* at 52. The Petition states, "[e]ach discloses a mobile robot that detects signals from its base station, and autonomously returns to, docks with, and recharges its battery." *Id.* With specific regard to combining the teachings of Everett as related to the "second velocity" as recited, the Petition states, "[a] skilled artisan would have been motivated to reduce base station approach velocity as taught by Everett in [ ]Kim's robot to achieve a predictable, desired result (avoiding collision and/or increased robot maneuverability for accurate alignment with the base station)." *Id.* at 63.

Patent Owner argues that Kim and Everett have significant differences in size, weight, configuration, and operation. *See* Resp. 42–47. Petitioner

---

[34] In its limitation-by-limitation mapping of the cited art for the Kim–Everett combination to claims 13–15, 18–23, 25, and 26 (Resp. 53–80), Petitioner specifically relies on, and cites to, Everett only with regard to claims that explicitly recite a "second velocity" (*see id.* at 63 (discussing claim 13), 76 (discussing claim 20)) and only with regard to limitations that explicitly recite a "second velocity" (*see id.*). For the remaining claims and limitations that explicitly recite a "second velocity," Petitioner relies on its showing as to claims 13 and 20. *See id.* at 77 (relying on the showing for claim 13 for claim 21), 78 (relying on its showing for claim 20 for claim 26), 79 (relying on its showing for claim 13 for claim 25). Thus, Petitioner contends that Kim alone teaches the majority of the limitations of claims 13–15, 18–23, 25, and 26 and Petitioner relies on Everett only for its teachings as to a "second velocity."

counters that Patent Owner's evidence of differences, particularly with regard to size and weight, is not supported, speculative, and incorrect. *See* Reply 18. Petitioner points out that Kim "is silent on the size/weight of its robot." *Id.* And, Petitioner argues, "[r]egardless of size or weight, a POSITA would have found it obvious to reduce the approach velocity of [ ]Kim's robot in view of Everett," because "[a] POSITA would have recognized that reducing velocity would reduce the momentum of [ ]Kim's robot, making it easier to stop the robot upon alignment with the magnets and charging contacts on [ ]Kim's base station." *Id.* at 19. Petitioner's reasoning is sound. Moreover, as Petitioner points out, Patent Owner's argument is a legally insufficient bodily incorporation argument. *Id.* at 18 (citing *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016)).

Patent Owner also argues that "Petitioner fails to show that there would have been any motivation to modify Kim as Kim already provides a mechanism for avoiding collision and accurately aligning the charging prong of the robot with the base statin: a magnet." Resp. 47 (citing Ex. 1009, 8:63–9:6, Figs. 11a, 11b). Petitioner counters that "[a]lthough [ ]Kim provides magnets for alignment, a POSITA would understand that these magnets would not prevent misalignment of a robot, traveling at a higher velocity, with its charging station." Reply 20 (citing Ex. 1012 ¶ 73). We find that the system disclosed in Kim would benefit from the robot approaching the base station to recharge at a lesser velocity than its cleaning velocity. We find that, as contended by Petitioner, a skilled artisan would have been motivated to combine Kim and Everett to control movement of the "cleaning robot" toward the base station "at a second velocity less than

the first velocity" as recited in claims 13, 20, 21, 25, and 26 of the '423 patent.[35]

Having considered the arguments of the parties relating to motivation to combine Kim and Everett and weighed the cited evidence, including objective evidence of nonobviousness, we find that a skilled artisan would have been motivated to combine the teachings of Everett relating to "a second velocity less than a first velocity" as recited in claims 13–15, 18–23, 25, and 26 with the relevant teachings of Kim. A preponderance of the evidence on this issue supports this finding and favors Petitioner's position on this issue.

The Petition provides a detailed limitation-by-limitation mapping of claims 13–15, 18–23, 25, and 26 to explicit teachings in Kim and Everett. *See* Pet. 80. The Petition provides a well-supported showing that each of the limitations of claims 13–15, 18–23, 25, and 26 is taught in the Kim-Everett combination. *See id.* This showing is not disputed by Patent Owner. We,

---

[35] We also find a skilled artisan would recognize the advantages of reducing the velocity of a moving device as it approaches a stationary structure to facilitate accurate alignment of the moving device with the stationary structure and to avoid or soften collisions between the two. *See KSR*, 550 U.S. 418 ("As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."). In this regard, the Petition states, "[a]lthough [ ]Kim does not explicitly disclose the speed at which its robot travels toward charging means 30, a skilled artisan would have found it obvious that [ ]Kim's robot would approach the charging means as a second velocity lower that the robot's cleaning velocity (the first velocity). Pet. 63 (citing Ex. 1012 ¶ 84); *see also id.* at 17–19 (asserting obviousness of a "second velocity" in the context of Jeon and claim 1).

having reviewed the entire record, accept and adopt Petitioner's showing as to claims 13–15, 18–23, 25, and 26. In reliance on this evidence and the motivation to combine evidence relating to the Kim-Everett combination, we conclude that claims 13–15, 18–23, 25, and 26 would have been obvious in view of Kim and Everett.

## III. CONCLUSION[36]

For these reasons, we conclude that Petitioner has met its burden of showing, by a preponderance of evidence, that claims 1–4, 6–8, 10, 12–15, 18–23, 25, and 26 of the '423 patent are unpatentable. Claims 1–4, 6–10, and 12 would have been obvious in view of Jeon, Everett, and Abramson. Claims 13–15, 18–23, 25, and 26 would have been obvious in view of Kim and Everett.

We conclude that Petitioner has not met its burden of showing that claim 9 of the '423 patent is unpatentable. Petitioner has not established that the cited art teaches or suggests all the limitations of claim 9.

## IV. MOTIONS FOR PROTECTIVE ORDER AND TO SEAL

Patent Owner's Motion to Enter Protective Order is pending. Paper 23. Patent Owner seeks entry of a Protective Order in the form agreed upon by the parties and submitted as Exhibit 2099. *Id.* at 2. The proposed "Protective Order is based on the Default Protective Order provided in

---

[36] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

Appendix B of the Trial Practice Guide . . . with modifications agreed upon by the parties." *Id.*; (*see also* Consolidated Trial Practice Guide[37] at 107–122 (App. B, Protective Order Guidelines and Default Protective Order)). Patent Owner "also file[d], as Exhibit 2100, a redlined version of the Protective Order highlighting the differences between the Default Protective Order and the modified Protective Order." *Id.* The agreed-to modifications to the Board's Default Protective Order delete provisions providing access to information designated confidential to the parties, in-house counsel, and other employees of a party. *See* Exhibit 2100, 2–3. As the agreed-to modifications do not diminish the access of the Board or the public to information, we deem them acceptable and enter a Protective Order in the form of Exhibit 2099.

There are seven motions to seal pending, Papers 22, 45, 52, 60, 65, 67, 68.[38] Paper 22, filed by Patent Owner, relates to the Response and Exhibits 2010–2030, 2033–2058, and 2063–2067. In this motion to seal, Patent Owner argues good cause exists for sealing the redacted portions of the Response and these exhibits in order to protect "confidential engineering or design information that is unknown to the public and/or . . . designated as confidential under the protective order governing the ITC Investigation." *See* Paper 22, 2. Patent Owner contends:

> The public would have full access to the nature of the information and the conclusions reached using the information as part of [Patent Owner]'s expert testimony and Patent

[37] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

[38] The portions of the Response (Paper 25), Reply (Paper 46), and Sur-reply (Paper 51) requested to be sealed can be identified from the redacted version of the Response filed as Paper 24. Reply filed as Paper 47, and the Sur-reply filed as Paper 53.

> Owner's Response, which remains unsealed, but redacted where appropriate. Such access should adequately fulfill the needs of the public to maintain a complete and understandable file history, while still protecting confidential and proprietary information.

*Id.* Papers 52, 65, and 68 (all filed by Patent Owner) relate to additional filings by Patent Owner and contain similar contentions relating to why good cause for sealing the filings exists. Based on the representations in these motions to seal, Patent Owner has shown good cause for sealing and we grant its motions to seal (Papers 22, 52, 65, 68).

Paper 45, filed by Petitioner, relates to the Petitioner's Reply and Exhibits 1043, 1044, 1047–1053, and 1056. Petitioner argues good cause exists for sealing, because:

> Petitioner's Reply and the exhibits sought to be sealed contain non-public details of Petitioner's and Patent Owner's businesses, including internal information on research and development, sales, marketing, and customer relations. Good cause exists to seal and keep this information confidential because it could impact Petitioner's and Patent Owner's market position if made public.

Paper 45, 4. Papers 60 and 67 (both filed by Petitioner) relate to additional filings by Petitioner and contain similar contentions relating to why good cause for sealing the filings exists. Based on the representations in these motions to seal, Petitioner has shown good cause for sealing and we grant its motions to seal (Papers 45, 60, 67).

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 1–4, 6–8, 10, 12–15, 18–23, 25, and 26 of U.S. Patent 9,884,423 B2 have been shown to be unpatentable;

FURTHER ORDERED that claim 9 of U.S. Patent 9,884,423 B2 has not been shown to be unpatentable;

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2; and

FURTHER ORDERED that a protective order in the form of Exhibit 2099 is entered; the motions to seal (Papers 22, 45, 52, 60, 65, 67, 68) are granted; and the portions of the record requested to be sealed are sealed until further order.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–4, 6–10, 12 | 103 | Jeon, Everett | | 1–4, 6–10, 12 |
| 1–4, 6–10, 12 | 103 | Jeon, Everett, Abramson | 1–4, 6–8, 10, 12 | 9 |
| 9 | 103 | Jeon, Everett, Jones | | 9 |
| 9 | 103 | Jeon, Everett, Abramson, Jones | | 9 |
| 13–15, 18–23, 25, 26 | 103 | Kim, Everett | 13–15, 18–23, 25, 26 | |
| **Overall Outcome** | | | 1–4, 6–8, 10, 12–15, 18–23, 25, 26 | 9 |

FOR PETITIONER:

FOR PATENT OWNER:

US009884423B2

(12) **United States Patent**
**Cohen et al.**

(10) **Patent No.: US 9,884,423 B2**
(45) **Date of Patent: Feb. 6, 2018**

(54) **AUTONOMOUS ROBOT AUTO-DOCKING AND ENERGY MANAGEMENT SYSTEMS AND METHODS**

(71) Applicant: **iRobot Corporation**, Bedford, MA (US)

(72) Inventors: **David A. Cohen**, Brookline, MA (US); **Daniel N. Ozick**, Newton, MA (US); **Clara Vu**, Cambridge, MA (US); **James Lynch**, Georgetown, MA (US); **Philip R. Mass**, Portland, OR (US)

(73) Assignee: **iRobot Corporation**, Bedford, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/491,599**

(22) Filed: **Apr. 19, 2017**

(65) **Prior Publication Data**

US 2017/0217019 A1 Aug. 3, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 15/355,518, filed on Nov. 18, 2016, which is a continuation of application

(Continued)

(51) **Int. Cl.**

***H02J 7/00*** (2006.01)
***B25J 9/16*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ............. ***B25J 9/1664*** (2013.01); ***A47L 9/009*** (2013.01); ***A47L 9/0063*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC ...... H02J 7/0021; H02J 7/0044; H02J 7/0052; A47L 9/0063; A47L 9/2805; B25J 9/1664

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,679,152 A * 7/1987 Perdue .................. B25J 19/005 180/167
5,608,306 A * 3/1997 Rybeck ................ H02J 7/0004 320/106

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1331537 7/2003

OTHER PUBLICATIONS

'Trilobite.electrolux. se' [online]. "Facts on the Trilobite," Retrieved from the Internet at URL http://trilobiteelectroluxse/presskit_en/model11335asp?print=yes&pressID=, Dec. 12, 2003, 2 pages.

(Continued)

*Primary Examiner* — Edward Tso
*Assistant Examiner* — Aaron Piggush
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57) **ABSTRACT**

A method for energy management in a robotic device includes providing a base station for mating with the robotic device, determining a quantity of energy stored in an energy storage unit of the robotic device, and performing a predetermined task based at least in part on the quantity of energy stored. Also disclosed are systems for emitting avoidance signals to prevent inadvertent contact between the robot and the base station, and systems for emitting homing signals to allow the robotic device to accurately dock with the base station.

**26 Claims, 12 Drawing Sheets**



**Related U.S. Application Data**

No. 14/946,999, filed on Nov. 20, 2015, now Pat. No. 9,550,294, which is a continuation of application No. 14/475,984, filed on Sep. 3, 2014, now Pat. No. 9,215,957, which is a continuation of application No. 13/291,633, filed on Nov. 8, 2011, now Pat. No. 8,854,001, which is a continuation of application No. 11/648,230, filed on Dec. 29, 2006, now Pat. No. 8,749,196, which is a division of application No. 10/762,219, filed on Jan. 21, 2004, now Pat. No. 7,332,890.

(51) **Int. Cl.**

| | |
|---|---|
| ***A47L 9/00*** | (2006.01) |
| ***A47L 9/28*** | (2006.01) |
| ***G05D 1/02*** | (2006.01) |
| ***H02J 7/04*** | (2006.01) |
| ***G01S 1/16*** | (2006.01) |
| ***G01S 1/70*** | (2006.01) |
| ***B25J 5/00*** | (2006.01) |
| ***B25J 11/00*** | (2006.01) |
| ***B25J 19/00*** | (2006.01) |
| ***B60L 11/18*** | (2006.01) |

(52) **U.S. Cl.**

CPC ........... ***A47L 9/2805*** (2013.01); ***A47L 9/2852*** (2013.01); ***A47L 9/2857*** (2013.01); ***A47L 9/2873*** (2013.01); ***A47L 9/2889*** (2013.01); ***A47L 9/2894*** (2013.01); ***B25J 5/00*** (2013.01); ***B25J 11/0085*** (2013.01); ***B25J 19/005*** (2013.01); ***B60L 11/1816*** (2013.01); ***G01S 1/16*** (2013.01); ***G01S 1/70*** (2013.01); ***G05D 1/0219*** (2013.01); ***G05D 1/0225*** (2013.01); ***G05D 1/0227*** (2013.01); ***G05D 1/0242*** (2013.01); ***H02J 7/0026*** (2013.01); ***H02J 7/0036*** (2013.01); ***H02J 7/0044*** (2013.01); ***H02J 7/0045*** (2013.01); ***H02J 7/045*** (2013.01); *A47L 2201/02* (2013.01); *A47L 2201/022* (2013.01); *A47L 2201/04* (2013.01); *G05D 2201/0203* (2013.01); *G05D 2201/0208* (2013.01); *G05D 2201/0215* (2013.01); *H02J 7/0052* (2013.01); *Y10S 901/01* (2013.01)

(58) **Field of Classification Search**

USPC .................. 320/104, 107, 109, 134; 701/25; 700/258, 262

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 5,646,494 | A * | 7/1997 | Han | A47L 11/4011 318/587 |
| 5,710,506 | A | 1/1998 | Broell et al. | |
| 5,926,909 | A | 7/1999 | McGee | |
| 5,995,884 | A | 11/1999 | Allen | |
| 6,389,329 | B1 * | 5/2002 | Colens | A47L 5/30 180/167 |
| 6,532,404 | B2 | 3/2003 | Colens | |
| 6,594,844 | B2 | 7/2003 | Jones | |
| 6,690,134 | B1 | 2/2004 | Jones et al. | |
| 6,764,373 | B1 | 7/2004 | Osawa et al. | |
| 6,781,338 | B2 | 8/2004 | Jones et al. | |
| 6,809,490 | B2 | 10/2004 | Jones et al. | |
| 6,859,010 | B2 | 2/2005 | Jeon et al. | |
| 6,883,201 | B2 | 4/2005 | Jones et al. | |
| D510,066 | S | 9/2005 | Hickey et al. | |
| 6,956,348 | B2 | 10/2005 | Landry et al. | |
| 6,957,712 | B2 | 10/2005 | Song et al. | |
| 6,965,209 | B2 | 11/2005 | Jones et al. | |
| 7,024,278 | B2 | 4/2006 | Chiappetta et al. | |
| 7,155,308 | B2 | 12/2006 | Jones | |
| 7,173,391 | B2 | 2/2007 | Jones et al. | |
| 7,196,487 | B2 | 3/2007 | Jones et al. | |
| 7,332,890 | B2 | 2/2008 | Cohen et al. | |
| 7,388,343 | B2 | 6/2008 | Jones et al. | |
| 7,389,156 | B2 | 6/2008 | Ziegler et al. | |
| 7,448,113 | B2 | 11/2008 | Jones et al. | |
| 7,571,511 | B2 | 8/2009 | Jones et al. | |
| 7,636,982 | B2 | 12/2009 | Jones et al. | |
| 7,706,917 | B1 | 4/2010 | Chiappetta et al. | |
| 7,761,954 | B2 | 7/2010 | Ziegler | |
| 8,087,117 | B2 | 1/2012 | Kapoor et al. | |
| 8,386,081 | B2 | 2/2013 | Landry et al. | |
| 9,008,835 | B2 | 4/2015 | Dubrovsky et al. | |
| 8,972,052 | B2 | 5/2015 | Chiappetta | |
| 9,215,957 | B2 | 12/2015 | Cohen | |
| 9,550,294 | B2 | 1/2017 | Cohen et al. | |
| 2002/0016649 | A1 | 2/2002 | Jones | |
| 2002/0120364 | A1 | 8/2002 | Colens | |
| 2003/0025472 | A1 | 2/2003 | Jones et al. | |
| 2004/0020000 | A1 | 2/2004 | Jones | |
| 2004/0049877 | A1 | 3/2004 | Jones et al. | |
| 2004/0187457 | A1 | 9/2004 | Colens | |
| 2004/0207355 | A1 | 10/2004 | Jones et al. | |
| 2005/0067994 | A1 | 3/2005 | Jones et al. | |
| 2005/0204717 | A1 | 9/2005 | Colens | |
| 2007/0266508 | A1 | 11/2007 | Jones et al. | |
| 2008/0140255 | A1 | 6/2008 | Ziegler et al. | |
| 2008/0155768 | A1 | 7/2008 | Ziegler et al. | |
| 2008/0307590 | A1 | 12/2008 | Jones et al. | |
| 2010/0049365 | A1 | 2/2010 | Jones et al. | |
| 2010/0257690 | A1 | 10/2010 | Jones et al. | |
| 2010/0257691 | A1 | 10/2010 | Jones et al. | |
| 2010/0263158 | A1 | 10/2010 | Jones et al. | |
| 2017/0072564 | A1 | 3/2017 | Cohen et al. | |


OTHER PUBLICATIONS


'www.electroluxusa.com' [online]. "Electrolux—Designed for the well-lived home; Welcome to the Electrolux Trilobite," Retrieved from the Internet at URL<http://www.electroluxusa.com/node57.as[?currentURL=nodel42.asp%3F, Mar. 18, 2005, 2 pages.

'www.i4u.com' [online]. Hitachi, News release: "The home cleaning robot of the autonomous movement type (experimental machine)," Retrieved from the Internet at URL <www.i4u.com./japanreleases/hitachirobot.htm, Mar. 18, 2005, 5 pages.

Doty, K. L., and Harrison, R. R., Sweep Strategies for a Sensory-Driven, Behavior-Based Vacuum Cleaning Agent, AAAI 1993 Fall Symposium Series, Instantiating Real-World Agents, Research Triangle Park, Raleigh, NC, Oct. 22-24, 1993, pp. 1-6.

Everett, H.R., "Sensors for Mobile Robots," AK Peters, Ltd., Wellesley, MA, (1995) 543 pages.

Honda Motor Co., Ltd., English Translation of JP11212642, Aug. 9, 1999, 31 pages.

Jones, J., Roth, D., "Robot Programming: A Practical Guide to Behavior-Based Robotics," McGraw-Hill Education Tab (Jan. 2, 2004) 288 pages.

Karcher, "Product Manual Download 'Karch'," available at www.karcher.com, 2004, 16 pages.

Prassler, et al., English Translation of DE19849978, Feb. 8, 2001, 16 pages.

'www.robocleaner.de' [online]. "Karcher RoboCleaner RC 3000," Retrieved from the Internet at URL<www.robocleaner.de/english/screen3.html, Dec. 2003, 4 pages.

'www.karcher-usa.com' [online]. "Karcher USA, RC3000 Robotic Cleaner," Retrieved from the Internet at URL http:// www.karcher-usa.com/showproducts.php?op=viewprod&paraml=143&param2=&param3, Mar. 2005, 3 pages.

Maschinemarkt Wurzburg 105, No. 27, pp. 3, 30, Jul. 5, 1999 (with English translation).


* cited by examiner




FIG. 1




FIG. 2A




FIG. 2B




FIG. 3




FIG. 4A




FIG. 4B




FIG. 4C




FIG. 5


IS SIGNAL DETECTED ?
110
N
Y
100
CHOOSE TURNING DIRECTION
120
TURN UNTIL SIGNAL NOT DETECTED
130
TURN ADDITIONAL 20°
140

FIG. 6A


INCREMENT COUNTER
122
120a
IS COUNTER ODD ?
124
N
Y
SET DIRECTION TO RANDOM
126

FIG. 6B



VACUUM
AVOID BASE
212
DETERMINE ENERGY LEVEL
214
210
200
ABOVE HIGH ?
Y
N
VACUUM
SEEK PASSIVELY
222
SIGNAL DETECTED ?
Y
DOCK & CHARGE
N
220
DETERMINE ENERGY LEVEL
224
ABOVE LOW ?
Y
N
STOP VACUUM
SEEK ACTIVELY
232
230
SIGNAL DETECTED ?
N
Y
DOCK & CHARGE


FIG. 7



MC_CHARGERAVAILABLE
CHGPWR
VPWR
C14
100uF
35V
C75
180
NPO
R121
10K
D15
4.3V
R113
10K
D31
1N5401
25V
Q5
SS8550
R122
10K
Q48
MMBT4401
R123
10K
0.140mv @ 5VDOC
2.2V @ 21VDOC
R224
10K
FDC5614P
U9
60 V. 3A RDS - 0.105 ohms
R222
18K
Q47
MMBT4401
Q45
MMBT4401
C55
180
NPO
R221
2K
C60
180
NPO
R223
27K
R101
2.7K
R116
330
R225
10K
R105
100K
D30
1N5401 3A
D32
1N5401
D23
1N4148
C22
1.0uF
R98
10K
D14
4.3V
C8
4.7uF
D24
1N4148
BASE STATION INPUT
J25
HRS1X2P079R
BI-TVS
50V
D12
BI-TVS
50V
D13
R96
10K
MC_CHARGERON
62Hz PWM
MC_CHARGERWATCHDOG
62Hz
C34
180
NPO
EXTERNAL CHARGER
INPUT
J15
HRS1X2P079R
F1
2.5A
POLYFUSE
MC_PLUGINCHARGERAVAILABLE


FIG. 8





Appx76

# AUTONOMOUS ROBOT AUTO-DOCKING AND ENERGY MANAGEMENT SYSTEMS AND METHODS

This application is a continuation of, and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 15/355,518, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Nov. 18, 2016, which is a continuation of and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 14/946,999, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Nov. 20, 2015, which is a continuation of, and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 14/475,984, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Sep. 3, 2014, which is a continuation of, and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 13/291,633, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Nov. 8, 2011, which is a continuation of, and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 11/648,230, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Dec. 29, 2006, which is a divisional, and claims priority under 35 U.S.C. § 120 from, U.S. application Ser. No. 10/762,219, entitled "Autonomous Robot Auto-Docking and Energy Management Systems and Methods," filed on Jan. 21, 2004. The disclosures of each of these prior applications are considered part of the disclosure of this application and are hereby incorporated by reference in their entireties.

## TECHNICAL FIELD

The present invention relates generally to robotic systems and, more specifically, to auto-docking and energy management systems for autonomous robots.

## BACKGROUND

Automated robots and robotic devices are becoming more prevalent today and are used to perform tasks traditionally considered mundane, time-consuming, or dangerous. As the programming technology increases, so too does the demand for robotic devices that require a minimum of human interaction for tasks such as robot refueling, testing, and servicing. A goal is a robot that could be configured a single time, which would then operate autonomously, without any need for human assistance or intervention.

Robotic devices and associated controls, navigational systems, and other related systems moving in this direction are being developed. For example, U.S. Pat. No. 6,594,844 discloses a Robot Obstacle Detection System, the disclosure of which is hereby incorporated by reference in its entirety. Additional robot control and navigation systems are disclosed in U.S. patent application Ser. Nos. 10/167,851, 10/056,804, 10/696,456, 10/661,835, and 10/320,729 the disclosures of which are hereby incorporated by reference in their entireties.

Generally, autonomous robotic devices include an on-board power unit (usually a battery) that is recharged at a base or docking station. The types of charging stations and methods used by robots in finding or docking with them (e.g., radio signals, dead reckoning, ultrasonic beams, infrared beams coupled with radio signals, etc.) vary greatly in both effectiveness and application. Wires buried below the surface on which the robot operates are common, but are



obviously limited in application, as it is costly to install guide wires within the floor of a building or below a road surface. If installed on the surface, the guide wires may be damaged by the robot itself or other traffic. Moreover, the wires need to be moved when the base station is relocated. A base station that emits a beam or beacon to attract the robotic device is, therefore, more desirable. Such devices, however, still exhibit numerous operational limitations.

Base stations that utilize emitted signals often still require additional safeguards to ensure proper mating between the robot and base station and, therefore, safe and effective charging. Some require mechanical locking devices to prevent dislocation of the robot during charging, or other components such as raised guiding surfaces to direct the robot into contact with the station. Such components can increase the size of the base station while decreasing the aesthetics, important considerations for automated robots directed at the consumer market. An increase in base station size also typically makes unobtrusive placement in the home more difficult and decreases the floor area available for cleaning. Additionally, existing base stations generally lack the ability to protect themselves from contact with the robot during operation, increasing the likelihood of damage to either the station or robot, or dislocation of the base station. Such an unintentional collision may require human intervention to reposition the base station or repair a damaged component.

These limitations are, at present, a hurdle to creating a truly independent autonomous robot, free from human interaction. There is, therefore, a need for a robot and base station that can ensure proper mating regardless of location of the base station. Moreover, a system that can prevent inadvertent dislocation of the base station by eliminating collisions between the station and robot is desirable.

## SUMMARY OF THE INVENTION

In one aspect, the invention relates to a method for energy management in a robotic device, the robotic device including at least one energy storage unit and a signal detector. The method includes the steps of: providing a base station for mating with the robotic device, the base station having a plurality of signal emitters including a first signal emitter and a second signal emitter; determining a quantity of energy stored in the energy storage unit, the quantity characterized at least by a high energy level and a low energy level; and performing, by the robotic device, a predetermined task based at least in part on the quantity of energy stored. In various embodiments of the foregoing aspect, coulometry or setting a time period are used to determine the quantity of energy stored or task period of the device.

In other embodiments of the foregoing aspect, the step of performing the predetermined task occurs when the quantity of energy stored exceeds the high energy level, the predetermined task including movement of the robotic device away from the base station in response to reception, by the signal detector, of a base station avoidance signal. Still other embodiments include the step of returning the robotic device to the base station in response to reception, by the signal detector, of a base station homing signal and/or returning the robotic device to the base station when the quantity of energy stored is less than the high energy level. In other embodiments of the foregoing aspect, the step of returning the robotic device to the base station occurs when the quantity of energy stored is less than the low energy level, and wherein the predetermined task includes a reduction in energy use by the robotic device. Various embodiments

further include altering a travel characteristic of the robotic device to locate effectively the base station, charging the device upon contact, and/or resuming the predetermined or a different task.

In another aspect, the invention relates to a method of docking a robotic device with a base station that has a plurality of signal emitters, including a first signal emitter and a second signal emitter. The method includes the steps of orienting the robotic device in relation to (i) a first signal transmitted by the first signal emitter and (ii) a second signal transmitted by the second signal emitter, and maintaining an orientation of the robotic device relative to the first and second signals as the robotic device approaches to the base station. Certain embodiments of the method of the foregoing aspect include the steps of detecting, by the robotic device, an overlap between the first signal and the second signal; following, by the robotic device, a path defined at least in part by the signal overlap; and docking the robotic device with the base station. Other related embodiments include reducing the velocity of the robotic device in the step of following the path defined at least in part by the signal overlap.

Various embodiments of the method of the foregoing aspect also include, during the step of docking the robotic device with the base station: detecting, by the robotic device, contact with charging terminals on the base station, and stopping movement of the robotic device. In some embodiments, contact of one or more on-board tactile sensors can be used, additionally or alternatively, to stop movement of the robotic device. Other embodiments include the step of charging fully the robotic device and/or charging the robotic device to one of a plurality of charging levels. Certain embodiments allow for resumption of the predetermined task or a new task upon completion of charging.

In another aspect of the invention, the invention relates to an autonomous system including a base station, that includes charging terminals for contacting external terminals of robotic device, and a first signal emitter and a second signal emitter. Certain embodiments of the above aspect provide that the first signal emitter transmit a base station avoidance signal and the second signal emitter transmit a base station homing signal. In other embodiments, the homing signal is a pair of signals, which can be either the same or different. The pair of signals may be emitted by a pair of emitters. In some embodiments, the signals may overlap, and may be optical signals.

Certain embodiments of the above aspect further include a robotic device for performing a predetermined task, the robotic device having at least one energy storage unit with an external terminal for contacting the charging terminal, and at least one signal detector. In certain embodiments, the at least one signal detector is adapted to detect at least one optical signal. The robotic device has, in certain embodiments, the capability to distinguish between the signals generated by multiple emitters.

Still other aspects of the current invention relate to an energy manager including: a robotic device having at least one energy storage unit and a signal detector; a base station for mating with the robotic device, the base station having a plurality of signal emitters including a first signal emitter and a second signal emitter; and a processor for determining a quantity of energy stored in the energy storage unit. Certain embodiments of the foregoing aspect use coulometry or set a time period to determine the quantity of energy stored or task period of the device. In still other embodiments the first signal emitter transmits an avoidance signal, thereby restricting a movement of the robotic device to directions away from the base station, and the second signal emitter transmits a homing signal, thereby directing a movement of the robotic device to the base station.

Other aspects of the invention relate to a homing system including a robotic device having a signal detector, and a base station having a first signal emitter and a second signal emitter. Certain embodiments of the foregoing aspect overlap signals transmitted by the first signal emitter and the second signal emitter. Still other embodiments further include charging terminals on the base station, and charging terminals on the robotic device.

An additional aspect of the invention relates to a homing system for a base station including a first signal emitter that transmits a first signal projected outward from the first signal emitter, and a second signal emitter that transmits a second signal projected outward from the second signal emitter, such that the first signal and the second signal overlap. Another aspect relates to an avoidance system for restricting a movement of at least one of a first device and a second device, the avoidance system including a first device that emits a signal, and a second device that receives the signal, thereby restricting the movement of at least one of the first device and the second device.

Still another aspect of the invention relates to a base station, including a base plate and a backstop, for a robotic device including: electrical contacts located on a top side of the base plate; a first signal emitter located on the backstop wherein a signal transmitted by the first signal emitter restricts the robotic device from moving within a predetermined distance of the base station; and a second signal emitter and a third signal emitter, wherein a plurality of signals transmitted by the second signal emitter and the third signal emitter guide at least one electrical contact of the robotic device to contact the at least one electrical contact of the base station.

Another aspect of the invention relates to a method of charging a battery of a device, the method having the steps of providing low power to charging terminals of a charger, detecting presence of the device by monitoring at least one of a predetermined change in and a predetermined magnitude of a parameter associated with the charger, and increasing power to the charging terminals to charge the battery. One embodiment of the method of the above aspect further includes the steps of determining a level of charge in the device, and permitting charging of the battery in the device when the level of charge is below a predetermined threshold.

Still another aspect of the invention relates to a system for charging a mobile device, the system having: a stationary charger comprising first charging terminals, circuitry for detecting presence of the device by monitoring at least one of a predetermined change in and a predetermined magnitude of a parameter associated with the charger, and a mobile device having: a battery, and second charging terminals adapted to mate with first charging terminals. Various embodiments of the above aspect include systems wherein the circuitry determines a level of charge in the battery and controls a power level provided to the first charging terminals. Still other embodiments include systems wherein the circuitry increases the power level provided to the first charging terminals upon measuring a predetermined voltage across the first charging terminals when mated with the second charging terminal.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. The draw-

ings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. **1** is a schematic perspective view a base station in accordance with one embodiment of the invention;

FIG. **2**A is a schematic perspective view of an robotic device in accordance with one embodiment of the invention;

FIG. **2**B is a schematic side view of the robotic device of FIG. **2**A.

FIG. **3** is a schematic perspective view of a representation of robotic device and base station, depicting an avoidance signal in accordance with one embodiment of the invention transmitted by the base station and detected by the robotic device;

FIGS. **4**A-**4**C are schematic perspective views of representations of homing signals in accordance with one embodiment of the invention transmitted by the base station and detected by the robotic device;

FIG. **5** is a schematic perspective view of the robotic device and the base station in a docking or mating position;

FIGS. **6**A-**6**B are flow charts of avoidance algorithms in accordance with one embodiment of the invention;

FIG. **7** is a flow chart of an energy management algorithm in accordance with one embodiment of the invention; and

FIG. **8** depicts an embodiment of the charger circuitry schematic in accordance with one embodiment of the invention.

## DETAILED DESCRIPTION

FIG. **1** is a schematic perspective view a base station **10** in accordance with one embodiment of the invention. The base station **10** includes both a substantially horizontal base plate **12** and a substantially vertical backstop **14**. The base station **10** may be any of a variety of shapes or sizes, providing sufficient space for the desired components and systems, described below. The base plate **12** is generally parallel to the ground surface on which the base station **10** rests, but may have a slight upwards angle directed toward the backstop **14**. By minimizing the angle of rise of the base plate **12**, the robotic device (FIGS. **2**A-**2**B) may easily dock with the station **10**. Electrical charging contacts **16** are located on a top surface of the base plate **12**, allowing them to contact corresponding contacts (FIG. **2**B) on the underside of the robotic device. The contacts **16** or the contacts on the robot may be either fixed or compliant. In the depicted embodiment, two contacts **16** (one positive, one negative) are utilized to properly detect a completed circuit when the robot **40** docks with the base station **10**. This circuit recognition sequence is described in more detail below. In other embodiments, however, a single contact **16** or more than two contacts may be utilized. An additional contact would provide redundancy in the event that one of the robot contacts becomes damaged, dirty, or obstructed. This would allow the robot to dock and recharge itself properly, even after such an occurrence. Other embodiments utilize two contacts **16** to charge the battery and additional contacts to transmit data and information between the devices.

The contacts **16** are sized and positioned to reliably and repeatably contact the corresponding contacts on the robot. For example, the contacts **16** may be oversized and/or may extend above the base plate **12**, e.g., in a domed shape, to ensure contact with the robot contacts. Alternatively, the contacts **16** may be flush-mounted on a base plate **12** with a higher angle of rise or may protrude above a base plate **12** that is flat or has substantially no rise. Depending on the application, the base plate **12** angle of rise may vary from 0° to up to 20° and greater. The embodiment depicted in FIG. **1** also includes a depression **26** in the base plate **12**, between the two contacts **16**, sized to engage a front caster (FIG. **2**B) of the robot. The depression **26**, in combination with the configuration of the charging contacts **16**, ensures proper alignment and registration between the charging contacts on both the base station **10** and the robot. Alternatively, the depression **26** may contain one or more of the contacts **16** arranged to mate with one or more corresponding contacts on the front caster of the robot.

The backstop **14** provides locations for many of the base station **10** components. Specifically, in the depicted embodiment, the backstop **14** includes a top signal emitter **18**, a front signal emitter **20**, several indicator LEDs **22**, and an AC plug receptacle **24**. The top signal emitter **18** generates a first signal, such as an avoidance signal (FIG. **3**), in a diffuse region near the base station **10** to prevent generally the robot from coming into inadvertent direct contact with the base station **10** while performing a task, such as vacuuming. The top signal emitter **18** generally utilizes a parabolic reflector to transmit the avoidance signal. In such an embodiment, the avoidance signal is emitted by a single LED directed at a lens whose geometry is determined by rotating a parabola about its focus. This parabolic reflector thus projects the avoidance signal **60** out in a 360° pattern, without the necessity of multiple emitters. A similar configuration can be employed in the detector on the robot, with a single receiver used in place of the single LED.

While the location of the top signal emitter **18** may vary, locating the emitter **18** on top of the backstop **14** transmits the avoidance signal through an uninterrupted 360° field around the base station **10**. Alternatively, base stations designed for corner, on-wall, or near-wall installation may project the avoidance signal substantially only along the unobstructed side. The front signal emitter **20** projects one or more additional signals, such as homing beams (FIGS. **4**A-**4**C), to allow the robotic device to orient itself during docking with the base station **10** for recharging or during periods of non-use. Naturally, if properly located on the base station **10**, a single emitter may be used to perform the functions of both emitters **18**, **20**. Both the avoidance signal and homing beams are described in more detail below.

FIGS. **2**A-**2**B are schematic perspective views of a robotic device, such as an autonomous robot **40** adapted to mate with the base station **10**. In the following description of the autonomous robot **40**, use of the terminology "forward/fore" refers generally to the primary direction of motion of the robot **40**, and the terminology fore-aft axis (see reference characters "FA" in FIG. **2**A) defines the forward direction of motion (indicated by arrowhead of the fore-aft axis FA), which is coincident with the fore-aft diameter of the robot **40**.

In the embodiment depicted, the housing infrastructure **42** of the robot **40** includes a chassis **44**, a cover **46**, and a displaceable bumper **48**. The chassis **44** may be molded from a material such as plastic as a unitary element that includes a plurality of preformed wells, recesses, and structural members for, inter alia, mounting or integrating elements of the various subsystems that operate the robotic device **40**. Such subsystems may include a microprocessor, a power subsystem (including one or more power sources for the various subsystems and components), a motive subsystem, a sensor subsystem, and task-specific component subsystems. The cover **46** may be molded from a material such as plastic as a unitary element that is complementary in

configuration with the chassis **44** and provides protection of and access to elements and components mounted to the chassis **44**. The chassis **44** and the cover **46** are detachably integrated in combination by any suitable means (e.g., screws), and in combination, the chassis **44** and cover **46** form a structural envelope of minimal height having a generally cylindrical configuration that is generally symmetrical along the fore-aft axis FA.

The displaceable bumper **48**, which has a generally arcuate configuration, is mounted in movable combination at the forward portion of the chassis **44** to extend outwardly therefrom (the "normal operating position"). The mounting configuration of the displaceable bumper **48** is such that it is displaced towards the chassis **44** (from the normal operating position) whenever the bumper **48** encounters a stationary object or obstacle of predetermined mass (the "displaced position"), and returns to the normal operating position when contact with the stationary object or obstacle is terminated (due to operation of a control sequence which, in response to any such displacement of the bumper **48**, implements a "bounce" mode that causes the robot **40** to evade the stationary object or obstacle and continue its task routine).

Mounted on the robotic device **40** are a pair of detectors **50**, **52**. In this embodiment of the robotic device **40**, the detectors **50**, **52** receive signals projected from the emitters **18**, **20** on the base station **10**. In other embodiments, a single detector receives signals from both emitters **18**, **20** on the base station **10**, or more than two detectors may be used. In certain embodiments, the detectors **50**, **52** are standard infrared ("IR") detector modules, that include a photodiode and related amplification and detection circuitry, in conjunction with an omni-directional lens, where omni-directional refers to a substantially single plane. The IR detector module can be of the type manufactured by East Dynamic Corporation (p/n IRM-8601S). However, any detector, regardless of modulation or peak detection wavelength, can be used as long as the emitters **18**, **20** on the base station **10** are adapted to match the detectors **50**, **52** on the robot **40**. In another embodiment, IR phototransistors may be used with or without electronic amplification elements and may be connected directly to the analog inputs of a microprocessor, Signal processing may then be used to measure the intensity of IR light at the robot **40**, which provides an estimate of the distance between the robot **40** and the source of IR light. Alternatively, radio frequencies, magnetic fields, and ultrasonic sensors and transducers may be employed. As shown in FIGS. **2**A-**2**B, at least one detector **50** is mounted at the highest point on the robot **40** and toward the front of the robot **40** as defined by the primary traveling direction, as indicated by an arrow on axis FA.

While the detector **50** is mounted at the highest point of the robot **40** in order to avoid shadows, it is desirable in certain applications to minimize the height of the robot **40** and/or the detector **50** to prevent operational difficulties and to allow the robot **40** to pass under obstacles. In certain embodiments, the detector **50** can be spring-mounted to allow the detector **50** to collapse into the body of the robot **40** when the robot **40** runs under a solid overhanging object.

One of skill in the art will recognize that, in alternative embodiments, multiple detectors can be used. Such an embodiment might include using multiple side-mounted sensors or detectors. Each of the sensors can be oriented in a manner so that a collective field of view of all the sensors corresponds to that of the single, top mounted sensor. Because a single, omni-directional detector is mounted at the highest point of the robot for optimal performance, it is possible to lower the profile of the robot by incorporating multiple, side mounted detectors.

The undercarriage of the robotic device **40** is indicated generally by numeral **54**. One or more charging contacts are present in the undercarriage **54**, configured in such a location to correspond with the location of the electrical contacts. **16** of the base station **10**. Generally, the charging contacts on the robotic device mirror those present on the base station **10**, regardless of their location or orientation. In certain embodiments, the charging contacts may be larger on either the base station **10** or robot **40**, to allow wider compliance in making contact. Also, the motive and task specific components of the robot **40** are located in the undercarriage **54**. The motive components may include any combination of motors, wheels, drive shafts, or tracks as desired, based on cost or intended application of the robot **40**, all of which are well known in the art. The motive components may include at least one caster **56** which, in this embodiment, drives the robot **40** and mates with the depression **26** on the base plate **12**. As the tasks to which the robotic device **40** is suited are virtually unlimited, so too are the components to perform those tasks. For example, the robotic device **40** may be used for floor waxing and polishing, floor scrubbing, ice resurfacing (as typically performed by equipment manufactured under the brand name Zamboni®), sweeping and vacuuming, unfinished floor sanding and stain/paint application, ice melting and snow removal, grass cutting, etc. Any number of components may be required for such tasks, and may each be incorporated into the robotic device **40**, as necessary. For simplicity, this application will describe vacuuming as the demonstrative predetermined task. It will be apparent, though, that the energy management and auto-docking functions disclosed herein have wide application across a variety, of robotic systems.

The robotic device **40** uses a variety of behavioral modes to vacuum effectively a working area. Behavioral modes are layers of control systems that can be operated in parallel. The microprocessor is operative to execute a prioritized arbitration scheme to identify and implement one or more dominant behavioral modes for any given scenario, based upon inputs from the sensor system. The microprocessor is also operative to coordinate avoidance, homing, and docking maneuvers with the base station **10**.

Generally, the behavioral modes for the described robotic device **40** can be characterized as: (1) coverage behavioral modes; (2) escape behavioral modes; and (3) safety behavioral modes. Coverage behavioral modes are primarily designed to allow the robotic device **40** to perform its operations in an efficient and effective manner, while the escape and safety behavioral modes are priority behavioral modes implemented when a signal from the sensor system indicates that normal operation of the robotic device **40** is impaired (e.g., obstacle encountered), or is likely to be impaired (e.g., drop-off detected).

Representative and illustrative coverage behavioral modes (for vacuuming) for the robotic device **40** include: (1) a Spot Coverage pattern; (2) an Obstacle-Following (or Edge-Cleaning) Coverage pattern, and (3) a Room Coverage pattern. The Spot Coverage pattern causes the robotic device **40** to clean a limited area within the defined working area, e.g., a high-traffic area. In a certain embodiments the Spot Coverage pattern is implemented by means of a spiral algorithm (but other types of self-bounded area algorithms, such as polygonal, can be used). The spiral algorithm, which causes outward or inward spiraling movement of the robotic device **40**, is implemented by control signals from the microprocessor to the motive system to change the turn

radius/radii thereof as a function of time or distance traveled (thereby increasing/decreasing the spiral movement pattern of the robotic device **40**).

The robotic device **40** is operated in the Spot Coverage pattern for a predetermined or random period of time, for a predetermined or random distance (e.g., a maximum spiral distance) and/or until the occurrence of a specified event, e.g., activation of one or more of the obstacle detection systems (collectively a transition condition). Once a transition condition occurs, the robotic device **40** can implement or transition to a different behavioral mode, e.g., a Straight Line behavioral mode (in one embodiment of the robotic device **40**, the Straight Line behavioral mode is a low priority, default behavior that propels the robot in an approximately straight line at a preset velocity of approximately 0.306 m/s) or a Bounce behavioral mode in combination with a Straight Line behavioral mode. The Bounce behavioral mode is a basic function that allows the robot **40** to evade a stationary object or obstacle and continue its task routine. Avoidance is achieved by executing a series of turns until the obstacle is no longer detected (i.e., the bumper **48** is no longer compressed).

If the transition condition is the result of the robotic device **40** encountering an obstacle, the robotic device **40** can take other actions in lieu of transitioning to a different behavioral mode. The robotic device **40** can momentarily implement a behavioral mode to avoid or escape the obstacle and resume operation under control of the spiral algorithm (i.e., continue spiraling in the same direction). Alternatively, the robotic device **40** can momentarily implement a behavioral mode to avoid or escape the obstacle and resume operation under control of the spiral algorithm (but in the opposite direction—reflective spiraling).

The Obstacle-Following Coverage pattern causes the robotic device **40** to clean the perimeter of the defined working area, e.g., a room bounded by walls, and/or the perimeter of an obstacle (e.g., furniture) within the defined working area. Preferably, the robotic device **40** utilizes an obstacle-following system to continuously maintain its position with respect to an obstacle, such as a wall or a piece of furniture, so that the motion of the robotic device **40** causes it to travel adjacent to and concomitantly clean along the perimeter of the obstacle. Different embodiments of the obstacle-following system can be used to implement the Obstacle-Following behavioral pattern.

In certain embodiments, the obstacle-following system is operated to detect the presence or absence of the obstacle. In an alternative embodiment, the obstacle-following system is operated to detect an obstacle and then maintain a predetermined distance between the obstacle and the robotic device **40**. In the first embodiment, the microprocessor is operative, in response to signals from the obstacle-following system, to implement small clockwise or counterclockwise turns to maintain its position with respect to the obstacle. The robotic device **40** implements a small clockwise turn when the robotic device **40** transitions from obstacle detection to non-detection (reflection to non-reflection) or to implement a small counterclockwise turn when the robotic device **40** transitions from non-detection to detection (non-reflection to reflection). Similar turning behaviors are implemented by the robotic device **40** to maintain the predetermined distance from the obstacle.

The robotic device **40** is operated in the Obstacle-Following behavioral mode for a predetermined or random period of time, for a predetermined or random distance (e.g., a maximum or minimum distance) and/or until the occurrence of a specified event, e.g., activation of one or more of the obstacle detection system a predetermined number of times (collectively a transition condition). In certain embodiments, the microprocessor will cause the robotic device **40** to implement an Align behavioral mode upon activation of the obstacle-detection system in the Obstacle-Following behavioral mode, wherein the robot **40** implements a minimum angle counterclockwise turn to align the robotic device **40** with the obstacle.

The Room coverage pattern can be used by the robotic device **40** to clean any defined working area that is bounded by walls, stairs, obstacles or other barriers (e.g., a virtual wall unit that prevents the robotic device **40** from passing through an otherwise unbounded zone). Certain embodiments of the Room Coverage pattern include the Random-Bounce behavioral mode in combination with the Straight Line behavioral mode. Initially, the robotic device **40** travels under control of the Straight-Line behavioral mode (wheels operating at the same rotational speed in the same direction) until an obstacle is encountered. The obstacle may be indicated by physical contact with a wall or detection of the base station avoidance signal. Upon activation of one or more of the obstacle detection system, the microprocessor is operative to compute an acceptable range of new directions based upon the obstacle detection system activated. The microprocessor selects a new heading from within the acceptable range and implements a clockwise or counterclockwise turn to achieve the new heading with minimal movement. In some embodiments, the new turn heading may be followed by forward movement to increase the cleaning efficiency of the robotic device **40**. The new heading may be randomly selected across the acceptable range of headings, or based upon some statistical selection scheme, such as Gaussian distribution. In other embodiments of the Room Coverage behavioral mode, the microprocessing unit can be programmed to change headings randomly or at predetermined times, without input from the sensor system.

The robotic device **40** is operated in the Room Coverage behavioral mode for a predetermined or random period of time, for a predetermined or random distance (e.g., a maximum or minimum distance) and/or until the occurrence of a specified event, e.g., activation of the obstacle-detection system a predetermined number of times (collectively a transition condition).

Certain embodiments of the robotic device **40** include four escape behavioral modes: a Turn behavioral mode, an Edge behavioral mode, a Wheel Drop behavioral mode, and a Slow behavioral mode. One skilled in the art will appreciate that other behavioral modes can be utilized by the robotic device **40**. One or more of these behavioral modes may be implemented, for example, in response to a current rise in one of the task components (indicating some sort of interference), the forward bumper **48** being in compressed position for determined time period, or detection of a wheel-drop event.

In the Turn behavioral mode, the robotic device **40** turns in place in a random direction, starting at higher velocity (e.g., twice normal turning velocity) and decreasing to a lower velocity (one-half normal turning velocity), i.e., small panic turns and large panic turns, respectively. Low panic turns are preferably in the range of 45° to 90°, large, panic turns are preferably in the range of 90° to 270°. The Turn behavioral mode prevents the robotic device **40** from becoming stuck on surface impediments (e.g., high spot on carpet), from becoming stuck under other obstacles (e.g., an overhang), or from becoming trapped in a confined area.

In the Edge behavioral mode, the robotic device **40** follows the edge of an obstacle unit it has turned through a

predetermined number of degrees, without activation of any of the obstacle detection units, or until the robotic device **40** has turned through a predetermined number of degrees, since initiation of the Edge behavioral mode. The Edge behavioral mode allows the robotic device **40** to move through the smallest possible opening to escape from confined areas.

In the Wheel Drop behavioral mode, the microprocessor reverses the direction of the main wheel drive assemblies momentarily, then stops them. If the activated wheel drop sensor deactivates within a predetermined time, the microprocessor then reimplements the behavioral mode that was being executed prior to the activation of the wheel drop sensor.

In response to certain events, e.g., activation of a wheel drop sensor or a cliff detector, the Slow behavioral mode is implemented to slow down the robotic device **40** for a predetermined distance and then ramp back up to its normal operating speed.

When a safety condition is detected by the sensor subsystem, e.g., a series of task component or wheel stalls that cause the corresponding electric motors to be temporarily cycled off, or a wheel drop sensor or a cliff detection sensor activated for greater that a predetermined period of time, the robotic device **40** is generally cycled to an off state. In addition, an audible alarm may be generated.

The foregoing description of typical behavioral modes for the robotic device **40** are intended to be representative of the types of operating modes that can be implemented by the robotic device **40**. One skilled in the art will appreciate that the behavioral modes described above can be implemented in other combinations and other modes can be defined to achieve a desired result in a particular application.

A navigational control system may be used advantageously in combination with the robotic device **40** to enhance the cleaning efficiency thereof, by adding a deterministic component (in the form of a control signal that controls the movement of the robotic device **40**) to the motion algorithms, including random motion, autonomously implemented by the robotic device **40**. The navigational control system operates under the direction of a navigation control algorithm. The navigation control algorithm includes a definition of a predetermined triggering event.

Broadly described, the navigational control system, under the direction of the navigation control algorithm, monitors the movement activity of the robotic device **40**. In one embodiment, the monitored movement activity is defined in terms of the "position history" of the robotic device **40**, as described in further detail below. In another embodiment, the monitored movement activity is defined in terms of the "instantaneous position" of the robotic device **40**.

The predetermined triggering event is a specific occurrence or condition in the movement activity of the robotic device **40**. Upon the realization of the predetermined triggering event, the navigational control system operates to generate and communicate a control signal to the robotic device **40**. In response to the control signal, the robotic device **40** operates to implement or execute a conduct prescribed by the control signal, i.e., the prescribed conduct. This prescribed conduct represents a deterministic component of the movement activity of the robotic device **40**.

While the robotic device **40** is vacuuming, it will periodically approach the stationary base station **10**. Contact with the base station **10** could damage or move the base station into an area that would make docking impossible. Therefore, avoidance functionality is desirable. To avoid inadvertent contact, the base station **10** may generate an avoidance signal **60**, as depicted in FIG. **3**. The avoidance signal **60** is shown being transmitted from the emitter **18** on the top of the backstop **14**. The radial range of the avoidance signal **60** from the base station **10** may vary, depending on predefined factory settings, user settings, or other considerations. At a minimum, the avoidance signal **60** need only project a distance sufficient to protect the base station **10** from unintentional contact with the robot **40**. The avoidance signal **60** range can extend from beyond the periphery of the base station **10**, to up to and beyond several feet from the base station **10**, depending on the application.

Here, the avoidance signal **60** is depicted as an omnidirectional. (i.e., single plane) infrared beam, although other signals are contemplated, such as a plurality of single stationary beams or signals. If stationary beams are used, however, a sufficient number could provide adequate coverage around the base station **10** to increase the chances of the robotic device **40** encountering them. When the detector **50** of the robotic device **40** receives the avoidance signal **60** from the emitter **18**, the robotic device **40** can alter its course, as required, to avoid the base station **10**. Alternatively, if the robotic device. **40** is actively or passively seeking the base station **10** (for recharging or other docking purposes), it can alter its course toward the base station **10**, such as by circling the base station **10**, in such a way to increase the chances of encountering the homing signals described with respect to FIGS. **4A-48** below.

In certain embodiments, a collimated IR emitter is used, such as Waitrony p/n IE-320H. Because of potential interference from sunlight and other IR sources, most IR devices, such as remote controls, personal digital assistants and other IR communication devices, emit signals that may be modulated. Herein, the emitters **18**, **20** modulate the beams at 38 kHz. In an embodiment of the present invention, additional modulation of the beams at a frequency, far example 500 Hz, different from the frequency of common IR bit streams, prevents interference with other IR equipment. Generally, the avoidance signal **60** is coded, as are the homing signals **62**, **64**. The bit encoding method as well as binary codes are selected such that the robot **40** can detect the presence of each signal, even if the robot **40** receives multiple codes simultaneously.

Whenever a measurable level of IR radiation from the avoidance signal **60** strikes the detector **50**, the robot's IR avoidance behavior is triggered. In one embodiment, this behavior causes the robot **40** to spin in place to the left until the IR signal falls below detectable levels. The robot **40** then resumes its previous motion. Spinning left is desired in certain systems because, by convention, the robot may attempt to keep all objects to its right during following operations. The robot's avoidance behavior is consistent with its other behaviors if it spins left on detecting the avoidance signal **60**. In one embodiment, the detector **50** acts as a gradient detector. When the robot **40** encounters a region of higher IR intensity, the robot **40** spins in place. Because the detector **50** is mounted at the front of the robot **40** and because the robot **40** does not move backward, the detector **50** always "sees" the increasing IR intensity before other parts of the robot **40**. Thus, spinning in place causes the detector **50** to move to a region of decreased intensity. When the robot **40** next moves forward, it necessarily moves to a region of decreased IR intensity—away from the avoidance signal **60**.

In other embodiments, the base station **10** includes multiple coded emitters at different power levels or emitters that vary their power level using a system of time multiplexing. These create concentric coded signal rings which enable the

robot **40** to navigate towards the base station **10** from far away in the room. Thus, the robot **40** would be aware of the presence of the base station **10** at all times, facilitating locating the base station **10**, docking, determining how much of the room has been cleaned, etc. Alternatively, the robot **40** uses its motion through the IR field to measure a gradient of IR energy. When the sign of the gradient is negative (i.e., the detected energy is decreasing with motion), the robot **40** goes straight (away from the IR source). When the sign of the gradient is positive (energy increasing), the robot **40** turns. The net effect is to implement a "gradient descent algorithm," with the robot **40** escaping from the source of the avoidance signal **60**. This gradient method may also be used to seek the source of emitted signals. The concentric rings at varying power levels facilitate this possibility even without a means for determination of the raw signal strength.

A flowchart of one embodiment of the control logic of the avoidance behavior **100** is shown in FIG. **6**A. The robot **40** determines whether the signal **110** detected by the detector **50** is an avoidance signal **60**. If an avoidance signal **60** is detected, the robot **40** chooses a turning direction **120**. The robot **40** then begins to turn in the chosen direction until the avoidance signal **60** is no longer detected **130**. Once the avoidance signal **60** is no longer detected, the robot **40** continues turning for an additional amount **140**, such as 20°, or the robot may turn randomly between 0° and 135°.

While in flowchart step **120**, the direction selection algorithm **120***a*, illustrated in the flowchart shown in FIG. **6**B, is used. The robot's control logic keeps track of the robot's discrete interactions with the beam. The robot **40** first increments a counter by one **122**. On odd numbered interactions, the robot **40** chooses a new turning direction randomly **124**, **126**; on even numbered interactions, the robot **40** again uses its most recent turning direction. In the alternative, the robot **40** may choose which direction to turn at random. It will continue to turn in that direction until it has moved a sufficient distance.

In other embodiments, the robot **40** can always turn in a single direction or choose a direction randomly. When the robot **40** always turns in one direction, it may get stuck in a loop by turning away from the beam, bumping into another obstacle in a room, turning back toward the beam, seeing the beam again, turning away, bumping again, ad infinitum. Moreover, when the robot **40** only turns in a single direction, it consequently may fail to vacuum certain areas of the floor. Thus, where the robot's task is to complete work evenly throughout a room, a single turning direction may not be optimal. If the direction is chosen purely randomly, the robot **40** may turn back and forth often, as it encounters the beam.

Again referring to FIG. **6**A, in the embodiment of step **140**, the robot **40** turns an additional 20° from the point at which the avoidance signal **60** is lost. The arc of the turn can be varied for the particular robot **40** and application. The additional turn helps to prevent the robot **40** from re-encountering the avoidance signal **60** immediately after first encountering it. For various applications, the amount of additional movement (linear or turning) can be a predetermined distance, angle or time, or in the alternative may include a random component. In still other embodiments, the robot's avoidance behavior may include reversing the robot's direction until the avoidance signal **60** is no longer detected, or as described above, the robot may turn randomly between 0° and 135° after losing the avoidance signal **60**.

FIGS. **4**A-**4**C depict the robotic device **40** in various stages of seeking the base station **10** by using the homing signals **62**, **64**. The robotic device **40** may seek the base station **10** when it detects the need to recharge its battery, or when it has completed vacuuming the room. As described above, once the robotic device **40** detects the presence of the avoidance signal **60** (and therefore the base station **10**), it can move as required to detect the homing signals **62**, **64**. As with the avoidance signal **60** above, the projected range and orientation of the homing signals **62**, **64** may be varied, as desired. It should be noted however, that longer signals can increase the chance of the robot **40** finding the base station **10** efficiently. Longer signals can also be useful if the robotic device **40** is deployed in a particularly large room, where locating the base station **10** randomly could be inordinately time consuming. Horning signal **62**, **64** ranges that extend from approximately six inches beyond the front of the base plate **12**, to up to and beyond several feet beyond the base plate **12** are contemplated, depending on application. Naturally, the angular width of the homing signals **62**, **64** may vary depending on application, but angular widths in the range of 5° to up to and beyond 60° are contemplated. A gradient behavior as described above can also be used to aid the robot in seeking out the base station.

In addition to operating as navigational beacons, horning signals **62**, **64** (and even the avoidance signal **60**) may also be used to transmit information, including programming data, fail safe and diagnostic information, docking control data and information, maintenance and control sequences, etc. In such an embodiment, the signals can provide the control information, dictating the robot's reactions, as opposed to the robot **40** taking certain actions upon contacting certain signals from the base station **10**. In that case, the robot **40** functions as more of a slave to the base station **10**, operating as directed by the signals sent.

The robot **40** performs its docking with the base station **10** accurately and repeatably, without the need for gross mechanical guidance features. The two homing signals **62**, **64** are distinguishable by the robotic device, for example as a red signal **62** and a green signal **64**. IR beams are generally used to produce the signals and, as such, are not visible. The color distinction is given for illustrative purposes only, and any "color" (i.e., signal bit pattern) may be used, provided the robotic device **40** recognizes which signal to orient a particular side. Alternatively, the signals **62**, **64** may be distinguished by using different wavelengths or by using different carrier frequencies (e.g., 380 kHz versus 38 kHz, etc.).

Thus, when the robotic device **40** wants or needs to dock, if the detector **50** receives the red signal **62** transmitting from the base station **10**, it moves to keep the red signal **62** on the robot's right side; if it detects the green signal **64** transmitting from the base station **10**, it moves to keep the green signal **64** on the robot's left side. Where the two signals overlap (the "yellow" zone **66**), the robot **40** knows that the base station **10** is nearby and may then dock. Such a system may be optimized to make the yellow zone **66** as thin as practicably possible, to ensure proper orientation and approach of the robot **40** and successful docking. Alternatively, the red signal **62** and green signal **64** may be replaced by a single signal, which the robot **40** would follow until docked.

FIGS. **4**A-**4**C depict, at various stages, a docking procedure utilizing two signals. In FIG. **4**A, the detector **50** is in the green or left signal **64** field, and thus the robotic device **40** will move towards the right, in direction $M_R$ in an effort to keep that green signal **64** to the left of the robot **40** (in actuality, the robot **40** moves to keep the green signal **64** to the left of the detector **50**). Similarly, in FIG. **48**, the detector **50** is in the red or right signal **62** field, and thus the robotic

device **40** will move towards the left, in direction $M_L$ in an effort to keep that red signal **64** to the right of the detector **50**. Last, in FIG. **4**C, the detector **50** has encountered yellow zone **66**. At this point, the robotic device **40** will move in direction $M_F$ directly towards the base station **10**. While approaching the base station **10**, the robotic device **40** may slow its speed of approach and/or discontinue vacuuming, or perform other functions to ensure trouble-free docking. These operations may occur when the robot **40** detects the avoidance signal **60**, thus recognizing that it is close to the base station **10**, or at some other predetermined time, e.g., upon a change in the signal from the emitters **62**, **64**.

Various methods are contemplated for ensuring that the robot **40** correctly docks with base station **10**. For example, the robot **40** can continue to move toward the base station **10** (within the yellow zone **66**) until the bumper **48** is depressed, signaling the robot **40** that it has contacted the base station **10**. Another embodiment overlaps the homing signals **62**, **64** such that the yellow zone **66** terminates at a point calibrated such that the robot **40** will contact the charging contacts **16** upon reaching the termination point. Other embodiments simply stop the robot **40** when its electrical contacts touch the electrical contacts **16** on the base station **10**. This would guarantee that the robot **40** is moving over the contacts **16**, providing a wiping action that cleans the contacts **16** and improves the electrical integrity of the connection. This also enables the base station **10** to be lighter, since it does not have to resist the force necessary to depress the robot's bumper a FIG. **5** shows the robotic device **40** completely docked with the base station **10**. Naturally, this procedure may also utilize detector **52** or a combination of both detectors.

While this embodiment of the invention describes use of IR signals for both avoidance and homing, the system and method of the present invention can use other signals to accomplish the goals. Other types of waves may have drawbacks, however. For example, radio waves are more difficult and expensive to make directional, and visible light suffers from interference from many sources and may be distracting to users. Sound waves could also be used, but it is similarly difficult to make sound purely directional and such waves tend to scatter and reflect more.

FIG. **7** depicts a schematic diagram which shows the control sequence **200** of the robotic device **40** during vacuuming. Generally, the control sequence **200** includes three subsequences based on the measured energy level of the robotic device **40**. Those are referenced generally as a high energy level **210**, a medium energy level **220**, and a low energy level **230**. In the high energy level subsequence **210**, the robotic device **40** performs its predetermined task, in this case, vacuuming (utilizing various behavioral modes as described above), while avoiding the base station **212**. When avoiding the base station **212**, the robotic device **40** performs its avoidance behavior and continues to operate normally. This process continues while the robotic device **40** continually monitors its energy level **214**. Various methods are available to monitor the energy level **214** of the power source, such as coulometry (i.e., the measuring of current constantly entering and leaving the power source), or simply measuring voltage remaining in the power source. Other embodiments of the robotic device **40** may simply employ a timer and a look-up table stored in memory to determine how long the robotic device **40** can operate before it enters a different energy level subsequence. Still other embodiments may simply operate the robot **40** for a predetermined time period before recharging, without determining which energy level subsequence it is operating in. If the robot **40** operates on a liquid or gaseous fuel, this level may also be measured with devices currently known in the art.

Once the energy remaining drops below a predetermined high level, the robot **40** enters its medium energy level sequence **220**. The robot **40** continues to vacuum and monitor its energy level **224**, employing methods indicated in step **214** above. In the medium energy level **220**, however, the robot **40** "passively seeks" **222** the base station **10**. While passively seeking **222** the base station **10**, the robot **40** does not alter its travel characteristics; rather, it continues about its normal behavioral mode until it fortuitously detects the avoidance signal **60** or a homing signal **62**, **64**, each of which may be followed until the robot **40** ultimately docks with the base station **10**. In other words, if the robot detects the avoidance signal **60** while passively seeking **222**, rather than avoiding the base station **10** as it normally would, it alters its travel characteristics until it detects the homing signals **62** or **64**, thus allowing it to dock.

Alternatively, the robot **40** continues operating in this medium energy level subsequence **220** until it registers an energy level **224** below a predetermined low level. At this point, the robot **40** enters the low level subsequence **230**, characterized by a change in operation and travel characteristics. To conserve energy, the robot **40** may discontinue powering all incidental systems, and operations, such as vacuuming, allowing it to conserve as much energy as possible for "actively searching" **232** for the base station **10**. While actively searching **232**, the robot **40** may alter its travel characteristics to increase its chances of finding the base station **10**. It may discontinue behavioral modes such as those employing a spiral movement, which do not necessarily create a higher chance of locating the base station, in favor of more deliberate modes, such as wall-following. This deliberate seeking will continue until the robot **40** detects the presence of the base station **10**, either by detecting the avoidance signal **60** or the homing signals **62**, **64**. Clearly, additional subsequences may be incorporated which sound alarms when the power remaining reaches a critical level, or which reconstruct the route the robot **40** has taken since last contacting the base station **10** to aid in relocating the station **10**.

The robot **40** may also dock because it has determined that ft has completed its assigned task (e.g., vacuuming a room). The robot **40** may make this determination based on a variety of factors, including considerations regarding room size, total run time, total distance traveled, dirt sensing, etc. Alternatively, the robot may employ room-mapping programs, using the base station **10** and/or walls and large objects as points of reference. Upon determining that it has completed its task, the robot **40** will alter its travel characteristics in order to find the base station **10** quickly.

Once the robot **40** contacts the base station **10**, it can recharge itself autonomously. Circuitry within the base station **10** detects the presence of the robot **40** and then switches on the charging voltage to its contacts **16**. The robot **40** then detects the presence of the charging voltage and then switches on its internal transistor power switch to allow current flow into the battery. In one embodiment, the base station **10** contains a constant-current type switching charger. Maximum current is limited to approximately 1.25 amps even under a short circuit condition. Maximum unloaded terminal voltage is limited to approximately 22Vdc. This constant-current charging circuit is used to charge the battery in the robot **40** via the electrical connections provided by the contacts **16** on the base station **10** and those on the undercarriage **54** of the robot **40**. One embodiment of this charging sequence is detailed below.

Generally, while the robot **40** is away from the base station **10**, the charging contacts **16** will present five volts, limited to 1 mA maximum short circuit current flow. This low voltage/low current "sense" condition limits the amount of available energy at the contacts **16**, thus rendering them safe in the event they are contacted by humans, animals, and electrically conductive objects. The contacts on the undercarriage **54** of the robot **40**, when contacting the contacts **16** on the base station **10**, present a precise resistive load that, along with a resistor in the base station **10**, creates a high impedance voltage divider. A microprocessor that constantly monitors the voltage across the contacts **16** recognizes this lower voltage. This voltage divider creates a specific voltage, plus or minus a known tolerance. When the microprocessor determines that the voltage has fallen into the specific range, it detects that the robot **40** is present. The microprocessor then turns on a transistor switch that delivers a higher voltage/current charge (capable of charging the robot's internal battery) to the charging contacts **16**. Alternatively, the robot **40** and/or base station **10** can verify the integrity of the charging circuit by sending signals through the IR beams, thereby confirming that the robot **40** has, in fact, docked.

FIG. **8** depicts an embodiment of the charger circuitry schematic. With five volts being presented by the base station, it is the job of resistor dividers R101 and R116 to hold Q48 and Q5 off when J25 is in contact with the initial low voltage state. This divider also provides the known impedance of R101 plus R116 in parallel with R224 plus the base-emitter diode drop of Q48. This Thevenin impedance is in series with a resistor in the docking station thus forming a voltage divider. A window comparator circuit within the docking station looks for a specific voltage created by the divider. Once the base station has determined this impedance is likely the robot (not some other conductive body), it then delivers the full 22 volt capable, 1.25 Amp charging voltage to the robot.

At the onset of this higher voltage, the divider of R101 and R224 are such that the requirements are met to turn on Q48 and Q5 respectively. It is this combination of transistors that then allows current to flow to the on-board robot electronics only, allowing the robot's processor to become active if in fact it was inoperative due to a depleted battery.

Once operative, the robot's processor is then able to detect the presence of the base station voltage via R113 and D15 and if driving, turn off its drive motors. Once stable on the charging contacts, it becomes the job of the robot processor to measure the internal robot battery and decide when and what type of charging control cycle is needed when allowing current to flow into the battery. For example, if the battery is at 12 volts, then it is acceptable to turn on Q45 and Q47 via processor control, in order to allow current to flow through FET U9 to the battery on a continuous basis.

If, however, the battery voltage is deemed less than 5 volts, it generally would not be desirable to allow the full current to flow to the battery on a continuous basis. The reason this condition is of concern lies in the fact that the power source within the DOC is a constant current charger, which will adjust its output voltage to be slightly higher than the battery voltage in order to flow 1.25 A into the battery. In some cases, this might be millivolts higher than the battery voltage itself and in the case of the battery at low voltage, for example, 3 volts, would cause the output voltage to drop below the necessary 5 volt level needed to operate the on board base station and robot electronics suite.

In this case, the robot processor then delivers a pulse width modulation to the charger control line pertaining to Q47, such that the energy storage capacitors in both the robot and base station maintain enough charge to keep their respective electronics working properly throughout the charge pulse. The energy storage capacitors are then replenished during the off time of the pulse width modulation charging cycle, ready to then sustain the next charge pulse. This scenario continues until the battery has been charged to the point where a continuous charge is no longer able to bring the supply voltage down to a critical level and the charge control can become a static level.

Since this pulse width modulation process in this embodiment relies on software control, health monitoring of the processor, both within the base station and robot, are important. The requirement then set fourth for charging is for a charger "watchdog" be incorporated via Q45 such that a static high or low state on this signal line will disable current flow into the battery. It is a requirement of the robot processor to continuously pulse this control line in order for any current to flow, therefore eliminating most cases of processor latch up due to electrostatic discharge or other battery related events from mistreating the charging profile. Naturally, other control and related fail safe schemes could be utilized.

The described charging sequence provides particular safety features, even though the charging contacts **16** are exposed and energized. Because a specific resistance is required to create a specific voltage drop across the contacts **16** when the 5-volt sense voltage is present to when the robot **40** is not docked) there is no danger of electric shock due to accidental contact because the low sense current is harmless. Also, the base station **10** will never switch to the higher voltage/current level, because the sense current has not entered the predetermined range. When the base station **10** does determine that the robot **40** is present, it delivers the charging voltage/current. This charging current is limited to approximately 22 volts/1.25 amps maximum. Even if inadvertent contact occurred during delivery of the charging current—which is unlikely, since the robot chassis **44** effectively blocks the contacts **16**—the voltage delivered would not present a serious shock hazard, as it is relatively low.

Another level of safety is afforded by the base station **10** checking for the robot **40** at regular intervals, from as little as once per minute to as much as 10 times per second or more. Thus, in the event that the robot **40** is dislodged from the base station **10** (either by an animal or human), the charging current could be shut down immediately. This same condition applies if the contacts **16** are short circuited with the robot **40** docked (either intentionally or accidentally, for example, if the robot **40** drags debris onto the charging contacts **16**).

An additional safety feature of this charging sequence prevents overheating of contacts **16** due to intentional shorting or oxidation. A thermal circuit breaker or similar device can be employed to perform this task, as well as a microprocessor equipped with a temperature measuring subroutine. The circuit breaker, however, provides the advantage of controlling contact temperature in the event of a microprocessor or software failure. Additionally, the base station **10** circuitry can also incorporate a timer to reset the temperature measuring subroutine or circuit breaker in the event of system failure. These safety controls may be incorporated into the "watchdog" described above.

While docked with the base station **10**, the robot **40** can also perform other maintenance or diagnostic checks. In certain embodiments, the robot **40** can completely recharge its power source or only partially charge it, based on various factors. For example, if the robot **40** determines, through the

use of route-tracking subroutines, that only a small portion of the room still requires vacuuming, it may take only a minimal charge before returning to complete cleaning of the room. If, however, the robot **40** requires a full charge before returning to clean the room, that option is also available. If the robot **40** has completed its vacuuming of the room prior to docking, it may dock, fully recharge, and stand by to await a signal (either internal or external) to begin its next cleaning cycle. While in this stand-by mode, the robot **40** may continue to measure its energy levels and may begin charging sequences upon reaching an energy level below a predetermined amount. Alternatively, the robot **40** may maintain a constant or near-constant trickle charge to keep its energy levels at or near peak. Other behaviors while in the docking position such as diagnostic functions, internal mechanism cleaning communication with a network, or data manipulation functions may also be performed.

While there have been described herein what are to be considered exemplary and preferred embodiments of the present invention, other modifications of the invention will become apparent to those skilled in the art from the teachings herein. The particular methods of manufacture and geometries disclosed herein are exemplary in nature and are not to be considered limiting. It is therefore desired to be secured in the appended claims all such modifications as fall within the spirit and scope of the invention. Accordingly, what is desired to be secured by Letters Patent is the invention as defined and differentiated in the following claims.

What is claimed is:

**1**. A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a right signal emitter and a left signal emitter, the method comprising:

directing the robotic cleaning device about a room at a first velocity;

detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;

controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;

detecting contact with charging terminals on the base station;

stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station; and

charging a battery of the robotic cleaning device.

**2**. The method of claim **1**, further comprising:

detecting a presence of the robotic cleaning device at the charging terminals on the base station using a first non-charging sensing current level, and

providing a second charging current level upon detecting the presence of the robotic cleaning device at the charging terminals.

**3**. The method of claim **1**, further comprising:

detecting an energy level of the battery of the robotic cleaning device, and

seeking, by the robotic cleaning device, the right signal and the left signal when the energy level of the battery is less than a predetermined energy level.

**4**. The method of claim **3**, further comprising stopping, by the robotic cleaning device, a task when the energy level of the battery is below the predetermined energy level while seeking the right signal and the left signal.

**5**. The method of claim **4**, further comprising resuming, by the robotic cleaning device, the task upon completion of charging of the battery.

**6**. The method of claim **3**, further comprising altering a movement characteristic of the robotic cleaning device in seeking the right signal and the left signal.

**7**. The method of claim **1**, further comprising alternately moving the robotic cleaning device rightward to position the left signal to a left of the robotic cleaning device, and leftward to position the right signal to a right of the robotic cleaning device.

**8**. The method of claim **1**, further comprising recognizing the left signal as being different from the right signal by detecting a difference in at least one of carrier frequencies, modulations, bit patterns, or wavelengths of the right signal and the left signal.

**9**. The method of claim **1**, further comprising avoiding, by the robotic cleaning device, the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level.

**10**. The method of claim **1**, wherein the sensor is an omnidirectional sensor.

**11**. The method of claim **1**, wherein charging the battery of the robotic cleaning device comprises only partially charging the battery of the robotic cleaning device prior to departure from the base station.

**12**. The method of claim **1**, wherein controlling the forward movement of the robotic cleaning device toward the base station at the reduced second velocity comprises initiating the forward movement at the second velocity in response to detecting the right signal or the left signal.

**13**. An autonomous cleaning robot, comprising:

an undercarriage;

a motive system configured to propel the undercarriage;

an energy storage unit configured to be charged while the cleaning robot is positioned at a base charging station; and

a navigational control system configured to autonomously:

control the motive system to direct the cleaning robot about a room at a first velocity;

control forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity before completing a cleaning task in the room and in response to detecting a need to charge the energy storage unit;

stop the forward movement of the cleaning robot to dock the cleaning robot to the base charging station;

charge the energy storage unit with the cleaning robot docked at the base charging station; and

control the motive system to direct the cleaning robot to continue to clean the room at the first velocity.

**14**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to track a cleaning route of the cleaning robot and monitor an amount of the room remaining to be cleaned.

**15**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to direct the cleaning robot to a portion of the room still requiring cleaning following charging the energy storage unit.

**16**. The autonomous cleaning robot of claim **13**, wherein the cleaning robot is configured to control charging at the

base charging station by only partially charging the energy storage unit before leaving the base charging station to continue cleaning the room.

**17**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to direct the cleaning robot to leave the base charging station and continue to clean the room upon determining that the energy storage unit has reached an amount of charge needed to complete the cleaning task in the room.

**18**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to return the cleaning robot to the base charging station before completing the cleaning task in the room in response to a level of energy remaining in the energy storage unit falling to a predetermined threshold.

**19**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to control the forward movement of the cleaning robot toward the base charging station at the second velocity while orienting the cleaning robot relative to one or more signals emitted by the base charging station.

**20**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to initiate the forward movement of the cleaning robot toward the base charging station at the second velocity in response to detecting a signal emitted by the base charging station.

**21**. An autonomous cleaning robot, comprising:

an undercarriage;

a motive system configured to propel the undercarriage;

an energy storage until supported by the undercarriage and configured to be charged while the cleaning robot is positioned at a base charging station; and

a navigational control system configured to autonomously:

control the motive system to direct the cleaning robot about a room at a first velocity;



control forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity in response to detecting a need to charge the energy storage unit;

stop the forward movement of the cleaning robot to dock the cleaning robot to the base charging station; and

charge the energy storage with the cleaning robot docked at the base charging station.

**22**. The autonomous cleaning robot of claim **21**, wherein the navigational control system is configured to track a cleaning route of the cleaning robot and monitor an amount of the room remaining to be cleaned.

**23**. The autonomous cleaning robot of claim **21**, wherein the navigational control system is configured to direct the cleaning robot to a portion of the room still requiring cleaning following charging the energy storage unit.

**24**. The autonomous cleaning robot of claim **21**, wherein the cleaning robot is configured to control charging at the base charging station by only partially charging the energy storage unit before leaving the base charging station to continue cleaning the room.

**25**. The autonomous cleaning robot of claim **13**, wherein the navigational control system is configured to control the forward movement of the cleaning robot toward the base charging station at the second velocity while orienting the cleaning robot relative to one or more signals emitted by the base charging station.

**26**. The autonomous cleaning robot of claim **21**, wherein the navigational control system is configured to initiate the forward movement of the cleaning robot toward the base charging station at the second velocity in response to detecting a signal emitted by the base charging station.

* * * * *

## CERTIFICATE OF SERVICE AND FILING

I certify that on April 28, 2023, I electronically filed the foregoing **NON-CONFIDENTIAL OPENING BRIEF** of Appellant iRobot Corporation using the Court's CM/ECF filing system. Counsel for appellees were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The **NON-CONFIDENTIAL OPENING BRIEF** of Appellant is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The **NON-CONFIDENTIAL OPENING BRIEF** contains 13,949 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.

Dated: April 28, 2023

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## CERTIFICATE OF CONFIDENTIAL INFORMATION

Appellant iRobot Corporation's **NON-CONFIDENTIAL OPENING BRIEF** complies with Federal Circuit Rule 25.1(d)'s limitations on the amount of material that can be marked confidential in motions, responses, replies, or briefs. The Addendum to this Opening Brief contains confidential information. No material has been redacted from the text of the Opening Brief.

Dated: April 28, 2023

*/s/ Lauren A. Degnan*
Lauren A. Degnan