Appeal Nos. 2023-1398, -1416

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

**IROBOT CORPORATION**
*Appellant*,

v.

**SHARKNINJA OPERATING LLC, SHARKNINJA MANAGEMENT LLC, SHARKNINJA SALES COMPANY,**
*Cross-Appellants*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2021-00544

# PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS SHARKNINJA OPERATING LLC, SHARKNINJA MANAGEMENT LLC, SHARKNINJA SALES COMPANY

Daniel C. Tucker
Michael V. Young
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2793

ERIKA H. ARNER
LUKE MCCAMMON
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413
(202) 408-4000

July 21, 2023

*Counsel for Cross-Appellants*

## Exemplary Claims

1. A method of docking a robotic cleaning device with a base station that includes a plurality of signal emitters including a right signal emitter and a left signal emitter, the method comprising:

directing the robotic cleaning device about a room at a first velocity;

detecting, by a sensor mounted on the robotic cleaning device, a right signal transmitted by the right signal emitter of the base station and a left signal transmitted by the left signal emitter of the base station;

controlling forward movement of the robotic cleaning device toward the base station at a second velocity less than the first velocity while orienting the robotic cleaning device in relation to the right signal and the left signal;

detecting contact with charging terminals on the base station;

stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station; and

charging a battery of the robotic cleaning device.

9. The method of claim 1, further comprising avoiding, by the robotic cleaning device, the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level.

Appx86 19:32-52, 20:20-24.

## CERTIFICATE OF INTEREST

**Case Number** 23-1398, 23-1416

**Short Case Caption** iRobot Corporation v. SharkNinja Operating LLC

**Filing Party/Entity** SharkNinja Operating LLC, SharkNinja Management LLC, SharkNinja Sales Company

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: July 21, 2023 Signature: /s/ Erika H. Arner

Name: Erika H. Arner

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ☐ None/Not Applicable | ☐ None/Not Applicable | ☐ None/Not Applicable |
| SharkNinja Operating LLC | JS Global Lifestyle Co. Ltd. | EP Midco LLC |
| SharkNinja Management LLC | JS Global Lifestyle Co. Ltd. | SharkNinja Operating LLC |
| SharkNinja Sales Company | JS Global Lifestyle Co. Ltd. | SharkNinja Operating LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Abhay A. Watwe | Trenton Ward | Jency J. Mathew |
| Doris Johnson Hines | Kai Rajan | Brady Nash |
| Jia W. Lu | Brian A. Rosenthal<br>Gibson, Dunn & Crutcher LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS


STATEMENT OF RELATED CASES .......... x

JURISDICTIONAL STATEMENT .......... 1

I. PRELIMINARY STATEMENT .......... 2

II. STATEMENT OF THE ISSUES .......... 4

III. STATEMENT OF THE CASE .......... 5

A. The ’423 Patent .......... 5

B. Background Related to iRobot’s Conception Arguments for Claims 1-4, 6-8, 10, and 12 .......... 8

1. Briefing and Evidence .......... 8

a. Source Code File (user.tl) .......... 9

b. Roomba 2 System Design Strategies Document .......... 12

2. Oral Hearing .......... 14

3. Post-Hearing Briefing .......... 15

4. The Board’s Final Written Decision .......... 16

C. Background Related to iRobot’s Arguments Regarding Obviousness of Claims 13-15, 18-23, 25, and 26 .......... 20

D. Background Related to SharkNinja’s Cross Appeal Regarding Claim 9 .......... 23

IV. SUMMARY OF THE ARGUMENT .......... 28

V. ARGUMENT .......... 30

A. Standard of Review .......... 30

B. The Court Should Affirm the Board’s Judgment that iRobot Failed to Establish Conception of Claims 1, 3, 4, 6-8, and 12 Before the Filing Dates of Jeon and Abramson .......... 32

1. Substantial Evidence Supports the Board's Determination that the Evidence Did not Establish Earlier Conception ....................32

a. Substantial Evidence Supports the Board's Finding that iRobot's Evidence Failed to Corroborate Earlier Conception of Claim 1 ....................32

b. Substantial Evidence Supports the Board's Finding that Inventor Testimony Failed to Show Conception of the Claimed Invention ....................43

2. Evidence that iRobot Relies on For the First Time on Appeal to Show Conception of the Disputed Elements of Claim 1 Does Not Support Its Argument ....................46

3. The Board Properly Analyzed the Issue of Conception ....................49

4. SharkNinja Did Not Make New Arguments at the Oral Hearing ....................52

C. The Court Should Affirm the Board's Judgment as to Claims 13-15, 18-23, 25, and 26 Because Substantial Evidence Supports the Board's Findings Regarding Motivation to Combine and Objective Evidence of Nonobviousness ....................54

1. Substantial Evidence Supports the Board's Determination that It Would Have Been Obvious to Combine Kim and Everett ....................55

2. Substantial Evidence Supports the Board's Determination that iRobot Failed to Establish a Nexus to the Claimed Invention ....................60

a. Substantial Evidence Supports the Board's Determination that iRobot Failed to Establish It Is Entitled to a Presumption of a Nexus ....................60

b. Substantial Evidence Supports the Board's Determination that iRobot's Alleged Objective Evidence Bears No Nexus to the Claimed Features ....................66

3. iRobot's Objective Evidence Argument Does Not Overcome the Strong Obviousness Case ..... 68

D. Cross Appeal – The Board Committed Two Legal Errors in Holding that SharkNinja Had Not Proven Claim 9 to Be Obvious Based on the Prior Art ..... 69

1. For the First Set of Grounds, the Board Erred by Narrowly Construing "Avoiding . . . the Right Signal and the Left Signal" ..... 70

2. For the Second Set of Grounds, the Board Erred in Determining that Jeon and Jones Do Not Render Obvious Claim 9 ..... 73

VI. CONCLUSION ..... 76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
25 F.4th 1354 (Fed. Cir. 2022) ....................31

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................58

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ....................75

*Bosch Auto. Serv. Sols., LLC v. Matal*,
878 F.3d 1027 (Fed. Cir. 2017) ....................31

*Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003) ....................43

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................63

*Eaton v. Evans*,
204 F.3d 1094 (Fed. Cir. 2000) ....................30

*Field v. Knowles*,
183 F.2d 593 (CCPA 1950) ....................36

*Fox Factory, Inc. v. SRAM, LLC*,
944 F.3d 1366 (Fed. Cir. 2019) .................... *passim*

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .................... 71-72

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) ....................59

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................30

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ....................31, 75

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................................................................72

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ..............................................................30, 32, 49

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ....................................................................60

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
903 F.3d 1365 (Fed. Cir. 2018) ..................................................................30

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ..............................................................55, 58, 67

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ..............................................................59, 75, 76

*Paice LLC v. Ford Motor Co.*,
881 F.3d 894 (Fed. Cir. 2018) ....................................................................58

*Parus Holdings, Inc. v. Google LLC*,
70 F.4th 1365 (Fed. Cir. 2023) ..................................................................47

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..................................................................69

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ..................................................................60

*Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*,
625 F. App'x 552 (Fed. Cir. 2015) ..............................................................54

*Quanergy Sys. Inc. v. Velodyne Lidar USA, Inc.*,
24 F.4th 1406 (Fed. Cir. 2022) ..................................................................31

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ..................................................................67

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015) ....................................................................30

*REG Synthetic Fuels, LLC v. Neste Oil Oyj*,
841 F.3d 954 (Fed. Cir. 2016) ....................2, 44, 49

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ....................47, 48

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................*passim*

*Therasense, Inc. v. Becton, Dickinson & Co.*,
593 F.3d 1289 (Fed. Cir. 2010) ....................65

*Tokai Corp. v. Easton Enters., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) .................... 66-67

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ....................47, 48

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
626 F.3d 1361 (Fed. Cir. 2010) ....................69

*Yeda Rsch. v. Mylan Pharms. Inc.*,
906 F.3d 1031 (Fed. Cir. 2018) ....................54

**Statutes**

5 U.S.C. § 706(2) ....................30, 31

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 141(c) ....................1

## STATEMENT OF RELATED CASES

Counsel for SharkNinja Operating LLC, SharkNinja Management LLC, and SharkNinja Sales Company ("SharkNinja") hereby certifies that no other appeal from the same proceeding in the United States Patent and Trademark Office, Patent Trial and Appeal Board ("Board"), is or was previously before this Court or another appellate court, whether under the same or similar title.

The Court's decision in this appeal may affect or be affected by the following cases:

- *iRobot Corp. v. SharkNinja Operating LLC et. al.*, Case No. 1:21-cv-10155 (D. Mass.) (currently stayed).
- *SharkNinja Operating LLC v. ITC*, Case No. 2023-2162 (Fed. Cir.), which is an appeal from *In the Matter of Certain Robotic Floor Cleaning Devices and Components Thereof*, Inv. No. 337-TA-1252 (Int'l Trade Comm'n).

## JURISDICTIONAL STATEMENT

The United States Patent and Trademark Office, Patent Trial and Appeal Board ("Board"), issued its final written decision in IPR2021-00544 regarding U.S. Patent No. 9,884,423 ("the '423 patent") on November 14, 2022. Appx1-62. iRobot timely appealed on January 12, 2023. SharkNinja timely appealed on January 13, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## I. PRELIMINARY STATEMENT

The Board correctly determined that iRobot's evidence of conception omitted key claim limitations. Independent claim 1 requires "*detecting contact with charging terminals* on the base station" and "stopping the forward movement of the robotic cleaning device *in response to detecting contact with the charging terminals* on the base station." Appx86 19:47-51 (emphases added). iRobot's evidence was silent regarding detecting contact with charging terminals or stopping the robot based on such detection. Instead, it demonstrated that, at best, the inventors had conceived of a way to detect when a *bumper* on the robot contacts the base station. iRobot's evidence thus fell short of the requirement that "[c]onception must include *every feature or limitation* of the claimed invention." *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) (emphasis added).

In rejecting iRobot's conception arguments, the Board made two key factual findings, both of which are supported by substantial evidence. First, the Board considered iRobot's inventor testimony and determined that it did "not specifically show conception of detecting contact with the charging terminals or stopping movement of the robot in response to detecting contact with the charging terminals." Appx20; Appx14-17. Second, the Board considered iRobot's corroborating evidence and determined that it was similarly deficient: "[iRobot's testimony] is not corroborated by independent evidence of conception of the relevant elements of the

claimed invention." Appx20; Appx17-20. iRobot does not even mention many of the Board's findings related to corroboration, which is fatal to its appeal. Because substantial evidence supports both factual findings, the Court should affirm the Board's determination that iRobot failed to demonstrate earlier conception and the Board's conclusion that claims 1-4, 6-8, and 12 would have been obvious.

iRobot's conception arguments do not apply to claims 13-15, 18-23, 25, and 26. For these claims, iRobot challenges two of the Board's other factual findings: (1) that one skilled in the art would have been motivated to combine Kim and Everett; and (2) that iRobot failed to demonstrate a nexus between its objective evidence and its claims. The record belies iRobot's argument that the Board performed a "cursory" analysis, engaged in "hindsight," or required the objective evidence to "mimic the [claim] language." Blue33-34. The Board took a methodical approach to both factual issues, agreed with SharkNinja's arguments and evidence, and rejected iRobot's responses. Appx54-58; Appx27-34. Substantial evidence supports both findings, so the Court should affirm the Board's determination that claims 13-15, 18-23, 25, and 26 are unpatentable.

The Board's sole errors occurred in its analysis of claim 9. There, the Board committed separate legal errors in rejecting each of SharkNinja's two alternative grounds for invalidity. Regarding the first grounds, the Board erroneously construed "avoiding . . . the right signal and the left signal" in a way that is inconsistent with

iRobot's previous admissions and limits the claims based on preferred embodiments that are not directed to the claimed subject matter. Once the Board's construction is corrected, there can be no dispute that the prior art in SharkNinja's first grounds teaches this limitation. Regarding the second grounds, the Board erred in ignoring key pieces of SharkNinja's argument and evidence and failing to articulate its own reasoning with sufficient clarity. This provides an independent reason to at least vacate the Board's decision regarding claim 9.

## II. STATEMENT OF THE ISSUES

1. Did the Board correctly determine that iRobot failed to demonstrate earlier conception of claims 1, 3, 4, 6-8, and 12, where substantial evidence supports the Board's findings that (a) the inventors' testimony did not address key limitations of independent claim 1; and (b) iRobot failed to corroborate the inventors' testimony regarding those same claim limitations?

2. Did the Board correctly determine that claims 13-15, 18-23, 25, and 26 are unpatentable where substantial evidence supports the Board's findings that (a) one skilled in the art would have been motivated to combine Kim and Everett as proposed in SharkNinja's petition; and (b) iRobot failed to demonstrate a nexus between its objective evidence and its claims?

3. Did the Board err in finding that claim 9 was not unpatentable when (a) its analysis of SharkNinja's first grounds was premised on an unduly narrow

construction of the phrase "avoiding . . . the right signal and the left signal"; and (b) its analysis of SharkNinja's alternative grounds ignored SharkNinja's evidence and argument and did not adequately explain its reasoning?

## III. STATEMENT OF THE CASE

### A. The '423 Patent

The '423 patent is directed to a mobile robot that seeks a base station and docks to recharge its battery. Appx63 Abstract; Appx78 3:5-22; Appx83 13:65-14:2. Examples of a robot (left) and base station (right) are shown below:



FIG. 2A



FIG. 1

Appx65-66 Figs. 2A (left), 1 (right). The base station includes electrical charging contacts 16 located on top of base plate 12, which allows them to contact corresponding contacts on the underside of the robot. Appx79 5:44-47. The robot also includes a bumper 48 on the forward portion of the chassis. Appx80 7:9-15. The

bumper can be depressed when the robot contacts an object, allowing the robot to react to that contact. Appx80 7:9-23; Appx84 15:14-18.

To assist the robot with orienting itself in relation to the dock, the base station can also include an emitter 20 to emit a left or green signal field 64 and a right or red signal field 62 (also referred to as "homing signals"), as shown below. Appx79 6:37-41; Appx83 13:65-67; Appx83-84 14:60-15:5.




FIG. 4C

Appx71 Fig. 4C. If the robot's detector 50 is in the left signal field 64, it will move right. Appx83 14:61-66. If it is in the right signal field 62, it will move left. Appx83-84 14:66-15:3. And if the robot detects that it is in the overlapping yellow zone 66, as shown above, it will move toward the base station. Appx84 15:3-5.

The '423 patent explains that "[v]arious methods are contemplated for ensuring that the robot 40 correctly docks with base station 10," and it describes three distinct alternatives for doing so:

> (1) "the robot 40 can continue to move toward the base station 10 (within the yellow zone 66) until the bumper 48 is depressed, signaling the robot 40 that it has contacted the base station 10";
>
> (2) "Another embodiment overlaps the homing signals 62, 64 such that the yellow zone 66 terminates at a point calibrated such that the robot 40 will contact the charging contacts 16 upon reaching the termination point"; and
>
> (3) "Other embodiments simply stop the robot 40 when its electrical contacts touch the electrical contacts 16 on the base station 10."

Appx84 15:13-24. Claim 1 of the '423 patent claims the third alternative, reciting [1d] "detecting contact with charging terminals on the base station" and [1e][1] "stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station." Appx86 claim 1.

The '423 patent further explains how the system can detect contact with the charging contacts:

> The contacts on the undercarriage 54 of the robot 40, when contacting the contacts 16 on the base station 10, present a precise resistive load that, along with a resistor in the base station 10, creates a high impedance voltage divider.

[1] iRobot refers to these limitations as [1d] and [1e], respectively. *See* Blue38.

> A microprocessor that constantly monitors the voltage across the contacts 16 recognizes this lower voltage. . . . When the microprocessor determines that the voltage has fallen into the specific range, it detects that the robot 40 is present.

Appx85 17:7-16.

### B. Background Related to iRobot's Conception Arguments for Claims 1-4, 6-8, 10, and 12

#### 1. Briefing and Evidence

SharkNinja petitioned the Board, asserting the following obviousness grounds against the '423 patent's claims:

| Grounds | Claims | References |
|---|---|---|
| 1A/1B | 1-4, 6-10, 12 | Jeon in view of: Everett (1A) or Everett and Abramson (1B) |
| 2A/2B | 9 | Jeon in view of: Everett and Jones (2A) or Everett, Abramson, and Jones (2B) |
| 3 | 13-15-18-23, 25, 26 | Samsung-Kim in view of Everett |

Appx99.

In response to Grounds 1A/1B, iRobot argued that Jeon[2] and Abramson[3] were not prior art because the inventors had conceived of claims 1, 3, 4, 6-8, and 12 before

[2] Jeon is U.S. Patent Publication No. 2004/0178767, filed on June 23, 2003. Appx780.

[3] Abramson is U.S. Patent Publication No. 2005/0010330, filed on July 11, 2003. Appx1350.

June 23, 2003. Appx292-293. In support of its arguments, iRobot submitted declarations from certain witnesses, including two inventors, and certain documentation. Regarding claim 1's limitations [1d] and [1e], iRobot's patent owner response relied on the testimony of two inventors, Ms. Clara Vu and Mr. Daniel Ozick; testimony of its expert, Dr. Richard Hooper; and cited only two documents as corroborating evidence: (1) a source code file ("user.tl") and (2) a "Roomba 2 System Design Strategies" document. Appx303.[4]

#### a. Source Code File (user.tl)

Ms. Vu, one of the inventors, testified at her deposition that the robot controlled by the produced source code did not have charging contacts, and that it stopped in response to detecting that the bump sensor was pressed:

> Q. And the purpose of this behavior is to control the robot when it reached the dock, right?
>
> A. . . . So our early prototypes of these algorithms, the earliest ones were actually done just with two virtual walls next to each other and there was other prototype hardware in between. So *the way that that hardware at the time knew when to stop was from the bump sensor. We didn't yet have the charging contacts*. . . .

[4] Although iRobot's opening brief relies on additional documents, iRobot previously relied on only these two documents and three declarations for the relevant limitations. *See* Appx303; *see also infra* Section V.B.2.

> Q. So looking at this source code file then, *the robot is stopping in response to the bumper being pressed* and the robot seeing both buoys, right?
>
> . . . .
>
> [A.] . . . *Yeah*, this behavior triggers when those two conditions are met that you have a bump sensor and you have the buoys.

Appx4759-4760 84:12-85:25 (emphases added). iRobot relied on this testimony and stated that it applied to "the code files saved prior to June 23, 2003" (the purported conception date). Appx406; Appx292-293. Consistent with Ms. Vu's deposition testimony, her declaration stated that the user.tl source code file would determine if the robot was "electrically connected" to a battery charger but made no mention of detecting charging contacts. Appx7416 ¶27.

The relevant portion of the source code is shown below.

```
33. (define-behavior (user-charge
34.                   :start-when (charger-available?)
35.                   :onetime? t )
36.
37.   (set-robot-state charging)
38.   (stop-all)
```

Appx6735-6736 ll.33-38.

Mr. Ozick, another inventor, testified that the "user-charge" behavior is initiated "depending on whether a charger is available" based on the function "charger-available?". Appx7449-7450 ¶27. Based on the output of that function, the

robot may stop. *Id.* While Mr. Ozick testified that this behavior would be activated if the robot was connected to the charging contacts, *id.*, at his deposition he admitted that the file does not explain how the charger-available function works:

> Q. [T]he charger-available macro or function isn't defined in this user.tl file, right? . . . .
>
> A. . . . No, it's not defined here.
>
> Q. And because it's not defined, this file doesn't explain how the charger-available macro or function works, right?
>
> A. Correct.

Appx4391 80:9-22.

In a previous deposition,[5] Mr. Ozick similarly testified that he could not determine the operation of the behavior based on the available code because he "would have to look at the definition of charger-available?," Appx5135-5136 115:3-116:3, which iRobot never produced. Simply put, Mr. Ozick testified that without the definition or other parts of the code, "I don't have the context" to understand the function's operation. *Id.* In Ms. Vu's prior ITC deposition, she was likewise unable

[5] This deposition was taken in the copending ITC Investigation involving the parties, *Certain Robotic Floor Cleaning Devices and Components Thereof*, Inv. No. 337-TA-1252. Appx5021.

to describe the operation of the undefined function beyond "guess[ing], from the name of that function," that it "has something to do with . . . when there is charge available to the battery." Appx4919-4920 122:22-123:5.

Finally, iRobot's expert, Dr. Hooper, also testified regarding the source code file. Appx6648 ¶56. His testimony was similar to that of Ms. Vu and Mr. Ozick, and he did not provide the definition for "charger-available?" that Mr. Ozick admitted was necessary to determine its operation. *Id.*

**b. Roomba 2 System Design Strategies Document**

iRobot also relied on a Roomba 2 System Design Strategies document, the pertinent portion of which is excerpted below.

> 1.4. Dock at the charger
>
> This depends on the mechanical configuration of the charger. A logic input tells the robot when the external charger is available (that is, when good contact has been made).

Appx6765. In their previous ITC depositions, neither Ms. Vu nor Mr. Ozick recognized this document. Appx4927-4928 130:25-131:13; Appx4802 5:16-18 Appx5086-5087 66:19-67:11; Appx5024 4:20. In their IPR declarations, Ms. Vu and Mr. Ozick provided identical testimony and merely quoted portions of the document, stating that the excerpts were "representative of some of the ideas to achieve auto-docking processes on the Roomba 2." Appx7422 ¶¶41-42; Appx7456 ¶¶41-42.

Mr. Matt Cross also testified regarding this document. He was a senior lead software engineer at iRobot who worked on the Roomba 2 project with Mr. Ozick

and Ms. Vu. Appx7499-7500 ¶¶5-6. At his deposition, Mr. Cross agreed that the System Design document did not explain how the robot determined that contact was made with the charger and acknowledged it could be based on bumper contact:

> Q. . . . Section 1.4, doesn't detail any particular way for the robot to know when contact is made with the charger, right?
>
> . . . .
>
> A. . . . It states there's a logic input but doesn't state what drives that.
>
> . . .
>
> Q. It states there's a logic input and also states that it depends on the mechanical configuration of the charger, right?
>
> A. Yes.
>
> Q. So depending on the mechanical configuration of the charger, contact could be made if the bumper is pressed, right?
>
> A. Yes.

Appx4267-4268 28:9-29:1.

Finally, While Ms. Vu and Dr. Hooper testified that they believed the described "contact" referred to electrical contact, neither witness identified anything

in the document that discussed *how* the robot determined that contact had been made. Appx4743-4745 68:12-70:18; Appx3961-3962 42:10-43:18.

### 2. Oral Hearing

At the Oral Hearing, iRobot's attorney admitted that iRobot did not have source code detecting charging contacts:

> [The inventors] didn't have charging contacts at the relevant time so they didn't have software code detecting those contacts. You couldn't write software code because the hardware was behind and it didn't exist at the time.

Appx503 75:12-16. iRobot's counsel also acknowledged that iRobot had not provided code to show how the "charger-available?" function was defined:

> Petitioner made, you know, a big deal that we can't produce what that charge available code is.
>
> We've given you everything we can find. You know, I'm not sure that that code existed or where it was located or, you know, where it was from. But it wasn't -- we didn't have detailed code from 19 years ago on that one specific feature.

Appx480-481 52:20-53:12.

iRobot's counsel also acknowledged that the '423 patent discloses three distinct embodiments and iRobot had implemented a different embodiment than what was claimed:

> You have clear disclosure in the patent of three examples, just three, three embodiments, and one being detecting charging contacts.
>
> So, you know, we've heard a lot about Ms. Vu's testimony and how Ms. Vu testified that there was a bumper press. Sure that is one embodiment. Sure there was code that was directed to that embodiment.

Appx503-504 75:22-76:3. iRobot's counsel also admitted that, using this alternative method, you can determine whether the charger is available using the bumper, stating that "[a] bumper press tells you [that you] bumped into the base station and then maybe you can infer that the charger is available . . . ." Appx480 52:8-9.

### 3. Post-Hearing Briefing

Over a month after the oral hearing, iRobot filed a motion to submit supplemental information. Appx507. In that motion, iRobot argued that SharkNinja made a new argument at the hearing and requested to submit a second declaration by Ms. Vu. Appx507-508. But Ms. Vu's new declaration sought to change her testimony by averring that her original declaration discussing the user.tl source code "was intended to include the concept of stopping forward movement in response to the indicator indicating detection of electrical connection made by contact with the charging terminals of the base station." Appx517-518 (referring to her original declaration, Appx7416 ¶27).

The Board denied iRobot's motion for several reasons. First, the Board found that Ms. Vu's new declaration contradicted her prior testimony. Appx537-538. While iRobot attempted to rely on the new testimony to argue that the source code showed that "the inventors had conceived of detecting contact with the charging terminals," Ms. Vu's preexisting deposition testimony established that "the hardware that [iRobot was] using did not have charging contact and instead used a bump sensor to stop the robot." Appx537.[6]

Second, the Board found that iRobot had not shown that it could not have submitted this testimony earlier, as SharkNinja properly challenged iRobot's conception arguments in its reply "months prior to the oral argument." Appx538-543. Finally, the Board found the interest of justice did not warrant permitting iRobot to change the record after the evidentiary record was closed. Appx543-546.

### 4. The Board's Final Written Decision

In its decision, the Board analyzed iRobot's evidence related to purported conception of elements [1d] and [1e]. Appx14-21.

[6] In its opposition to iRobot's motion, SharkNinja noted that Ms. Vu's new testimony that the source code included the concept of stopping in response to detecting charging contacts also contradicted the admission of iRobot's counsel at the hearing. In particular, iRobot's counsel acknowledged that the inventors "didn't have charging contacts at the relevant time so they didn't have software code detecting those contacts." Appx522 (quoting Appx503 75:13-16).

First, the Board reviewed the testimony of the inventors. It found that while Ms. Vu's testimony spoke generally of the Roomba being "electrically connected," it did not discuss conception of the specific feature of "detecting contact with the charging terminals" or stopping forward movement in response to that detection. Appx14-15 (citing Appx7416 ¶27). It determined that Mr. Ozick's testimony was "identical in all respects to the testimony by Ms. Vu" except for two additional sentences, where Mr. Ozick stated that the behavior in the user.tl source code "would be activated if the Roomba 2 is connected to the charging contacts of the base station and would stop movement of the Roomba 2 and initiate the charging process." Appx15-17 (quoting Appx7449-7550 ¶27). It noted that this was "the only testimony by the inventors that refers to the charging contacts (or charging terminals) of the base station." Appx17. It found, however, that this did not discuss "detecting contact with the charging terminals or stopping movement of the robot in response to detecting contact with the charging terminals." Appx20.

The Board next turned to the evidence iRobot relied on for corroboration. It noted that the user.tl source code lacked any explicit reference to charging contacts, detecting charging contacts, or stopping forward movement in response to detecting contact with the charging contacts. Appx17-18. The Board discussed that "the '423 patent discloses determining that the robot has docked by bumper depression" as an alternative to the claimed feature. Appx18-19 (citing Appx84 15:13-24). The Board

noted that Mr. Ozick testified "that there is no explanation or definition . . . as to how the 'charger-available?' macro or function in the source code file 'user.tl' works." Appx16 n.14 (citing Appx4389-4391 78:15-80:22).

The Board also acknowledged Ms. Vu's testimony that the prototype represented in the code used a bump sensor to know when to stop, as it did not have charging contacts. Appx19 (citing Appx4759-4761 84:5-86:20). Finally, the Board relied on iRobot's statement that Ms. Vu's testimony applied to "the code files saved prior to June 23, 2003." Appx19 (quoting Appx406). In light of this, the Board found that "it would be contrary to the evidence to use the code files from the period prior to June 23, 2003, to corroborate that the inventors had conceived of using detecting the electrical contacts to stop the movement of the robot." Appx19. It further found that, even considering that code, it did not corroborate conception of the claimed feature. Appx19-20 n.17.

The Board found that the Roomba 2 System Design Strategies document had no explicit reference to charging contacts, detecting the charging contacts, or stopping in response to detecting charging contacts. Appx17-18. The Board also recognized that both inventors previously testified that they did not recognize the document. Appx15 n.13 (citing Appx4802 5:16-17; Appx4928 131:1-13); Appx16 n.15 (citing Appx5024 4:20; Appx5086-5088 66:19-68:16).

The Board noted that the only pertinent portion of the Design Strategies document was Section 1.4. Appx18 (citing Appx6765 Section 1.4). It found that the section does not reference charging terminals and that it further states that "'dock[ing] at the charger . . . depends on the mechanical configuration of the charger,' which appears to be unknown." Appx18 (alteration in original) (quoting Appx6765 Section 1.4). The Board also recognized that the document has no reference to "stopping the robot in response to detecting contact with the charging terminals." Appx18. Moreover, the Board recognized that, while the document discusses "Roomba and the charger recognizing that docking has been achieved," it contains "no indication as to how this recognition is accomplished." Appx18 (quoting Appx6765 Section 1.5).

The Board also discussed an iRobot "Technical Summary" document, which it noted that iRobot did not rely on in its patent owner response for conception of the disputed feature, but which the inventors briefly discussed in their declarations. Appx17 n.16. In particular, it noted that the inventors stated that the document (in addition to the other two discussed above) corroborate "conception of a process to detect whether a charger (e.g., the drive-on charger or base station) is available." *Id.* (quoting Appx7422-7423 ¶43; Appx7456-7457 ¶43). The Board found, however, that the Technical Summary contained no reference to detecting the charging terminals of the base station or stopping in response to such a detection. *Id.*

In view of this evidence, the Board found that none of testimony specifically addressed the disputed limitation, nor was prior conception "corroborated by independent evidence of conception of the relevant elements of the claimed invention." Appx20.

### C. Background Related to iRobot's Arguments Regarding Obviousness of Claims 13-15, 18-23, 25, and 26

The Board determined that claims 13-15, 18-23, 25, and 26 would have been obvious based on Kim[7] and Everett.[8] Appx54-58. As the Board noted, iRobot never disputed that Kim and Everett teach each limitation of these claims. Appx57. Instead, iRobot (a) challenged the motivation to combine Kim and Everett, Appx333-339; and (b) argued that objective evidence demonstrated nonobviousness, Appx339-353. The Board weighed the evidence and decided both factual questions in SharkNinja's favor. Appx54-58; Appx27-34.

The motivation-to-combine dispute involved the limitation "control[ling] forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity . . . in response to detecting a need to charge the energy storage unit," recited in independent claims 13 and 21. Appx86 20:47-51; Appx87 22:1-4. SharkNinja demonstrated—and iRobot did not dispute—that Kim

[7] Kim is U.S. Patent No. 5,440,216. Appx1636.

[8] Everett is H.R. Everett, *Sensors for Mobile Robots* (1995). Appx791.

expressly discloses the limitation, except for “a second velocity less than the first velocity.” Appx157-160 (citing Appx1656 8:46-62; Appx1659 13:67-14:2, 14:6-12, 14:26-35; Appx1652 Fig. 16); Appx2258-2261 ¶¶182-184. That is, Kim undisputedly discloses moving the robot toward the base station in response to detecting the need to charge the battery but does not disclose slowing the robot when doing so.

SharkNinja demonstrated that Everett discloses reducing the robot’s velocity as it approaches the base station, and it explained that it would have been obvious to combine Everett’s reduced velocity with Kim’s disclosure of docking to recharge the battery to achieve the predictable and desired results of avoiding collisions, increasing robot maneuverability, and accurately aligning with the base station. Appx160 (citing Appx1243); Appx2261 ¶185; *see* Appx2195-2197 ¶¶79-83 (citing Appx1239-1243). SharkNinja referred to its multi-page analysis and accompanying expert testimony regarding the corresponding limitation in claim 1, which details why a skilled artisan would have been motivated and found it obvious to reduce the velocity of a robot as it was approaching the base station. Appx160 (citing Appx114-116); Appx2261 ¶185 (citing Appx2190-2195 ¶¶72-78).

After weighing the parties’ arguments and evidence, the Board found that “a skilled artisan would have been motivated to combine Kim and Everett to control movement of the ‘cleaning robot’ toward the base station ‘at a second velocity less

than the first velocity." Appx54-57. It rejected iRobot's arguments, Appx55-57, and it credited SharkNinja's arguments and evidence regarding the known benefits of reducing the velocity of the robot as it approaches the base station, Appx57 & n.35.

The Board also considered and rejected iRobot's arguments regarding objective indicia of nonobviousness because it found that iRobot had not shown a nexus between its evidence and the claimed invention. Appx27-34.

The Board determined that iRobot was not entitled to a presumption of a nexus because "[t]here are several problems with [iRobot's] evidence." Appx29. First, while iRobot provided a claim chart purportedly showing that a specific Roomba 900 series product was coextensive with the claims, iRobot provided no evidence or argument that this product was representative of the many other Roomba products on which iRobot relied for its argument. Appx28-29. In other words, there was a mismatch between the subset of products iRobot had charted and the larger class of products it alleged were commercially successful. Appx28-29; Appx32. Second, iRobot's claim chart failed to show that the charted products included "control[ling] forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity . . . in response to detecting a need to charge the energy storage unit," as recited in independent claims 13 and 21. Appx29-30. Third, iRobot's evidence did not demonstrate that any of the claimed features were important and instead touted several unclaimed features. Appx30-31. Fourth,

iRobot's Roomba products are allegedly covered by *ninety* other patents, undermining a nexus between the evidence and the '423 patent. Appx31.

The Board also determined that iRobot had not proven a nexus because it did not show "that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" Appx31 (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373-74 (Fed. Cir. 2019)). The Board found that iRobot's "evidence is of broad scope" relating to a broad class of "Roomba" products and was not "related to the claimed invention." Appx33. It further found that the functionality on which iRobot relied—which iRobot vaguely referred to as "auto charge and resume functionality"—was (a) known in the prior art; and (b) not recited in independent claims 13 and 21. Appx33-34 (citing Appx349-353).

Thus, while the Board "considered all the proffered evidence of objective indicia of nonobviousness," it found the evidence was weak because iRobot failed to establish a nexus between it and the claims. Appx34; Appx27-28.

### D. Background Related to SharkNinja's Cross Appeal Regarding Claim 9

Independent claim 1, from which claim 9 depends, recites "detecting . . . a right signal . . . and a left signal" transmitted by a base station. Appx86 19:38-41. Claim 9 further recites "avoiding, by the robotic cleaning device, the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level." Appx86 20:20-24. SharkNinja's

petition proposed two alternative sets of obviousness grounds for claim 9. Appx99; Appx139-140; Appx143-146.

In the first set of grounds, SharkNinja relied on Jeon, which was the primary reference in its ground for claim 1. Regarding claim 1's detecting step, SharkNinja explained that Jeon's robot includes a "charge mode" in which its rotating plate 306, on which sensors 304, 305 are mounted, rotates so that the sensors can align to detect the signals transmitted from the right signal 402 and the left signal 401. Appx111-113 (citing Appx787-788 ¶¶[0046], [0058]-[0060], [0065]; Appx783 Fig. 3); Appx2187-2189 ¶¶68-69. The Board agreed. Appx37-38.

FIG. 3




Appx783 Fig. 3 (as annotated at Appx112-113; Appx2188-2189 ¶69).

Regarding claim 9's "avoiding" step, SharkNinja referred to its analysis of the "detecting" step and Jeon's disclosure of selectively rotating plate 306 to allow the sensors 304, 305 to detect infrared signals from Jeon's base station. Appx139; Appx2233-2235 ¶143. It explained that Jeon's robot only performs this rotation in charge mode, and that when the robot is not in charge mode, Jeon's robot "do[es] not attempt to detect (i.e., avoid[s]) infrared signals" from the base station. Appx139-140; Appx2233-2235 ¶¶143-144. Supported by expert testimony, it explained that by not rotating the plate 306 to detect these infrared signals, Jeon's robot avoided the signals. Appx139-140; Appx2233-2235 ¶¶143-144.

Despite agreeing that Jeon rotating sensors 304, 305 in the charge mode constituted detecting the two signals in the context of claim 1, Appx37-38, the Board disagreed that Jeon not doing so outside of charge mode constituted "avoiding" those signals, Appx52-53. In reaching this conclusion, the Board construed "avoiding . . . the right signal and the left signal" to require "more than not attempting to detect the signals," and affirmatively "moving away from the base station or altering its course to avoid the base station." Appx53.

In the second set of grounds, SharkNinja relied on Jones in combination with Jeon. Appx144-146; Appx2241-2245 ¶¶155-162. SharkNinja and its expert explained that Jones's robot uses an infrared (IR) sensor to sense reflections from obstacles and, if it detects the IR signal, Jones's robot implements an "Avoid"

behavior to "arbitrarily decide[] to turn left" or right. Appx2241-2242 ¶¶156-157 (quoting Appx1547); Appx144. It further explained that, "when the IR detectors do not detect any more infrared rays, Avoid stops turning the robot." Appx2242 ¶157.




Figure 10.1. Behavior control diagram for Lewis and Clark. In conflicts over which behavior gets to control the robot's motors, Escape has the highest priority, Avoid the next highest, and Cruise the lowest.

Appx1546 Fig. 10.1 (as annotated at Appx2241-2242 ¶156; Appx144).

SharkNinja and its expert explained that Jones's Avoid behavior is similar to "avoidance behavior" embodiments described in the '423 patent, which "cause[] the robot 40 to spin in place to the left until the IR signal falls below detectable levels." Appx2242-2243 ¶158 (quoting Appx82 12:43-47); Appx144-145. While they recognized that Jones's "IR sensors detect a reflection" from an obstacle instead of a ray received from a base station, Appx2241 ¶156 (quoting Appx1547), SharkNinja and its expert explained that Jones's Avoid behavior would have been implemented on Jeon's robot to work "in response to detecting infrared rays emitted by []*Jeon*'s

base station instead of detecting reflected infrared rays from an obstacle." Appx2244 ¶160; Appx145.

Moreover, SharkNinja and its expert explained that a skilled artisan would have found it obvious to includes Jones's Avoid behavior in Jeon's robot so that if Jeon's robot detected the rays generated by the base station emitters when its battery had sufficient energy for cleaning, it would implement Jeon's Avoid behavior to turn until its sensors 304, 305 no longer detected the rays, preventing the robot from traveling to the base station. Appx2243-2244 ¶¶159-160; Appx145. SharkNinja's expert explained that this would have been "simply combining familiar elements (avoidance behavior of Jones) using known methods (rotating in place until no IR signal is received) to achieve a predictable result (preventing movement of the robot towards the base station to conserve energy, save time, and avoid accidental collision with the base station)." Appx2244-2245 ¶161; *see* Appx145-146. He further explained that modifying robot behaviors in this manner by altering its microcomputer programming was well known to and within the skillset of the skilled artisan. Appx2244-2245 ¶161 (citing Appx2123 ¶[0033]; Appx2142 ¶[0219]).

The Board largely ignored SharkNinja's evidence and concluded that SharkNinja's second ground did not render obvious claim 9. Appx53-54. In its limited discussion, the Board stated that Jones's "'Avoid' behavior is based on detecting reflections of IR signals from the robot off of *obstacles* and not right and

left signals from *emitters on the base station*." Appx53 (emphases added). It then agreed with iRobot that no single prior art reference "describes a robot detecting and avoiding an infrared signal emitted by a charging base station," Appx54 (quoting Appx322), even though SharkNinja's obviousness combination had modified Jeon (which does detect rays emitted from the base station) to implement Jeon's Avoid behavior. The Board concluded by rejecting the rest of SharkNinja's arguments as being "too general and conclusory" and finding that "the combination would still not include all the elements recited in claim 9." Appx54.

## IV. SUMMARY OF THE ARGUMENT

Regarding claims 1-4, 6-8, and 12, the Board correctly determined that iRobot's evidence did not show conception of did limitations [1d] and [1e]. The Board's conclusion rested on two factual findings, both of which are supported by substantial evidence. First, the Board determined that iRobot's inventor testimony did not show conception of these features. Appx20; Appx14-17. Second, the Board determined that even if the inventor testimony had addressed these features, iRobot's corroborating evidence did not. Appx20; Appx17-20. Importantly, iRobot's appeal brief does not even discuss many of the Board's findings related to corroboration, which is fatal to its appeal. Both findings are supported by substantial evidence, and either finding is an independent basis to affirm the Board's determination regarding conception and its conclusion that claims 1-4, 6-8, and 12 would have been obvious.

Regarding claims 13-15, 18-23, 25, and 26, iRobot challenges two of the Board's factual findings: (1) that one skilled in the art would have been motivated to combine Kim and Everett; and (2) that iRobot failed to demonstrate a nexus between its objective evidence and its claims. Substantial evidence supports the Board's finding on both points. Regarding motivation to combine, iRobot ignores key pieces of evidence that the Board relied on in its analysis, dooming its argument on appeal. iRobot employs a similar approach regarding nexus, ignoring large swaths of the record that provide substantial evidence for the Board's analysis. On both issues, the Board took a methodical approach, considered all the evidence, and agreed with SharkNinja. There is ample evidence to support the Board's findings here, so the Court should affirm the Board's determination that claims 13-15, 18-23, 25, and 26 are unpatentable.

On cross appeal, SharkNinja challenges the Board's erroneous conclusion that claim 9 would not have been obvious. SharkNinja proposed two alternative grounds for invalidity, and the Board separately erred regarding each. Regarding the first grounds, the Board erroneously construed "avoiding . . . the right signal and the left signal" in a way that is inconsistent with iRobot's previous admissions and limits the claims based on preferred embodiments that are not directed to the claimed subject matter. Under the proper construction, there can be no dispute that the prior art in SharkNinja's first grounds teaches this limitation. Regarding the second

grounds, the Board erred in ignoring key pieces of SharkNinja's argument and evidence and failing to articulate its own reasoning with sufficient clarity. This provides an independent reason to at least vacate the Board's decision regarding claim 9.

# V. ARGUMENT

## A. Standard of Review

The Court reviews the Board's factual findings for substantial evidence and its legal conclusions de novo. *See* 5 U.S.C. § 706(2)(E); *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1374 (Fed. Cir. 2018) (citation omitted).

Conception is a question of law based on subsidiary factual findings. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) (quoting *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000)). "[C]orroboration is properly viewed as a subsidiary factual finding" and thus "[w]hether or not corroboration exists is a question of fact." *Medichem*, 437 F.3d at 1171.

Obviousness is a question of law with underlying factual questions. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). Motivation to combine in a "pure question of fact." *Id.* at 1366-67. "[T]he existence

of and weight assigned to any objective indicia of nonobviousness" is also an "underlying factual question[]." *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1364 (Fed. Cir. 2022); *see also Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1036-38 (Fed. Cir. 2017) ("[W]hether the requisite nexus exists is a question of fact." (citation omitted)).

Claim construction is a question of law with subsidiary questions of fact. *Quanergy Sys. Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1413 (Fed. Cir. 2022). The Court reviews the Board's construction based on intrinsic evidence de novo. *Id.*

Finally, the Court reviews the Board's decisions under the Administrative Procedure Act to determine whether the Board's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (quoting 5 U.S.C. § 706(2)). Under this standard, the Board's "[o]mission of a relevant factor required by precedent is both legal error and arbitrary agency action." *Id.* at 1344.

### B. The Court Should Affirm the Board's Judgment that iRobot Failed to Establish Conception of Claims 1, 3, 4, 6-8, and 12 Before the Filing Dates of Jeon and Abramson

#### 1. Substantial Evidence Supports the Board's Determination that the Evidence Did not Establish Earlier Conception

In evaluating iRobot's evidence of prior conception, the Board made several factual findings that are supported by substantial evidence. The Board found that "[iRobot's testimony] is not corroborated by independent evidence of conception of the relevant elements of the claimed invention." Appx20. This finding included several subsidiary findings of fact, many of which iRobot does not even address. Similarly, the Board found the inventor testimony was also insufficient to show conception of the relevant claim limitations. Appx20; Appx14-17. Both findings are supported by substantial evidence and provide independent grounds for affirming the Board's judgment regarding claims 1, 3, 4, 6-8, and 12.

##### a. Substantial Evidence Supports the Board's Finding that iRobot's Evidence Failed to Corroborate Earlier Conception of Claim 1

iRobot relied on only two documents to corroborate its purported conception of elements [1d] and [1e]: (1) a "user.tl" source code file; and (2) a "Design Strategies" document. Appx303 (citing Appx6735-6736; Appx6765). Substantial evidence supports the Board's factual finding that these documents did not corroborate earlier conception of claim 1. *Medichem*, 437 F.3d at 1171 ("Whether or not corroboration exists is a question of fact.").

#### (1) Substantial Evidence Supports the Board's Finding Related to the user.tl Source Code

The Board made two significant factual findings related to the user.tl source code file. First, the Board found that "it would be contrary to the evidence to use the code files . . . , to corroborate that the inventors had conceived of using detecting the electrical contacts to stop the movement of the robot." Appx19. iRobot does not mention this finding, dispute the Board's reasoning, or discuss the relevant evidence. iRobot has waived its ability to challenge this finding by not raising it in its opening brief. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."). Second, the Board also found that, even considering the source code, it did not "corroborat[e] that the inventors conceived of" the disputed limitations prior to June 23, 2003. Appx19-20 n.17. Both findings are supported by substantial evidence.

The user.tl source code, excerpted below, includes the "charger-available?" function that iRobot spends much of its opening brief discussing.

```
(define-behavior (user-charge
                   :start-when (charger-available?)
                   :onetime? t )

  (set-robot-state charging)
  (stop-all)
```

Appx6735-6736 ll.33-38 (highlighted). Mr. Ozick testified that this reference to "charger-available" does not define how the function operates. Appx4391 80:9-22. Indeed, Mr. Ozick admitted that the charger-available function is defined elsewhere, that you would have to look at the definition of the function to see *how* it operates, and that the file user.tl does not define the function or explain how the function operates. *Id.*; Appx5135-5136 115:3-116:3. Moreover, iRobot admitted not only that it did not produce code showing how the function operates, but also that the inventors did not have code for detecting charging contacts at the time. Appx480-481 52:20-53:12; Appx503 75:12-16.

While iRobot did not provide any documents showing detecting contact with base station charging terminals, Ms. Vu, an inventor, *did* testify that iRobot was instead detecting a *bumper press* to determine when to stop. Appx4759-4760 84:12-85:25 ("[T]he way that that hardware at the time knew when to stop was from the bump sensor."). Moreover, iRobot admitted that Ms. Vu's testimony applied to the very code at issue. Appx406. And finally, while much of iRobot's opening brief assumes that having the "charger available" means that the charging terminals have been "detected," iRobot previously admitted that was not the case. In particular, iRobot's counsel acknowledged that you could know whether a charger was available from a bumper press (i.e., detecting the charging contacts was *not* necessary). Appx480 52:8-10.

In view of this evidence, the Board appropriately found that "it would be contrary to the evidence to use the code files from the period prior to June 23, 2003, to corroborate that the inventors had conceived of using detecting the electrical contacts to stop movement of the robot." Appx19. This finding of fact is supported by substantial evidence:

1. Mr. Ozick admitted that the source code does not explain how "charger-available" operates. Appx4391 80:9-22; Appx5135-5136 115:3-116:3; *see also* Appx16 n.14 (Board relying on Mr. Ozick's testimony).
2. iRobot admitted that the source code explaining how "charger-available" operates was not produced and may not have existed. Appx480-481 52:20-53:12.
3. At the time, iRobot's prototype detected whether the *bumper* was pressed to stop the robot. Vu, Appx4759-4760 84:12-85:25; *see also* Appx19 (Board relying on Ms. Vu's testimony).
4. iRobot admitted that Ms. Vu's testimony regarding the use of the bumper applied to the "code files saved prior to June 23, 2003" (i.e., the code that iRobot relied on to try to prove conception). Appx406-407; *see also* Appx19 (Board relying on iRobot's admission).
5. iRobot further admitted that the inventors did not have source code detecting charging contacts. Appx503 75:12-16.

In light of these facts, the Board was entirely justified in finding that the reference to "charger-available" could not corroborate the disputed features. Appx18-19. Indeed, the inventor testimony and iRobot's admissions indicate that the cited code only relates to detecting the *bumper*, not the charging terminals. iRobot does not mention or dispute this finding by the Board. Nor does it discuss even one of these supporting facts. This is fatal to iRobot's reliance on this source code, and iRobot should not be permitted to dispute the Board's finding for the first time in its reply brief. *SmithKline Beecham*, 439 F.3d at 1319.

Instead of confronting these issues, iRobot seeks to change the language of the claims. In particular, iRobot argues that a base station being "electrically connected" to a robot "mirrors the 'contact with the charging terminals' portion of the claims, as both describe the auto-docked position." Blue39. But in doing so, iRobot focuses on the *result* of docking (being electrically connected) rather than what the claims actually recite—*how* the robot accomplishes docking (*detecting charging terminals* and stopping in response to that *detection*). "It is not sufficient that the *result* to be obtained be conceived, but it is required that there be conceived and disclosed the *means provided to accomplish that result*." *Field v. Knowles*, 183 F.2d 593, 611 (CCPA 1950) (emphases added).

This distinction is especially important because the '423 patent describes different ways to accomplish docking, but claim 1 only recites one of those ways.

Importantly, the other unclaimed embodiments still result in an "electrical connection." For example, in one of the unclaimed embodiments, the '423 patent explains that the "embodiment overlaps the homing signals 62, 64 such that the yellow zone 66 terminates at a point calibrated such that the robot 40 *will contact the charging contacts* 16 upon reaching the termination point." Appx84 15:18-21 (emphasis added); *see also* Appx490 62:9-17 (iRobot acknowledging that this embodiment is different than claimed). Thus, the result of this embodiment is that the robot will "contact the charging contacts" (and thus be electrically connected), but it *detects* the "yellow zone 66 . . . termination point" rather than "detecting contact with charging terminals" as claimed.

The other unclaimed embodiment detects when "the bumper 48 is depressed, signaling [to] the robot 40 that it has contacted the base station 10." Appx84 15:14-18. iRobot's counsel acknowledged that a "bumper press tells you [that you] bumped into the base station and then maybe you can infer that the charger is available." Appx480 52:8-10. Thus, the *result* is still that the robot is "electrically connected," (you can infer whether a charger is available), but the robot *detects* a bumper press and not "contact with charging terminals," as claimed. Indeed, iRobot's counsel distinguished this embodiment from the one claimed, noting that for the claimed invention, "[y]ou have to have detection of the actual contact" with the terminals. Appx480 52:6-7. Notably, iRobot's evidence *only* suggests using this unclaimed

bumper embodiment, both in the form of Ms. Vu's testimony on its use and iRobot's admission that the source code used the bumper embodiment. Appx4759-4760 at 84:12-85:25; Appx406-407. And iRobot's opening brief fails to even address these unclaimed embodiments, even though the Board analyzed them as part of its reasoning. *See* Appx18-19.

While the Board found that it would be contrary to the record to rely on iRobot's source code to show conception, it also separately found that even considering the source code, it did not "corroborat[e] that the inventors conceived of" the disputed limitations prior to June 23, 2003. Appx19-20 n.17. The following substantial evidence supports the Board's finding: (1) Ms. Vu's and iRobot's admissions that the code detected the bumper press to determine when to stop, Appx4759-4760 84:12-85:25; Appx406-407; (2) Mr. Ozick's admission that the code does not explain how charger-available operates and iRobot's admission that code explaining how it operates was not produced, Appx4391 80:9-22; Appx5135-5136 115:3-116:3; Appx480-481 52:20-53:12; (3) iRobot's admission that the inventors did not have source code detecting charging contacts, Appx503 75:12-16; and (4) iRobot's admission that you do not need to detect charging contacts to know if a charger is available, as it can be inferred from a bumper press. Appx480 52:8-9. This evidence demonstrates, at best, that the inventors had conceived of using the

unclaimed bumper embodiment, and not the claimed detection of charging terminals embodiment.

While iRobot ignored all of the above evidence, the little source-code related evidence that iRobot relied on does not contradict the Board's findings. For example, both inventors testified that the missing charger-available function indicates that the charger "is electrically connected" to the robot. Appx7416 ¶27; Appx7449-7550 ¶27. But as discussed above, this discussion of the *result* (electrical connection) does not address *how* this feature is accomplished (detecting contact with charging terminals). While Mr. Ozick discussed that the "user-charge" will be activated when the robot "is connected to the charging contacts," he did not describe whether that is done by detecting contact with the terminals (as claimed) or by detecting a bumper press (as Ms. Vu and iRobot admitted). The Board considered this testimony and found that it did not support conception and was not corroborated by independent evidence. Appx20. Substantial evidence supports this finding, especially when Mr. Ozick testified that the source code does not indicate how it operates, Ms. Vu indicated that a bumper press was used, iRobot admitted that Ms. Vu's bumper-related testimony applied to the source code, and iRobot admitted that the inventors did not have source code to detect the charger contacts. *See Supra*.

Finally, iRobot emphasizes its expert's testimony regarding the source code, Blue42, but Dr. Hooper's single-paragraph analysis of the user.tl source code merely

states that charger-available indicates that the robot is "electrically connected" to the base station. Appx6648 ¶56. It is no surprise that Dr. Hooper could not provide additional detail on *how* that is accomplished, as it is undisputed that the function definition was not produced, and iRobot admitted that the inventors "didn't have software code detecting [charging] contacts." Appx503 75:12-16. Thus, even this testimony does not contradict the Board's findings.

iRobot omitted critical contradictory evidence from its opening brief, ignored the '423 patent's discussion of unclaimed embodiments, and failed to even address the Board's findings of fact and analysis of that contradictory evidence. Unlike iRobot, the Board fully considered this significant evidence. Substantial evidence supports the Board's finding that the user.tl source code did not corroborate conception of the disputed limitations. Appx19-20.

#### (2) Substantial Evidence Supports the Board's Finding that iRobot's Other Documentation Did Not Corroborate Conception of Claim 1

The Board also correctly found that the remaining documentary evidence relied on by iRobot failed to corroborate conception. Appx20. The only other document that iRobot relied on in its patent owner response was the "Design Strategies" document, which includes a "Dock at the charger" section that states that a "logic input" indicates "when the external charger is available (that is, when good contact has been made)." Appx6765; Appx303. But an iRobot engineer testified that

the document lacks any detail on "what drives" the described input and agreed that the described "contact could be made if the bumper is pressed." Appx4265-4268 28:9-29:1.

The document also states that this feature "depends on the mechanical configuration of the charger," but the Board found that the document provides no details on what mechanical configuration is contemplated. Appx6765; Appx18. Finally, the document states that the "charger recognize[s] that docking has been achieved," Appx6765, but the Board correctly found that the document provides "no indication as to *how* this recognition is accomplished," Appx18 (emphasis added).[9] As a result, the document provides no indication of whether this language refers to the claimed or unclaimed embodiments. *See* Appx18-19.

iRobot relies heavily on the phrase "good contact," (Blue10, 25, 45) but merely mentioning "contact" does not distinguish any of the embodiments. Both unclaimed embodiments in the patent refer to "contact." *See* Appx84 15:18-21 (describing detecting "homing signals" at a "termination point" "such that the robot 40 *will contact the charging contacts*") (emphasis added), 15:14-18 (describing "mov[ing] toward the base station . . . until the bumper 48 is depressed, signaling

[9] iRobot did not discuss this finding in its opening brief and should not be permittted to dispute it for the first time in its reply brief. *SmithKline Beecham*, 439 F.3d at 1319.

the robot 40 that it has *contacted* the base station.") (emphasis added). The inventors likewise do not provide any details on how the robot determines "contact" has been made, as their testimony merely quotes the document. *Compare* Appx7422 ¶¶41-42 and Appx7456 ¶¶41-42*,* with Appx6765.

While Dr. Hooper testified that he believed the document's "Dock at the charger" section related to detecting the charging terminals, he did not mention the other embodiments or explain his reasoning when the document lacks any detail on *how* the robot determines if a charger is available. Appx6648 ¶57. At his deposition, he stated that his reasoning was because he thought that "good contact" referred to "electrical contact." Appx3961-3962 42:10-43:18. But as discussed previously, mere reference to contact failed to corroborate conception of the claimed features. Thus, the Board was correct in finding that the "Design Strategies" document failed to corroborate conception. Appx20.

Finally, the Board also addressed an iRobot "Technical Summary." Appx17 n.16 (citing Appx6712). While iRobot's patent owner response did not rely on the document in its briefing to show conception of these limitations, the inventors briefly referred to the document while discussing whether a charger is available. Appx17 n.16. In its opening brief, iRobot relies on this document for the concept of "Drive On Charging" or that it shows the existence of electrical contacts. Blue43-44. But neither of those concepts show *how* the robot determines it has successfully docked.

Indeed, both unclaimed embodiments use "Drive On Charging" and charging contacts, with the "homing signals" embodiment specifically disclosing that it detects the homing signals to "contact the charging contacts." Appx84 15:18-21. Thus, the "Technical Summary" does not corroborate the features that were missing from the other documentation relied on by iRobot.

The Board was correct in finding that the few documents that iRobot relied on fail to corroborate conception of elements [1d] and [1e]. Appx17-21. iRobot's opening brief largely ignored the Board's findings and did not discuss much of the evidence relied on by the Board in reaching that decision. But, unlike iRobot, the Board fully considered the relevant evidence, and substantial evidence supports the Board's finding that iRobot failed to provide sufficient corroborating evidence. Appx20.

#### b. Substantial Evidence Supports the Board's Finding that Inventor Testimony Failed to Show Conception of the Claimed Invention

The Board also correctly found that iRobot's inventor testimony failed to show conception of the disputed elements of claim 1. Appx14-21. While iRobot's failure to proffer sufficient inventor testimony is another basis for affirming the Board's decision, this Court need not even reach this issue if it finds that substantial evidence supports the Board's finding that the record lacked independent evidence corroborating conception of the claim. *Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed.

Cir. 2003) ("[W]hen a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony.").

Regardless, the Board correctly analyzed the inventor testimony and found that it did not show "detecting contact with the charging terminals" and stopping movement in response to that detection. Appx14-20. Instead, the inventor testimony suffered from the same flaw that plagued iRobot's purported corroborating evidence—it failed to discuss *how* the robot determined that it had successfully docked. For example, both inventors testified regarding the source code and stated that the source code "outputs an indicator" if the robot is "electrically connected" to the charger. Appx7416 ¶27; Appx7449-7550 ¶27. But as explained above, this discussion of the *result* (electrical connection) does not address *how* that result is accomplished. Indeed, the testimony fails to explain the process used to determine that an electrical connection has been achieved. Appx7416 ¶27; Appx7449-7550 ¶27. Given that the *result* in the *unclaimed* embodiments of the '423 patent is that the robot will be "electrically connected," this testimony is insufficient to distinguish between the claimed and unclaimed embodiments. And as iRobot acknowledges, "[c]onception must include every feature or limitation of the claimed invention." *REG Synthetic*, 841 F.3d at 962; *see* Blue54.

The Board recognized that Mr. Ozick's testimony differs slightly from Ms. Vu's in that it states that "user-charge" will be activated if the robot "is connected

to the charging contacts." Appx16-17 (quoting Appx7449-7550 ¶27). But as the Board found, this testimony does not specifically discuss the claimed feature. Appx20. Mr. Ozick does not clarify whether this process is performed by detecting the charging contacts (as claimed) or by detecting whether a bumper press is detected (as Ms. Vu testified and as iRobot admitted). Appx4759-4760 84:12-85:25; Appx406-407.

Finally, the inventors also discussed the "Design Strategies" and "Technical Summary" documents, but they provide no details beyond the documents. Appx7422-7423 ¶¶41-43; Appx7456-7457 ¶¶41-43. For example, both inventors merely quote from the "Design Strategies" document and state that it relates to "auto-docking processes," but the inventors do not discuss any specifics related to the disputed limitations. Appx7422 ¶¶41-42; Appx7456 ¶¶41-42. Similarly, the inventors stated that the "Technical Summary" document "corroborate[s their] conception of a process to detect whether a charger (e.g., the drive-on charger or base station) is available." Appx7422-7423 ¶43; Appx7456-7457 ¶43. But they merely refer to "*a* process to detect whether a charger . . . is available" without providing any details to show that they conceived of the *claimed* method, as opposed to the multiple unclaimed methods discussed in the patent.

At bottom, the inventor testimony suffers from the same deficiency as iRobot's corroborating evidence—it fails to provide any details establishing that the

inventors conceived of the steps actually recited in the claims. The Board correctly analyzed the inventor testimony, and substantial evidence supports its finding that the testimony fails to show conception of the disputed elements of claim 1.

#### 2. Evidence that iRobot Relies on For the First Time on Appeal to Show Conception of the Disputed Elements of Claim 1 Does Not Support Its Argument

In its opening brief, iRobot relies on dozens of documents that it never previously relied on to show conception of the disputed limitations. In its patent owner response, iRobot set forth a table presenting its "Evidence of Conception." Appx300. For the elements in dispute, which iRobot referred to as elements "[1d]" and "[1e]" in its chart, Appx303, iRobot relied on exactly two documents (Appx6735, user.tl; Appx6765, Design Strategies) and three declarations (Appx6619, Hooper; Appx7404, Vu; Appx7436, Ozick). iRobot's expert declaration relied on the same two documents for these limitations. Appx6648 (relying on Appx6735 and Appx6765).

In its sur-reply, after SharkNinja had challenged iRobot's evidence of conception, iRobot continued to rely on the user.tl and "Design Strategies" documents and the testimony of Hooper, Vu, and Ozick (including deposition testimony). Appx402-408. iRobot's sur-reply also referred to the deposition testimony of Matt Cross and Philip Mass and a source code file dated after the

purported conception. Appx402 (relying on Appx6983-7167), Appx405 (relying on Appx4240-4311), Appx407 (referring to Appx6919-6935).[10]

On appeal, iRobot inexplicably faults the Board for analyzing the very documents it cited rather than plumbing the entire record. *See* Blue55 ("[T]he Board considered only a fraction of the corroborating evidence iRobot supplied. For example, the Board considered only *some* of the contemporaneous source code files."). But this Court has previously rejected the notion that the Board must sift through the record to guess at what is relevant. *See Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1371 (Fed. Cir. 2023) ("One cannot reasonably expect the Board to sift through hundreds of documents, thousands of pages, to find the relevant facts."); *id.* at 1372 ("The Board should not be forced to 'play archaeologist with the record.'" (cleaned up)). Because iRobot did not argue that these new documents supported conception of the disputed limitations before the Board, it should not be permitted to raise these arguments for the first time on appeal.[11] *In re Watts*, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004) ("declin[ing] to consider the appellant's new argument" "raised for the first time on appeal"); *see also Sage Prods., Inc. v. Devon*

---

[10] iRobot's opening brief does not cite to these three documents.

[11] SharkNinja does not dispute that these documents were relied on for *other* issues, but iRobot did not present them as evidence of conception of elements [1d] and [1e], and it should not be permitted to do so for the first time on appeal.

*Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("With a few notable exceptions" "appellate courts do not consider a party's new theories, lodged first on appeal.").

Even if this Court were to consider iRobot's new arguments, they do not establish conception of the disputed limitations. For example, iRobot relies on several new source code files to argue that the robot must be electrically connected. Blue43 (citing Appx6728-6734 and Appx6745-6759). iRobot similarly relies on an additional document that mentions "[m]aking/detecting contact." Blue45 (citing Appx6769-6770). But none of these documents explain *how* the robot determines it is electrically connected/contacted. iRobot relies on yet another document that mentions communications between the robot and charger after they have "observe[d] contact." Blue45 (citing Appx6767-6768). But not only does this document not explain *how* contact is observed, it also *post-dates* iRobot's supposed conception date. *See* Appx7484 (identifying Appx6767-6768 (Exhibit 2017) as having an August 12, 2003 save date).[12]

---

[12] In its statement of the case, iRobot similarly discusses many additional documents that were not relied on to show conception of these limitations before the Board. *See* Blue24-25 (citing Appx7472-7496, Appx7497-7504, Appx7505-7512, Appx6721-6727, Appx6775-6776, Appx6772-6774, Appx6777, Appx6778-6779, Appx6780-6782, Appx6783-6785, Appx6788-6794, Appx6795-6797, and Appx6798-6799). iRobot does not rely on these documents in its argument section; however, they should likewise be disregarded since iRobot did not rely on them for this purpose before the Board. *Watts*, 354 F.3d at 1367-68.

Finally, iRobot also now relies on declarations from Scott Miller, Matthew Cross, and Michael Halloran. Blue46-48. As an initial matter, iRobot cannot show corroboration through mere testimony, and so without actual corroborating documentation, iRobot's new reliance on this testimony cannot salvage its arguments. *See Medichem*, 437 F.3d at 1171; Appx11. Regardless, iRobot argues only that the testimony shows that the *result* that the robot is in electrical contact, without providing any explanation of *how* that electrical contact is accomplished. Blue47-48.

### 3. The Board Properly Analyzed the Issue of Conception

iRobot incorrectly asserts that the Board required "magic words" in inventor testimony and corroborating documents. Blue50. The Board properly analyzed all of iRobot's evidence and found that the evidence failed to show conception of every limitation of claim 1.

As iRobot acknowledges, "[c]onception must include every feature or limitation of the claimed invention." *REG Synthetic*, 841 F.3d at 962; *see* Blue54. But iRobot repeatedly ignored the claim language. iRobot was required to show prior conception of the embodiment that was *actually claimed*, especially given that the '423 patent discloses embodiments that are undisputedly *unclaimed*. Appx84 15:13-24. While iRobot argues that the claim limitations "mirror[]" the result of there being

an "electrical[] connect[ion]," Blue39, the claims are not so generic, as this would subsume the unclaimed embodiments and ignore claim 1's specific requirements.

iRobot's corroborating documentation was devoid of any details that aligned with the claim limitations. And the inventor testimony it provided was consistent with its deficient corroborating evidence. It is no surprise that the inventors largely avoided the specifics of the claimed features when the corroborating documentation likewise lacked any requisite details. It is clear, however, that the Board did not require "magic words" in the inventor testimony, because its analysis did not stop with its consideration of the specific words of the inventors' testimony. Instead, the Board considered the inventor testimony and then *continued its analysis* of the purported corroborating evidence. Appx14-21. If the Board had imposed a "magic word" requirement on iRobot's testimony, there would have been no need for it to even consider iRobot's corroborating documentation.

iRobot also argues that the Board should have considered "all of the pertinent evidence" for its "substance" rather than "the presence of specific claim language." Blue55-56. But the Board did just that. In the case of the user.tl source code, the Board relied on significant testimony that iRobot never addresses in its opening brief. Appx16 n.14; Appx19. For example, Ms. Vu testified that, at the relevant time, iRobot was using detection of bumper depression to determine whether to stop the robot, and iRobot admitted that Ms. Vu's testimony related to the source code on

which it relied. Appx4759-4760 84:12-85:25; Appx406-407; Appx19. Moreover, Mr. Ozick testified that one could not determine how the code operated from the file provided, as it was defined elsewhere. Appx4391 80:9-22; Appx5135-5136 115:3-116:3; Appx16 n.14.

The Board considered each of these facts and found that the "substance" of this evidence failed to show conception. Indeed, as discussed previously, the evidence demonstrates, at best, that iRobot had conceived of using the unclaimed bumper embodiment, and not the claimed detection of charging terminals. The Board considered far more evidence than iRobot discusses in its opening brief, and it strains credulity for iRobot to criticize the Board for purportedly failing to consider "all of the pertinent evidence," while simultaneously ignoring critical evidence that formed part of the basis of the Board's decision. Blue54-55.[13]

Similarly, with respect to the "Design Strategies" document and related testimony, the Board found their "substance" lacking. Appx18-19. The Board recognized that the document merely refers to "contact" without explaining what that means or providing any details that would link it to the claimed feature. Appx18. Indeed, in conjunction with discussing this document, the Board referenced other

---

[13] iRobot similarly faults the Board for "consider[ing] only ***some*** of the contemporaneous source code files." Blue55. But as discussed in Section V.B.2, The only source code iRobot relied on as evidence of conception of these limitations was "user.tl."

embodiments from the patent that similarly refer to "contact" but are undisputedly unclaimed. Appx18-19. Notably, iRobot fails to discuss these other embodiments.

The Board's decision was correct and consistent with all the evidence, including the document and testimony referring to "contact" generally, the unclaimed embodiments in which "contact" is undisputedly made, and the inventor's testimony that iRobot was using the *unclaimed* bumper "contact" embodiment. The Board was correct to note the lack of any reference to charging contacts in the document, especially when that was relevant to the overall analysis.

#### 4. SharkNinja Did Not Make New Arguments at the Oral Hearing

iRobot argues that SharkNinja raised a new argument at the oral hearing when it argued that iRobot and the inventors failed to address the "actual claim limitations." Blue57-60. iRobot is wrong, as SharkNinja has long argued that iRobot's earlier conception theory failed to analyze the actual claims. The *first section* of SharkNinja's reply[14] stated that "iRobot does not address what is actually recited in elements [1d] and 1[e]." Appx362. It explained that: (1) rather than addressing "what is *claimed* . . . iRobot instead rewrites the claims to try to match its evidence"; and (2) "[b]ecause iRobot fails to address what is *actually claimed*, its

[14] Because iRobot first addressed conception in its patent owner response, the reply was SharkNinja's first and only opportunity to respond in writing.

conception arguments should be rejected." *Id.* This issue was squarely raised before the oral hearing.

iRobot argues that it could not have known before the oral hearing that SharkNinja contested its use of "high level" language like being "electrically connected," instead of addressing the actual claim language. Blue28. SharkNinja, however, contested that exact language in its reply. Appx362 (explaining that iRobot did not address the actual claim elements and instead discussed whether the robot "is electrically connected to the base station"). This is the precise language that SharkNinja contested in the inventor declarations, and SharkNinja's reply quoted and cited not only the patent owner response, where iRobot relied on the same testimony, but also the inventor declarations themselves. Appx362 (citing Appx303, which cites to and includes language mirroring the testimony of the Ozick and Vu declarations); Appx365 (citing Ozick and Vu declarations). Thus, the Board was correct in rejecting iRobot's arguments that this issue was newly raised. *See* Appx538-543.

Finally, while SharkNinja disagrees that any new argument was raised, iRobot cannot show that the purportedly new argument affected the outcome. The Board independently found that iRobot lacked any corroborating evidence for conception of the disputed limitations. Appx17-21. Thus, even setting aside disputes related to the inventor testimony, the result would be the same—a finding that the evidence

did not show earlier conception of claim 1. Accordingly, any purported error was harmless. *Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1042 (Fed. Cir. 2018) (concluding that the Board's reliance on a reference, to the extent such reliance was improper, was "harmless error because substantial evidence [otherwise] support[ed] the Board's conclusion"); *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, 625 F. App'x 552, 557 (Fed. Cir. 2015) (finding that "[i]f there was error, it was harmless" because there was an "independent ground" for the decision).

The Court should therefore affirm the Board's determination that claims 1-4, 6-8, 10, and 12 are unpatentable because iRobot failed to demonstrate earlier conception of these claims.

### C. The Court Should Affirm the Board's Judgment as to Claims 13-15, 18-23, 25, and 26 Because Substantial Evidence Supports the Board's Findings Regarding Motivation to Combine and Objective Evidence of Nonobviousness

iRobot challenges two of the Board's factual findings: (1) that a skilled artisan would have been motivated to combine Kim and Everett; and (2) that iRobot failed to demonstrate a nexus between its objective evidence and its claims. Blue60-70; Appx54-58; Appx27-34. Substantial evidence supports both findings, so the Court should affirm the Board's determination that claims 13-15, 18-23, 25, and 26 are unpatentable.

### 1. Substantial Evidence Supports the Board's Determination that It Would Have Been Obvious to Combine Kim and Everett

As the Board correctly noted, iRobot did not dispute that the Kim-Everett combination teaches each limitation of claims 13-15, 18-23, 25, and 26. Appx57. Instead, iRobot only disputed whether a skilled artisan would have been "motivated to combine Kim and Everett to control movement of the 'cleaning robot' toward the base station 'at a second velocity less than the first velocity.'" Appx54. Substantial evidence supports the Board's finding that one skilled in the art would have been motivated to do so.

Arguing to the contrary, iRobot contends that the Board engaged in "hindsight," gave the analysis "short shrift," and did not explain "why" one skilled in the art would have combined Everett with Kim. Blue60-61. The record shows otherwise, and it "reflects that the Board considered [iRobot's] arguments regarding motivation to combine, weighed them against the competing evidence and argument, and concluded that despite [iRobot's] contentions, one of skill in the art would have been motivated to combine" Kim and Everett to render the claims obvious. *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1327 (Fed. Cir. 2017).

The Board first recognized SharkNinja's argument that "a skilled artisan would have found it obvious to [combine Kim and Everett] because of their similarities." Appx55. It then credited SharkNinja's additional analysis that "[a]

skilled artisan would have been motivated to reduce base station approach velocity as taught by Everett in []Kim's robot to achieve a predictable, desired result (avoiding collision and/or increased robot maneuverability for accurate alignment with the base station)." Appx55 (alterations in original) (quoting Appx160).

But the Board and SharkNinja did not stop there, and iRobot is wrong when it states that SharkNinja "rel[ied] on *only* this conclusory assertion" and "[did] not explain *how* or *why* such a combination would be made." Blue63 (first emphasis added). The rest of the Board's analysis and SharkNinja's evidence—which iRobot entirely ignores—addressed these very questions. Specifically, the Board identified the "why"— "Kim would benefit from the robot approaching the base station to recharge at a lesser velocity than its cleaning velocity"—and the "how"—"a skilled artisan would have been motivated to combine Kim and Everett to control movement of the 'cleaning robot' toward the base station 'at a second velocity less than the first velocity.'" Appx56-57. And it credited SharkNinja's petition, which provides detailed analyses and evidence on these points. Appx57 n.35 (citing Appx114-116; Appx160).

That analysis and evidence explained that "[i]t would have been obvious to combine Everett's reduced base station approach velocity with []Kim for reasons like those discussed [above]" and then referenced a previous section of the petition (Appx114-116) that the Board cited. Appx160; Appx57 n.35 (citing Appx114-116;

Appx160). This petition section and its cited expert testimony—which iRobot's opening brief ignores—provided a detailed explanation of why and how a skilled artisan would have reduced base station velocity. It explained as follows:

- "A skilled artisan would [have] recognize[d] that a robot traveling at a higher velocity would require a longer stopping distance." Appx114 (citing Appx2191-2192 ¶73).

- "To timely stop the robot and prevent it from colliding with the charging station, a skilled artisan would have been motivated to reduce the robot's velocity toward the [charger]." Appx114. Indeed, "[t]his was well known for docking robots," as demonstrated by other contemporaneous references. Appx114 (citing Appx2192 ¶74; Appx2316; Appx2319; Appx2364; Appx2328; Appx2331-2332).

- If a robot is traveling too fast, there might not be enough time to turn it and align the robot's electrical contacts with those of the base station. Appx114-115 (citing Appx2192-2193 ¶¶75-76). A skilled artisan would have known that it was "essential to dock the robot accurately," which is "more likely achieved at lower speeds." Appx115 (citing Appx2193 ¶76).

- A skilled artisan would have understood "that maneuvering near a base station may require making sharp turns," which is "easier at low[er] speeds," and it was well known to reduce the speed of a robot when maneuvering in these tight spaces. Appx115 (citing Appx2194 ¶77; Appx2018, Appx1879).

- Moreover, this concept of slowing down is seen "in other areas that require accurate placement of a vehicle, such as parking a car or docking a boat," and "[c]ommon sense dictates slowing down to a reduced velocity" to position the device. Appx115 (citing Appx2193 ¶76).

This is more than substantial evidence supporting the Board's decision. "The substantial evidence inquiry requires this court to determine whether the evidence

reasonably supports the Board's conclusion, which in this case it does." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed. Cir. 2012).

Moreover, iRobot's "short shrift" allegation, Blue61, ignores that iRobot devoted little argument to this point below, and the Board's analysis is commensurate in scope with iRobot's arguments. *See Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905-06 (Fed. Cir. 2018) (affirming "[t]he Board's obviousness determinations [that] flow directly from its rejection of [patent owner's] arguments" and are "commensurate with [patent owner's] arguments"); *Novartis*, 853 F.3d at 1327-28.

Regarding motivation to combine, iRobot included only two arguments below, and the Board rejected both. First, iRobot argued that Kim and Everett have significant differences in size, weight, configuration, and operation. Appx333-338. The Board disagreed, crediting SharkNinja's counterarguments that Kim is silent regarding its size and weight and that, regardless of dimensions, a skilled artisan still would have reduced Kim's velocity because it would make it easier to turn. Appx55-56.

Second, iRobot argued that SharkNinja failed to demonstrate a motivation to modify Kim because Kim uses a magnet to accurately align the robot to the base station. Appx338-339. The Board rejected this argument too. Appx56-57. In doing so, it cited SharkNinja's arguments and evidence that Kim's magnets would not

necessarily prevent misalignment and that a POSITA would have nonetheless recognized the advantages of reducing the speed of the device when docking. Appx56-57; Appx57 n.35. In any event, iRobot's argument is contrary to law because it is not necessary "to show that replacing [the primary reference's feature with a known feature taught in a secondary reference] was an 'improvement' in a categorical sense" as long as it was a "suitable option" to achieve the stated purpose. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023) (citations omitted).

iRobot also suggests that the Board erred by giving "reasonable expectation of success short shrift." Blue61; *see also* Blue63. But below, iRobot never disputed that there would have been a reasonable expectation of success, Appx333-339, so it waived this argument. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1380-81 (Fed. Cir. 2016); *see* Appx8773 (Board's scheduling order "caution[ing]" iRobot "that any arguments for patentability not raised in the [patent owner] response may be deemed waived").

Substantial evidence therefore supports the Board's determination that one skilled in the art would have been motivated to combine Everett and Kim to slow down Kim's robot as it approached the base station, as taught by Kim and as was well-known in the art, for the specific benefits articulated in SharkNinja's petition and accompanying declaration. iRobot's hindsight allegations are meritless.

### 2. Substantial Evidence Supports the Board's Determination that iRobot Failed to Establish a Nexus to the Claimed Invention

iRobot alleges that the Board "legally erred in discounting the objective evidence," Blue69, but it does not cite a single case supporting any legal error. This is not surprising because there is no legal issue before the Court. Instead, the Board found that iRobot did not show a nexus between its objective evidence and the claimed invention. This is a factual question that the Court reviews for substantial evidence. *See Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). And substantial evidence overwhelmingly confirms that iRobot failed to demonstrate a nexus.

#### a. Substantial Evidence Supports the Board's Determination that iRobot Failed to Establish It Is Entitled to a Presumption of a Nexus

iRobot argued below that it was entitled to a presumption of a nexus between its objective evidence and the patented invention. Appx341-349; Appx422-425. On this point, iRobot bore the burden of proving "that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory*, 944 F.3d at 1373 (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). iRobot fell woefully short of this burden, and substantial evidence supports the Board's finding that there were "several problems with [iRobot's] evidence." Appx29.

*First*, the Board correctly determined that iRobot "provide[d] no evidence (or argument)" that the Roomba 900 series products in iRobot's claim chart were "representative of its products or when these products were sold." Appx29. Context is important to understand this point, and iRobot ignores that context in its opening brief. Specifically, while iRobot states that it introduced a chart showing that the Roomba 900 series products released in late 2015 embody claims 13 and 21, Blue65, 67, iRobot omits that it attempted to cast a wider net before the Board, vaguely using the word "Roomba" to refer to numerous products released between 2002 and the present day. Appx346-349. The Board recognized this disparity between the chart iRobot was using to establish a nexus (which discussed only the Roomba 900 series products) and its objective evidence (which related to many additional products). Appx32.

This is a critical failure in iRobot's evidence: iRobot was required to show that its objective evidence was tied to a "specific product," *Fox Factory*, 944 F.3d at 1373, but it did not even attempt to do so. Indeed, iRobot's opening brief demonstrates the criticality of this failure because it argues that the patented features "le[d] to incredible financial growth for the company," Blue68 (citing Appx346-348), but the vast majority of the "growth" iRobot points to in these citations were from before the Roomba 900 series products were released in late 2015, *see* Appx346-349.

iRobot minimizes this aspect of the Board's decision by characterizing it as simply finding that iRobot did not state when the Roomba 900 series products were released. Blue67. iRobot misses the point. The crux of the Board's finding does not relate to a specific release date for the Roomba 900 series products, but instead to the fact that iRobot did not demonstrate—or even argue—that the Roomba 900 series products[15] were representative of the other products on which iRobot based its commercial success argument. iRobot does not address this finding in its opening brief. Blue65-69.

*Second*, the Board correctly determined that the evidence in iRobot's claim chart did not show that the products embody the claims. Appx29-30. The claims require "control[ling] forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity . . . in response to detecting a need to charge the energy storage unit." Appx86 20:47-51; Appx87 22:1-4. iRobot's evidence did not show any Roomba product approaching a base station at a lower velocity *in response to detecting a need to charge the energy storage unit.* As the Board correctly noted, the Roomba user guide simply states that when the battery gets low, the Roomba "returns to the Home Base to recharge"; it never states that it does so at a second velocity less than the first velocity. Appx30 (quoting

[15] Even the Roomba "900 series" includes at least two different products: the Roomba 960 and Roomba 980. Appx29 n.22.

Appx7518). And as the Board correctly found, iRobot's CES video only shows the Roomba returning home "in response to a command sent using a cell phone app and not 'in response to detecting a need to charge the energy storage unit'" as required by the claims. Appx30. Nothing in the record demonstrates that the Roomba 900 series products approach the base station at a lower velocity in response to detecting a need to charge the energy storage unit.

On appeal, iRobot does not dispute these factual findings. Instead, it criticizes the Board for "its decision to look for claim language" in its evidence. Blue66-67. But the Board was not requiring that the evidence use "magic words," as iRobot alleges. Blue66. It was simply requiring iRobot to meet its legal burden, which makes clear that a "nexus can only be presumed where the evidence of secondary considerations is tied to a specific product that '*is* the invention disclosed and claimed.'" *Fox Factory*, 944 F.3d at 1377 (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). iRobot's evidence simply failed to demonstrate that even the Roomba 900 series products—the only products it charted—embodied claims 13 and 21.

Indeed, additional evidence showing the Roomba 900 series products and others in motion confirms that they do not meet this element. Instead, they travel at the same speed when cleaning or when seeking the base charging station, and they only slow in response to detecting base station homing signals at a later time—not

"in response to detecting a need to charge the energy storage unit." Appx8552 5:44-46; Appx8553 3:28-30; Appx8554 0:23-27; Appx8555 0:11-15; Appx8556 0:20-29. iRobot does not address this evidence in its brief.

*Third*, the Board correctly determined that iRobot never argued or showed that the Roomba user guide or the CES video "emphasize the elements set forth in the claims." Appx30-31. iRobot does not meaningfully dispute this point either. Blue65-69. Indeed, the video proves the Board's point because the video's narrator touts a laundry list of Roomba features, but slowing down when approaching the base station in response to a need to recharge the battery is not one of them. *See* Appx8552 0:47-57 (top-mounted camera); 0:57-1:06 (bottom-mounted optical sensor); 1:07-1:20 (navigation with visual localization); 1:46-1:59 (floor surface type detection and power adjustment based on floor surface type); 2:00-2:13 (connected robots controllable via phone app); 2:14-2:30 (scheduled cleanings); 2:30-3:46 (customizable cleaning preferences, including multi-pass cleaning and edge cleaning preferences); 3:46-3:55 (initiating cleaning via app); 4:41-46 (two-hour battery life); 4:47-56 (charging and resuming cleaning after charging); 5:04-5:24 (bin full indicator and settings); 5:30-6:00 (returning to Home Base based on command from app); 6:01-6:45 (customer service and robot management via app); 6:47-7:29 (removeable debris bin); 7:30-8:10 (easy maintenance of bristleless extractors); 8:11-18 (spinning side brush for corner and wall cleaning); 8:24-8:32

(prices of two Roomba models displayed). The user guide similarly touts a variety of features, but also does not discuss or emphasize slowing down when approaching the base station. Appx7517-7525. These exhibits provide substantial evidence for the Board's finding "that Patent Owner did not consider the elements of the claims to be important or attractive features of these products." Appx31.

*Fourth*, the Board correctly refused to find a presumption of a nexus because iRobot's "website identifies the '423 patent as one of *ninety* issued U.S. utility and design patents" related to its Roomba 900 series products. Appx31 (emphasis added) (citing Appx3752). In this situation, iRobot cannot show that "a specific product . . . 'embodies the claimed features, and is coextensive with them.'" *Fox Factory*, 944 F.3d at 1373 (citation omitted). Indeed, a nexus is presumed if "the success of a product can be attributed to a *single* patent," and generally does not apply when the "product embodie[s] *at least two patents*." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1299 (Fed. Cir. 2010) (emphases added). The only exception is "if the claims of [all] patents generally cover the same invention." *Fox Factory*, 944 F.3d at 1377. But as the Board correctly noted, iRobot never explained how these myriad other patents related to its products. Appx31. Thus, it could not have explained that these patents generally cover the same invention (they do not). And importantly, iRobot's opening brief did not challenge the Board's finding in this regard. It is therefore waived, *see SmithKline*

*Beecham*, 439 F.3d at 1319, and this alone is sufficient to affirm the Board's finding of no presumed nexus.

**b. Substantial Evidence Supports the Board's Determination that iRobot's Alleged Objective Evidence Bears No Nexus to the Claimed Features**

The Board correctly recognized that even though iRobot did not demonstrate entitlement to a presumption of a nexus, it could still "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" Appx31-32 (quoting *Fox Factory*, 944 F.3d at 1373-74)). Substantial evidence supports the Board's finding that iRobot also failed to meet its burden here.

Below, iRobot purported to introduce evidence of "commercial success" and "recogni[tion], praise[], and cop[ying] by others" based on what iRobot generally referred to as the Roomba's "auto charge and resume functionality." Appx346-353. The Board correctly noted that there were two problems with this evidence, each of which provide a separate basis for affirmance.

First, the Board found—and iRobot never disputed—that the "auto charge and resume functionality" was known in the prior art. Appx32 n.25; Appx33-34 (citing Appx382-383). As the Board correctly noted, this known functionality cannot provide a nexus with the claimed invention because "[i]f commercial success is due to an element in the prior art, no nexus exists." Appx32 n.25 (quoting *Tokai Corp.*

*v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011)); *see also Novartis*, 853 F.3d at 1330-31 (same); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013) ("[O]bjective evidence of nonobviousness lacks a nexus if it exclusively relates to a feature that was 'known in the prior art' . . . ." (citation omitted)).

iRobot did not challenge this finding in its opening brief, so it is waived. *See SmithKline Beecham*, 439 F.3d at 1319. This is sufficient to affirm the Board's finding of no nexus.

Second, the Board correctly found that iRobot's evidence was not directed to the claimed features. Appx33-34. The relevant claims require "control[ling] forward movement of the cleaning robot toward the base charging station at a second velocity less than the first velocity . . . in response to detecting a need to charge the energy storage unit." Appx86 20:47-51; Appx87 22:1-4. iRobot did not tie any of its alleged evidence to the claims' requirement of moving toward the base station at a slower speed in response to detecting a need to charge a battery. Instead, it vaguely referenced an "auto charge and resume functionality" that the Board properly found is not recited in independent claims 13 or 21, which formed the basis for iRobot's arguments. Appx33-34.

In its opening brief, iRobot re-cites some of the purported evidence of praise that it cited below. Blue68. But these citations demonstrate the weakness in iRobot's argument. First, iRobot's citation to SharkNinja's testimony is unavailing because it

generally describes a charge and resume functionality. Appx7898-7901. Second, iRobot's cited articles also generally discuss docking when the battery needs to be charged; they do not discuss the speed at which the robot approaches the dock. Appx7653; Appx7729; Appx7697. Moreover, the first two articles are not directed to the Roomba 900 series that iRobot now argues on appeal is the subject of its objective evidence argument, Blue65. Appx7653 (2004 article discussing Roomba discovery robot); Appx7727-7730 (describing a "Roomba 530" that the author purchased six years before the article's 2016 publication date).

The Board thus correctly found that iRobot's purported evidence of objective indicia was "of broad scope relating to Roomba and not shown to be related to the claimed invention due to a lack of nexus." Appx32-34. The Court should affirm that finding.

### 3. iRobot's Objective Evidence Argument Does Not Overcome the Strong Obviousness Case

iRobot wrongly accuses the Board of "reject[ing] any evidence as to commercial success." Blue66. The Board considered this evidence but found that it was "entitled to little or no weight" because iRobot failed to establish a nexus between it and the claims. Appx27. The Board elsewhere explained that it "considered all the proffered evidence of objective indicia of nonobviousness" in its determination as to obviousness. Appx34. This includes its determination that it would have been obvious to combine Kim and Everett as related to the "second

velocity less than a first velocity" limitation discussed in the previous section. Appx57.

Here, the Board simply determined that the objective evidence does not overcome the showing of obviousness. This is a separate reason to affirm the Board's decision because "secondary considerations . . . do not necessarily control the obviousness conclusion," *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007), and "weak secondary considerations generally do not overcome a strong prima facie case of obviousness." *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010). Here, that is precisely the case. As explained above in Section V.C.1, iRobot's motivation-to-combine challenge to the obviousness case fails. And iRobot's weak objective evidence does not overcome SharkNinja's strong evidence of obviousness. The Court should therefore affirm the Board's decision finding claims 13-15, 18-23, 25, and 26 unpatentable.

### D. Cross Appeal – The Board Committed Two Legal Errors in Holding that SharkNinja Had Not Proven Claim 9 to Be Obvious Based on the Prior Art

The Board erred in finding that SharkNinja had not shown dependent claim 9 to be obvious. Claim 9 recites "avoiding, by the robotic cleaning device, the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level." Appx86 20:20-24. As explained in Section III.D, SharkNinja's petition proposed two alternative sets of

grounds for claim 9. Appx139-140 (citing Appx2233-2236 ¶¶143-145); Appx143-146 (citing Appx2240-2245 ¶¶154-162). The Board committed independent legal errors with respect to each ground, warranting either reversal or vacatur of the Board's decision.

#### 1. For the First Set of Grounds, the Board Erred by Narrowly Construing "Avoiding . . . the Right Signal and the Left Signal"

In the first set of grounds, SharkNinja explained that Jeon's robot "avoid[s] . . . the right signal and the left signal" when it is not in "charge mode," because it does not rotate its plate 306 with sensors 304, 305 and thus does not try to detect the base station signals. *See supra* Section III.D (summarizing petition).

The Board disagreed. Appx52-53. Although the Board had previously determined that Jeon's rotation of sensors 304, 305 on plate 306 in charge mode disclosed "detecting" the two signals in the context of independent claim 1, Appx37-38, the Board determined that Jeon not rotating the sensors did not constitute "avoiding" them, Appx52-53. To reach this conclusion, the Board adopted iRobot's proposed construction of "avoiding" to be "more than not attempting to detect the signals," and to require "moving away from the base station or altering its course to avoid the base station." Appx53. The Board erred in this construction.

Jeon's disclosure of not turning the rotating plate so that the sensors 304, 305 remain turned away from the base station signals constitutes "avoiding" those

signals under that term's plain meaning. Indeed, as SharkNinja explained to the Board, iRobot's proposed construction directly conflicts with what iRobot told the ITC in a co-pending litigation. Appx376. There, iRobot contended that "avoiding" the signals includes simply "ignor[ing]" them. Appx4031. Specifically, when attempting to show domestic industry, iRobot argued that its own product met claim 9's limitation because "when the Roomba's battery level is above a certain threshold, the robot *ignores* the docking beacons." *Id.* (emphasis added). The Board did not consider iRobot's contrary position when construing this term. *See* Appx52-53.

Instead, the Board incorrectly determined that "avoiding . . . the right *signal* and the left *signal*" must be construed more narrowly solely because the specification "refers to the robot moving away from the *base station* or altering its course to avoid the *base station*." Appx53 (emphases added) (citing patent Appx77 2:55-57; Appx78 3:65-4:1; Appx79 6:17-22; Appx82 11:62-12:21). There are two problems with the Board's analysis.

First, none of the Board's citations define "avoiding . . . the right signal and the left signal" (or even "avoiding") according to the Board's narrow construction, and the Board erred in limiting the claims to these exemplary embodiments. The Court "do[es] not read limitations from the embodiments in the specification into the claims . . . [except in] two instances: lexicography and disavowal." *Hill-Rom Servs.,*

*Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (cautioning that the claims will not be limited to the preferred embodiment "unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'" (citation omitted)). Each of the Board's citations merely describes embodiments, and none use definitional language that would limit the scope of the claims. The Board erred in reading these embodiments into the claims.

Second, the claim requires "avoiding" the *signals*, whereas the Board relied solely on disclosures of avoiding the *base station* (as opposed to the signals it emits). The first and second citations describe avoiding the *base station* in response to receiving a signal. Appx77 2:55-57; Appx78 3:65-4:1. The third and fourth citations similarly discuss avoiding "direct contact with the *base station*" by generating a different signal that is meant to be detected. Appx79 6:17-22 (emphasis added); Appx82 11:62-12:21. Thus, even these exemplary embodiments do not describe the behavior recited in claim 9 because they describe avoiding physical contact with the base station, not avoiding the signals. Thus, the only evidence the Board cited in support of its construction is not relevant to the meaning of this limitation.

The Board's construction therefore lacks record support and is contrary to iRobot's previous litigation positions. Moreover, the Board's unappealed finding

that Jeon's rotation of sensors 304, 305 on plate 306 disclosed "detecting" the two signals in the context of claim 1 is inconsistent with its finding that Jeon's opposite behavior (not rotating the sensors) does not disclose "avoiding" them. Jeon's robot "avoid[s] . . . the right signal and the left signal" under plain meaning by not rotating its sensors to detect those signals. The Court should therefore reverse the Board's construction and its determination that claim 9 would not have been obvious.

#### 2. For the Second Set of Grounds, the Board Erred in Determining that Jeon and Jones Do Not Render Obvious Claim 9

In the second set of grounds, SharkNinja relied on Jones's Avoid behavior—which turns the robot away from detected IR signals that have reflected off obstacles—in combination with Jeon's teaching of controlling a robot based on detected IR signals emitted from a base station. Appx144-146; Appx2241-2245 ¶¶155-162; *see supra* Section III.D (summarizing petition). Specifically, SharkNinja explained that a skilled artisan would have combined the two references so that if Jeon's robot detected the signals generated by the base station emitters when its battery had sufficient energy for cleaning, it would implement Jones's Avoid behavior to turn until its sensors 304, 305 no longer detected the rays. *See supra* Section III.D. This would prevent the robot from traveling to the base station unnecessarily. *See supra* Section III.D.

The Board rejected SharkNinja's arguments in a single paragraph. Appx53-54. In that paragraph, the Board provided two rationales for its conclusion, both of which were flawed and provide a basis to vacate the Board's decision.

First, the Board reasoned that Jones's "'Avoid' behavior is based on detecting reflections of IR signals from the robot off of *obstacles* and not right and left signals from *emitters on the base station*." Appx53 (emphases added). And it agreed with iRobot that no single prior art reference "describes a robot detecting and avoiding an infrared signal emitted by a charging base station." Appx54.

The Board's analysis demonstrates that it ignored SharkNinja's obviousness evidence. SharkNinja recognized that Jones's Avoid behavior detects reflected IR signals from obstacles, but SharkNinja and its expert explained how one skilled in the art would have implemented Jones's Avoid behavior on Jeon's robot to work "in response to detecting infrared rays emitted by []Jeon's base station instead of detecting reflected infrared rays from an obstacle." Appx2244 ¶160; Appx145. The Board ignored this argument and evidence. *See* Appx53-54.

Moreover, while the Board faulted the prior art for not "describ[ing] a robot detecting and avoiding an infrared signal emitted by a charging base station," Appx54, it ignored that (a) Jones describes a robot detecting and avoiding an infrared signal reflected off an obstacle; (b) Jeon describes a robot detecting an infrared signal

emitted by a base station; and (c) SharkNinja explained how it would have been obvious to combine these references to teach the limitation. *See supra* Section III.D.

The Board was required to consider this evidence, and it erred by failing to do so. "Omission of a relevant factor required by precedent is both legal error and arbitrary agency action." *Lee*, 277 F.3d at 1344. Indeed,

> an agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706 . . . . That means that the agency must take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches.

*Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017).

Second, the Board erred by summarily dismissing the rest of SharkNinja's arguments, stating that they were "too general and conclusory" and that "the combination would still not include all the elements recited in claim 9." Appx54. This is insufficient to withstand appellate review. "First, 'conclusory statements' alone are insufficient and, instead, the finding must be supported by a 'reasoned explanation.' Second, it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument." *Nuvasive*, 842 F.3d at 1383 (quoting *Lee*, 277 F.3d at 1342, 1345).

Moreover, the record disproves the Board's statement. SharkNinja's explanation, backed by eight paragraphs of expert testimony spanning five pages, is not conclusory. Appx144-146; Appx2241-2245 ¶¶155-162. The Board's superficial

dismissal of SharkNinja's arguments should at least be vacated and remanded for the Board to consider SharkNinja's evidence and provide an explanation for its holding. *Nuvasive*, 842 F.3d at 1383 ("The PTAB's own explanation must suffice for us to see that the agency has done its job and must be capable of being 'reasonably . . . discerned' from a relatively concise PTAB discussion." (alteration in original) (citation omitted)).

For the reasons discussed above, the Court should reverse, or at least vacate and remand, the Board's decision that claim 9 was not shown to be unpatentable.

## VI. CONCLUSION

SharkNinja requests that this Court affirm the Board's determinations that claims 1, 3, 4, 6-8, 12-15, 18-23, 25, and 26 are unpatentable and reverse or vacate the Board's determination that claim 9 was not shown to be unpatentable.

Date: July 21, 2023

Respectfully submitted,

*/s/ Erika H. Arner*
Erika H. Arner
Luke McCammon
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, D.C. 20001-4413
(571) 203-2754

Daniel C. Tucker
Michael V. Young
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2700

*Attorneys for Cross-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1398, -1416

**Short Case Caption:** iRobot Corporation v. SharkNinja Operating LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 16,489 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 07/21/2023 Signature: /s/Erika H. Arner

Name: Erika H. Arner