**Nos. 23-1398, 23-1416**

# United States Court of Appeals for the Federal Circuit

**IROBOT CORPORATION,**

***Appellant,***

***v.***

**SHARKNINJA OPERATING LLC, SHARKNINJA MANAGEMENT LLC, SHARKNINJA SALES COMPANY,**

***Cross-Appellants.***

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2021-00544

## IROBOT'S RESPONSE AND REPLY BRIEF

Lauren A. Degnan
Walter K. Renner
Rosalynd D. Upton
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

Oliver Richards
FISH & RICHARDSON P.C.
12860 El Camino Real
Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

September 13, 2023

*Attorneys for Appellant iRobot Corporation*

# CERTIFICATE OF INTEREST

Counsel for Appellant iRobot Corporation certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **iRobot Corporation**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None/Not Applicable**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **BlackRock, Inc.**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: Roberto Devoto, Jeremy Monaldo**

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **Yes (*see* iRobot's Certificate of Interest filed at Dkt. 5)**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

Dated: September 13, 2023

*/s/ Lauren A. Degnan*
Lauren A. Degnan

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

INTRODUCTION ........ 1

APPEAL NO. 23-1398 ARGUMENT ........ 3

I. THIS COURT SHOULD VACATE AND REMAND THE JUDGMENT AS TO CLAIMS 1-4, 6-8, 10, AND 12 OF U.S. PATENT NO. 9,884,423........ 3

A. Shark's Response Fails To Respond Meaningfully to the Arguments Made in iRobot's Opening Brief........ 3

1. Shark's Response Ignores the Board's Erroneous Requirement for "Magic Words" in Both the Inventor Testimony and Corroborating Evidence........ 3

2. Shark's Response Fails To Account for the Board's Failure To Consider All Pertinent Evidence ........ 6

3. Shark's Response Ignores the Board's Failure To Allow iRobot To Address New Arguments Raised at the Oral Hearing........ 9

B. Shark's "Substantial Evidence" Arguments Do Not Justify Affirmance of the Board's Decision ........12

1. Shark's Theory Relating to Bumper Depression Lacks Substantial Evidence and Is Irrelevant ........ 12

2. Conclusory Fact-Findings Resulting from Legal Errors Do Not Justify the Board's Decision ........ 17

3. This Court Should Reject Shark's Attempts To Shore-Up the Board's Decision with Flawed Reasoning the Board Did Not Articulate........ 20

C. This Court Should Reverse the Board's Conception Determination ........ 24

II. THIS COURT SHOULD REVERSE THE BOARD'S JUDGMENT AS TO CLAIMS 13-15, 18-23, 25, AND 26 BECAUSE IT RESTS ON IMPERMISSIBLE HINDSIGHT ........ 24

A. The Board Erroneously Relied on Hindsight in Its Analysis of the Alleged Motivation To Combine Kim and Everett ........ 24

B. The Board Erred in Its Consideration of Objective Indicia ........ 27

SHARK'S CROSS-APPEAL ........ 30

I. COUNTER-STATEMENT OF THE ISSUES ........ 30

II. COUNTER-STATEMENT OF THE FACTS ........ 30

III. SUMMARY OF THE ARGUMENT ........ 34

IV. ARGUMENT ........ 35

A. This Court Should Affirm the Board's Judgment as to the Non-Jones Grounds (i.e., Shark's "First Grounds") ........ 35

1. The Board Correctly Determined that the Plain and Ordinary Meaning of "Avoiding" Requires More Than Not Attempting To Detect Signals, Which Is All the Prior Art Teaches ........ 35

2. The Board Did Not Err in Consulting the '423 Patent's Specification To Conclude That "Avoiding" Requires More Than Not Attempting To Detect the Left and Right Signals ........ 38

3. This Court Should Affirm the Board's Finding That the Jeon-Everett-Abramson Combination Does Not Invalidate Claim 9 ........ 43

B. This Court Should Affirm the Board's Finding with Respect to the Grounds Including Jones (i.e., Shark's "Second Ground") ........ 44

CONCLUSION .......................................................................................... 47

CERTIFICATE OF SERVICE AND FILING ....................................................... i

CERTIFICATE OF COMPLIANCE..................................................................... ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 26, 46, 47

*Apotex Inc. v. Wyeth LLC*,
657 F. App'x 998 (Fed. Cir. 2016) .......... 47

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) .......... 28

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) .......... 20

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .......... 10

*Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*,
40 F.3d 1223 (Fed. Cir. 1994) .......... 14, 22, 24

*Dawson v. Dawson*,
710 F.3d 1347 (Fed. Cir. 2013) .......... 22

*DeSilva v. DiLeonardi*,
181 F.3d 865 (7th Cir. 1999) .......... 25

*Ethicon LLC v. Intuitive Surgical, Inc.*,
No. 2020-1528, 2021 WL 3716397 (Fed. Cir. Aug. 23, 2021) .......... 43

*Field v. Knowles*,
183 F.2d 593 (C.C.P.A. 1950) .......... 20, 21, 22

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 20

*Gechter v. Davidson*,
116 F.3d 1454 (Fed. Cir. 1997) .......... 13, 17

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
840 F.2d 902 (Fed. Cir. 1988) .......... 26, 46

*Kim v. Hurston*,
182 F.3d 113 (2d Cir. 1999) ........................................ 11

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ........................................ 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 7

*Mycogen Plant Sci. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) ........................................ 4, 5

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ........................................ 47

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ........................................ 25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................ 36, 39, 43

*Price v. Symsek*,
988 F.2d 1187 (Fed. Cir. 1993) ........................................ 6, 7, 9

*Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*,
625 F. App'x 552 (Fed. Cir. 2015) ........................................ 11

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*,
66 F.4th 1373 (Fed. Cir. 2023) ........................................ 27

*Sec. & Exch. Comm'n v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................ 8, 18, 20, 30

*Sewall v. Walters*,
21 F.3d 411 (Fed. Cir. 1994) ........................................ 22

*Silvestri v. Grant*,
496 F.2d 593 (C.C.P.A. 1974) ........................................ 4, 28

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2003) ........................................ 22

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) ........................................................................36

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ..................................................................38, 42

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ........................................................................29

*WJR, The Goodwill Station v. Federal Commc'ns Comm'n*,
174 F.2d 226 (D.C. Cir. 1948), *rev'd on other grounds*, 337 U.S.
265 (1949) ........................................................................................................10

*Yeda Rsch. v. Mylan Pharms. Inc.*,
906 F.3d 1031 (Fed. Cir. 2018) ........................................................................11

# INTRODUCTION

iRobot's opening brief laid out the textbook case of the type of evidence an inventor should provide to prove an earlier conception date. The opening brief detailed the voluminous evidence iRobot supplied corroborating the inventors' claimed conception date and explained the legal errors that led the Board astray in finding against iRobot. Given the lack of genuine dispute about the facts, there can be no doubt that iRobot proved conception of the challenged claims well before the prior art the Board used to invalidate them.

Shark's response brief bears little resemblance to the brief to which it purports to respond. iRobot's opening brief raises serious and significant legal and procedural errors underlying the Board's determination of iRobot's priority claim, including that the Board (1) erroneously required iRobot's inventor testimony and corroborating evidence to mirror, *ipsissimis verbis*, the language of the claims, and (2) refused to allow iRobot to provide a supplemental declaration in response to arguments made for the first time at the oral hearing. Shark's response gives these issues short-shrift, pretending instead that iRobot merely disagrees with the Board's factual determinations. No doubt the Board erred in interpreting the facts, but iRobot's appeal seeks redress for the Board's failure to adhere to this Court's precedent.

Shark also argues that the ’423 patent’s inventors could not have conceived of using contact with the charging terminals on a base station as the trigger, as is required by the challenged claims, because (in its view) the inventors also conceived of using an alternative method for stopping. Even assuming Shark’s version of the facts is true—a dubious proposition given the tenuous evidence it identifies—inventors can and often do conceive of multiple ways of solving problems at the same time. The only question before the Board, and now on appeal, is whether iRobot’s evidence proved conception of the claimed method, not whether the inventors also conceived of other methods described in the patent.

Shark’s response similarly ignores the serious and substantial legal errors with respect to the Board’s obviousness analysis. The Board’s ultimate determination was hopelessly infected with hindsight because the Board ignored guardrails this Court has established to keep an obviousness analysis properly focused on how a skilled artisan would actually have approached a problem. Contrary to Shark’s wish, iRobot’s arguments are not directed to a substantial evidence challenge.

Finally, regarding Shark’s cross appeal, substantial evidence supports the Board’s finding that the prior art fails to teach the limitation of claim 9, and the Board did not commit any legal error. The Board properly determined that the “plain and ordinary meaning” of the word “‘avoiding’ in the context of the

Specification of the '423 patent requires more than not attempting to detect the signals," which is all Shark argued that one set of prior art teaches. Appx52-53. Regarding the second set of prior art, substantial evidence supports the Board's finding that Shark failed to establish motivation to combine and that the prior art combination would still lack all the recited elements. The Court should affirm Board's determination with respect to claim 9.

## APPEAL NO. 23-1398 ARGUMENT

## I. THIS COURT SHOULD VACATE AND REMAND THE JUDGMENT AS TO CLAIMS 1-4, 6-8, 10, AND 12 OF U.S. PATENT NO. 9,884,423

This Court should vacate the Board's judgment as to claims 1-4, 6-8, 10, and 12 and reverse or, at minimum, vacate the Board's conception determination. iRobot proved conception of as a matter of law and the Board's determination to the contrary is riddled with error. Shark's response largely ignores these errors, instead offering an irrelevant story about bumpers and reasoning that the Board did not articulate.

### A. Shark's Response Fails To Respond Meaningfully to the Arguments Made in iRobot's Opening Brief

#### 1. Shark's Response Ignores the Board's Erroneous Requirement for "Magic Words" in Both the Inventor Testimony and Corroborating Evidence

The Board erred as a matter of law in its conception analysis. Instead of considering the substance of the evidence submitted by iRobot, the Board erroneously looked for "magic words" mirroring the language of the claims. *See*

BB 50-57. As this Court has explained, "[t]he invention is not the language of the [claims] but the subject matter thereby defined." *Silvestri v. Grant*, 496 F.2d 593, 599 (C.C.P.A. 1974); *see also, e.g., Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1335 (Fed. Cir. 2001). Yet, when analyzing both the inventor testimony and corroborating documents, the Board repeatedly discounted this evidence because it did not find "specific reference[s]" to the claim language. *See, e.g.*, Appx15.

In the brief treatment Shark gives this issue (RB 49-50), Shark does not disagree that requiring inventor testimony and/or corroborating evidence to parrot the language of the claims would be legal error. Instead, Shark asserts that the Board "did not require 'magic words' in the inventor testimony, because its analysis did not stop with its consideration of the specific words of the inventors' testimony." RB 50. In the opening brief, however, iRobot explained that the Board erred by requiring "magic words" in ***both*** the inventor testimony (BB 51-54) ***and*** the corroborating evidence (BB 54-57).[1] The Board cannot cure a legally-erroneous analysis of inventor testimony with legally-erroneous analysis of the corroborating evidence—as Shark appears to suggest.

Moreover, Shark's suggestion that the Board did not require "magic words" is belied by the Board's own, clear statements in its Final Written Decision ("FWD"). Among other statements that Shark ignores, the Board explicitly

[1] All emphasis added unless noted otherwise.

dismissed an inventor's testimony because, "there is ***no specific reference*** to charging terminals of the base station, detecting contact with the charging terminals, or stopping forward movement of the robot in response to detecting contact with the charging terminals." Appx15. In other words, despite the inventor's explaining, *inter alia*, that a "stop-all" function is called after the "state of the Roomba 2" is set to "charging" (i.e., electrical contact between the base station and the Roomba is made), her testimony was insufficient because it did not "specific[ally] reference" the terminology used by the claim for these functions. *See* Appx14-15; *see also, e.g.*, Appx7416, ¶27 (referenced testimony).

As to the corroborating evidence, Shark also ignores the Board's explicit statement dismissing a document discussing "good contact" with a charger because the document does not explicitly "state that the 'contact' is with charging terminals of the base station." Appx18; *see also* Appx6765. Charging a Roomba is achieved when the metal contacts on the robot make an electrical connection with the metal contacts on the charger. *See id.* "Good contact" plainly refers to contact between the robot's and the base station's charging terminals, and the Board tellingly offered no alternative theory. Rather, the Board found the evidence irrelevant because it does not lay out every detail of the invention being discussed using the same language used in the claims. Appx18.

Any fair reading of the FWD leads to the conclusion that, rather than considering the substance of iRobot's evidence, the Board looked for magic language. This approach is legal error.

### 2. Shark's Response Fails To Account for the Board's Failure To Consider All Pertinent Evidence

iRobot's opening brief (at 55) highlights the Board's failure to consider all pertinent evidence relating to the conception of the challenged claims—as this Court's precedents require. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). For the evidence the Board did consider, the Board's approach involved taking each piece of evidence separately, looking for "magic words" in that piece of evidence, and then moving on to the next. Other evidence—such as the expert testimony provided by iRobot—the Board ignored in its entirety. Precedent requires more—a holistic "rule of reason" analysis that requires "[a]n evaluation of ***all*** pertinent evidence . . . so that a sound determination of the credibility" of an inventor's claim of priority can be adequately considered. *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). Under such an analysis, "an inventor can conceivably prove prior conception by clear and convincing evidence although no one piece of evidence in and of itself establishes the prior conception." *Id.*

Rather than respond to the Board's failure to address all pertinent evidence, Shark attempts to justify it because, in Shark's view, the Board need consider only

the documents that iRobot specifically cited in its "Conception Chart." RB 47-48. With respect to this class of evidence, however, Shark acknowledges (at 46) that iRobot cited its expert's declaration in the "Conception Chart" but ignores that the Board never considered the expert's testimony.

This expert testimony stands, to this day, as the only expert testimony addressing the documents and source code iRobot provided. Yet the Board ignored it, relying instead on its own interpretation of technical documents and source code. This error alone requires correction from this Court. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency decisions are arbitrary and capricious if they "fail[] to consider an important aspect of the problem"); *Price*, 988 F.2d at 1195 (a "rule of reason" analysis requires consideration of all pertinent evidence). Attempting to justify the Board's error, Shark identifies an alleged deficiency in the expert's testimony—i.e., he did not have access to another source code file for one of the functions called. RB 39-40. Such source code was not necessary because the inventor explained what this function did. *See* Appx6648, ¶56 (expert testimony discussing "user.tl" file); Appx7416, ¶27 (Vu discussing "user.tl"). In any event, the Board did not articulate this reason for ignoring the expert's testimony and this Court may affirm the Board's decision, if at all, based on only "[t]he grounds … upon which

the record discloses that its action was based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Shark also provides no reason why this Court should allow the Board to ignore some parts of iRobot's response (and the evidence cited therein). Shark does not dispute that iRobot's Patent Owner Response ("POR") addresses all of the documents cited in iRobot's opening brief. RB 47 n.11. Nor does Shark apparently dispute that these additional documents, at minimum, provide context that is relevant to the issues the Board decided. Nor could it. iRobot's POR describes all of the evidence iRobot provided, including a lengthy narrative (with specific citations to all submitted documents) detailing the way in which the inventors conceived of the challenged claims. *See* Appx294-300.

Even with respect to the specific limitations at issue, Shark is wrong that the Board could ignore documents because they are not in iRobot's "Conception Chart" (Appx300-306). The Board should have considered these other documents because they provide context to the documents that evidence conception of the limitations. Indeed, the Board rejected iRobot's interpretation of one of the documents cited in the Conception Chart—the Design Strategies document that discusses the robot's making "good contact" with the external charger (Appx6765-6766)—because, for example, "[t]here is no explicit reference to the charging contacts (or charging terminals) of the base station[.]" Appx17-18. The Board

should not have considered this document outside the context the other documents provide, including the "Technical Summary," which discusses the auto-docking process and shows the charger's contacts that Board believed were not proved to be present. Appx6719. All of the evidence, including evidence providing context for the specific documents evidencing conception of the limitations, should have been considered. *Price*, 988 F.2d at 1195.

Notably, rather than respond to this claim of error, Shark takes the same erroneous approach to the corroborating evidence that the Board did: examining each piece of evidence separately, seeking magic words corresponding to every claim requirement. *E.g.*, RB 50 ("iRobot's corroborating documentation was devoid of any details that aligned with the claim limitations.").

#### 3. Shark's Response Ignores the Board's Failure To Allow iRobot To Address New Arguments Raised at the Oral Hearing

The Board legally erred when it refused to allow iRobot to respond to new arguments raised for the first time at the hearing. *See* BB 57-60. Shark argued that the inventor testimony was insufficient because "[i]t does not actually discuss the . . . actual claim limitations." Appx437, 9:17-18. Although Shark argues that this hearing argument appears in "[t]he ***first section*** of SharkNinja's reply," RB 52 (original emphasis), Shark ignores that the argument in this section does not pertain to the testimony that Vu provided. Indeed, this "first section" of Shark's

reply does not address any of the evidence, but instead attempts to characterize arguments made in iRobot's POR. Appx362. In the rest of its reply, Shark merely attacked the corroborating evidence and did not address the sufficiency of the inventors' declarations. Appx363-369. Contrary to Shark's telling (at 53), this argument is different than the new arguments it presented at the hearing, where Shark attacked the sufficiency of the inventors' testimony. *See, e.g.*, BB 28, 57-58.

The Board's decision heavily features this argument about the inventors' testimony. *See* Appx15. When iRobot sought leave to address this new evidence with an additional declaration from inventor Vu, the Board refused. Appx532-546. Because the Board decided against iRobot without allowing iRobot an opportunity to address the arguments that would form the basis for its decision, the Board violated the fundamental fairness guarantees underlying administrative decision-making. *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015).

The Board's refusal to allow iRobot to supplement was not harmless. *Contra* RB 53-54. The Board's error here relates to the APA's guarantees of fundamental fairness before the Board—analogous to violations of Constitutional due process. Such errors rarely, if ever, should be treated as harmless. *See, e.g.*, *WJR, The Goodwill Station v. Federal Commc'ns Comm'n*, 174 F.2d 226, 241 (D.C. Cir. 1948) ("Denial of a procedural right guaranteed by the

Constitution . . . is never 'harmless error.'"), *rev'd on other grounds*, 337 U.S. 265 (1949); *cf. Kim v. Hurston*, 182 F.3d 113, 119 (2d Cir. 1999).

In any event, contrary to Shark's assertion (at 53-54), the Board did not reach its ultimate determination based on two independent grounds, nor was its analysis of the inventor testimony the "last piece of evidence in a lengthy analysis" as in the cases Shark cites. *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1042 (Fed. Cir. 2018) (harmless error where the Board relied on multiple other references and expert testimony); *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, 625 F. App'x 552, 557 (Fed. Cir. 2015) (finding error harmless where the Board reached its determination on two grounds "independently"). To the contrary, the Board's analysis of the corroborating evidence flows directly and draws from the Board's conclusions regarding inventor testimony, and Vu's supplemental declaration further discusses (*inter alia*) how her conception relates to certain of the corroborating evidence, including by supplementing her previous testimony about the source code files discussed by the Board. *See* Appx16-17; Appx517-518 (Vu declaration supplementing her previous discussion of the "user.tl" source code file); Appx7416, ¶27 (Vu's original testimony). These issues are far too intertwined for this Court to ignore the Board's error and find the Board would have reached the same decision even if it had considered the additional evidence.

### B. Shark's "Substantial Evidence" Arguments Do Not Justify Affirmance of the Board's Decision

Rather than address iRobot's arguments head-on, Shark pretends this appeal is a substantial evidence appeal and highlights facts the Board found in its favor. Even if the Board cites evidence in support of a conclusion, the conclusion is still erroneous if the Board improperly applies the law in reaching it, or fails to consider all of the pertinent evidence before arriving at a conclusion. *See* Section I.A, *supra*. Nevertheless, the supposed factual findings Shark cites are insufficient for the Board's decision to be affirmed.

#### 1. Shark's Theory Relating to Bumper Depression Lacks Substantial Evidence and Is Irrelevant

Shark relies on two supposed facts it contends are supported by substantial evidence. RB 33-34. The first relates to Shark's argument that, because the inventors of the '423 patent pursued and used in some early prototypes a different way of stopping the robot, the inventors could not have also conceived of using the method claimed in the challenged claims. The FWD block-quotes from a portion of Shark's sur-reply discussing the use of a bump sensor, and then states "it would be contrary to the evidence to use the code files from the period prior to June 23, 2003, to corroborate that the inventors had conceived of using detecting the electrical contacts to stop the movement of the robot." Appx19. This supposed fact-finding does not support affirmance.

The Board never made any explicit finding that the ’423 patent’s inventors pursued a bump sensor ***to the exclusion of other embodiments***, including those claimed in the challenged claims. Indeed, the Board’s decision simply quotes from Shark’s sur-reply and then, apparently assuming Shark’s recitation of the facts were true, draws conclusions based on that assumption. This approach is inadequate because, “[f]or an appellate court to fulfill its role of judicial review, it must have a clear understanding of the grounds for the decision being reviewed.” *Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997). Where the Board’s opinion “explaining [its] decision lacks adequate fact findings, meaningful review is not possible, frustrating the very purpose of appellate review[.]” *See id.* Thus, if the Board intends to rely on a factual determination to support its decision, that determination should be made explicitly. *See id.* at 1460. The Board certainly made no such explicit fact-finding here.

At most, the Board found that the inventors used a bump sensor in some of the early prototypes while they were reducing other claimed features of the robot to practice. Appx19. Even if true, such a factual determination is irrelevant to the question before the Board because it is undoubtedly common for an inventor to conceive of multiple ways to solve one aspect of a problem presented by a new invention. “[A]n inventor need not know that his invention will work for conception to be complete. . . . He need only show that he had the idea; the

discovery that an invention actually works is part of its reduction to practice." *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). That an inventor may have conceived of multiple embodiments and then diligently worked to determine which implementation was best, or whether they worked at all, is hardly unusual; nor is it a reason to discount other evidence corroborating an inventor's claim of conception. In other words, just because the inventors here may have conceived of the use of a bump sensor as one way to stop the robot does not mean that the inventors did not ***also conceive*** of detecting the contact with charging terminals and stopping the forward movement of a robot in response. Indeed, that is the very point iRobot's sur-reply makes in the portion excerpted in the FWD. *See* Appx19 (excerpting sur-reply); Appx406-407 (sur-reply).

In addition, reduction to practice is different than conception. *Burroughs*, 40 F.3d at 1228. Early prototypes are undoubtedly part of reducing an invention to practice. Even if the inventors may have used a bump sensor in ***some*** source code files of the early prototypes, such use does not mean that the inventors had not conceived of, or even implemented, the claimed methods in other prototypes and source code files (as the evidence shows here). BB 41. The only question for the Board to decide was the conception of the claimed embodiment. Whether the

inventors also conceived of other embodiments or had implemented those embodiments in one of the early prototypes is of no moment.

Furthermore, substantial evidence does not support this supposed "fact-finding." The Board's statement was based on testimony Vu offered during her deposition while Shark's attorneys asked about the source code files iRobot produced. *See* Appx19 (block-quoting Shark's sur-reply). In the relevant portion of that testimony (which begins on Appx4757), the questioning attorney asks about a file called "docking.tl" placed before Vu. When asked about whether the purpose of one of the behaviors programmed in the file was "to control the robot when it reached the dock," Vu answered:

> But I -- I believe this is one of the -- this is one of the documents that I looked at when I was creating the deposition (verbatim). And the -- and I actually remember this -- this very well because it was one of the things I was really excited about.
>
> When we first came up with the idea of using the read-write-returning algorithm, we did not have -- we had not yet built the hardware because you -- it always takes longer to build hardware than software. So our early prototypes of these algorithms, the earliest ones were actually done just with two virtual walls next to each other and there was other prototype hardware in between. So the way that that hardware at the time knew when to stop was from the bump sensor. We did not yet have the charging contacts. So I do not know -- depending on when exactly this code is from, this may or may not be the same as this behavior is implemented in the final production system.

Appx4759-4760 (84:12-85:15). When further questioned about the source code file, Vu acknowledged that she was not "exactly sure" and "would have to look at

the entire code base" in order be sure how the robot at the time of the source code file behaved because "this source file alone does not provide that full information." *See* Appx4761-4762 (86:2-87:4).

In other words, Vu attempted to answer counsel's questions but reasonably said she would have to look at additional material to refresh her recollection—given that the source code file was from more than a decade earlier and had been revised several times. Yet Shark (and the Board apparently) took this testimony to mean that, definitively, the only embodiment conceived of as of the date of the source code file was the bump-sensor embodiment.

The actual evidence is to the contrary. For example, when Vu did have time to review all of the source code files, her testimony is clear. In her declaration, she unambiguously explained that, according to her review of the "user.tl" file (dated April 2003, Appx7482, ¶16), the code programs the Roomba 2 to determine whether it is "electrically connected" to a base station using the "(charter available?)" function. *See* Appx7416, ¶27. If so, to "stop[] all motors of the Roomba 2, thereby stopping forward movement . . ."—exactly as claimed. This evidence is more than sufficient to show conception as of at least the file date—even if (as part of the reduction to practice) this functionality was not added to other source code files until a few months later. *See* Appx406-407 (explaining the "(charger-available?)" function was added to the docking.tl file as shown in

revision dated December 15, 2003); *see also* Appx6919-6935 (revision history for "docking.tl").

### 2. Conclusory Fact-Findings Resulting from Legal Errors Do Not Justify the Board's Decision

Shark also highlights (at 33-34) the Board's conclusory assertion that, "[e]ven considering the code files from the period prior to June 23, 2003," it did not find "corroboration that the inventors conceived of 'detecting contact with charging terminals on the base station' or 'stopping the forward movement of the robotic cleaning device in response to detecting contact with the charging terminals on the base station' prior to that date." Appx19-20 n.17. This supposed fact-finding is insufficient to support affirmance of the Board's determination.

First, the Board never explains any reasoning supporting this statement. It is a naked conclusion, without any reasoning or underlying factual support. Thus, this supposed finding-of-fact does not provide this Court with any meaningful avenue for review. *See Gechter*, 116 F.3d at 1457.

Second, although the Board did not explain its reasoning, the Board's conclusion stems from the legal errors evidenced elsewhere in its analysis. For example, as discussed above, the Board erroneously failed to consider all of the pertinent evidence, including testimony from an expert who reviewed the source code and provided independent explanations of it. Rather than cite to that expert's explanation of the source code, or even the inventor's explanation of it, the Board

appears to have attempted to review the source code on its own. *E.g.*, Appx17 n.16. Such independent and unassisted review of source code written in an unfamiliar language cannot produce findings supported by substantial evidence.

Shark attempts to supplement the Board's statement with its own explanation: because iRobot did not produce the source code underlying the "(charger-available?)" function, none of the other evidence about the source code should matter. RB 34. Putting aside that the Board's decision should be judged by the explanation (or lack thereof) actually supplied by the Board, *Chenery*, 318 U.S. at 87, iRobot addressed this argument in its opening brief. BB 41-42. The mere fact that the function is called is enough, as the only question at issue is conception, not reduction to practice. Shark's brief does not even acknowledge this argument, much less respond to it.

The so-called "admissions" that Shark cites do not change the fact that (1) Vu explained what the "(charger-available?)" function does; and (2) the source code ("user.tl") evidences conception of that function by April 2003. *E.g.*, RB 35. Such admissions cannot support affirmance because Shark may not augment the Board's reasoning. *See Chenery*, 318 U.S. at 87. Moreover, iRobot did not admit, for example, that Vu's testimony regarding the use of the bumper applied to ***all*** of the code files saved prior to June 23, 2003. *See* RB 35. Indeed, in the very same brief which Shark claims contains this admission, iRobot identified, *inter alia*, the

"user.tl" file from April 2003, which iRobot argued "clearly disclose[s] that the robot's forward motion is stopped when the robot is electrically connected to the base station and the charger is available" because it cites the "(charger-available?)" function. Appx404. The discussion later in the brief, Appx406-407 (which Shark cites), relates to Vu's testimony (detailed above) about the "docking.tl" file, Appx4759-4760, not "user.tl."

iRobot did not admit at oral argument that that "you do not need to detect charging contacts to ***know*** if the charger is available," RB 38, an assertion Shark needs in order to maintain its argument that the "(charger-available?)" function does not corroborate the inventors' testimony about detecting charging contacts. *See* RB 37-38. Rather, contrary to Shark's argument here, iRobot's counsel explained that "[a] bumper press doesn't do that [i.e., "detect whether the electrical charger is available"]." Appx480 (52:7-10). At most, "[a] bumper press tells you bumped into the base station and then ***maybe*** you can ***infer*** that the charger is available[.]" *Id.* Such an inference is not the same as "detection of the actual contact." *Id.* Furthermore, iRobot's discussion about source code for detecting charging contacts was made in the context of explaining that the reduction to practice efforts for the hardware at issue (i.e., the charging contacts) occurred after the reduction to practice efforts for the software such that the team could not necessarily write software code for the charging contacts because the prototypes

did not have the hardware of charging contacts. *See* Appx503-504 (75:8-24). As iRobot further stated, the absence of specific source code in the record "doesn't mean they didn't think of the idea"—the touchstone of conception. Appx503 (75:15).

#### 3. This Court Should Reject Shark's Attempts To Shore-Up the Board's Decision with Flawed Reasoning the Board Did Not Articulate

Shark's remaining arguments encourage this Court to affirm the Board's decision based on reasoning the Board never articulated. Relying on a 1950 decision from this Court's predecessor, Shark argues that none of the other evidence relating to conception should matter because "[i]t is not sufficient that the result to be obtained be conceived, but it is required that there be conceived and disclosed the means provided to accomplish that result." RB 36 (citing and quoting from *Field v. Knowles*, 183 F.2d 593, 611 (C.C.P.A. 1950)). Neither the *Field* case nor the reasoning Shark urges appears anywhere in the FWD.

Shark's attempts to supplement the Board's decision below should be rejected out of hand. Appellate review of the FWD is confined to "the grounds upon which the Board actually relied." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012); *see also Chenery*, 318 U.S. at 87; *In re Gartside*, 203 F.3d 1305, 1314 (Fed. Cir. 2000).

Shark's argument, in any case, results from a misunderstanding of the holding in *Field*. *Field* involves two interference proceedings. 183 F.2d at 608. The statement on which Shark relies comes from the *Field* court's consideration of the second (No. 81,217), which related to a refrigeration device comprising a "heat transfer drum" that would cool material as it passed around the drum on a belt. *Id.* at 609. The claims ("counts") at issue did not recite the specifics of how the drum was to work—only that a drum would be used. The evidence in the case showed that, even though one of the parties claiming priority had thought of using a drum, (1) the party was "unable to complete the design" for the drum, (2) the development of the drum required time and effort "[b]ecause of the difficulties inherent in a rotating evaporator, and in particular with one in which Freon refrigerant was to be used," and (3) after receiving the layout of the evaporator from another, the party "had to design a machine so as to incorporate and accommodate the design of the evaporator in it." *Id.* at 611. Thus, although the party had thought of the "the idea of a flexible belt ice machine consisting in part of a rotating evaporator," this idea consisted of nothing more than "posing a problem for solution rather than a complete concept sufficiently detailed so as to enable an artisan guided by the disclosure of that concept, successfully and within invention on his own part, to make the machine." *Id.* Hence, the *Field* court explained: "It is not sufficient that the result to be obtained be conceived, but it is

required that there be conceived and disclosed the means provided to accomplish that result[.]" *Id.*

The holding in *Field* is tantamount to this Court's consistent holdings that developing a research plan is not a complete conception. As this Court has explained in more modern cases, merely articulating a "problem to be solved" is not conception of the solution. *Singh v. Brake*, 317 F.3d 1334, 1341 (Fed. Cir. 2003). Accordingly, a party who merely shows "a general idea for a future research plan," *Dawson v. Dawson*, 710 F.3d 1347, 1351 (Fed. Cir. 2013), but not the results of that research has not shown complete conception, *id.* at 1353-54. What distinguishes a research plan from a complete conception is the amount of research or experimentation required to eventually reduce the invention to practice, with complete conception occurring "when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994); *see also Burroughs*, 40 F.3d at 1228. At the same time, "an inventor need not know that his invention will work for conception to be complete" because showing that the invention "actually works is part of its reduction to practice." *Burroughs*, 40 F.3d at 1228.

Shark's discussion of Vu's testimony is exemplary of its perversion of the holding of *Field*. Vu explained that, by at least June 2003, she and her co-inventors had conceived of a "function that outputs an indicator of whether a

battery charger, such as a base station, is electrically connected to the Roomba 2" and, upon learning that it is, "stops all motors of the Roomba 2." Appx7416, ¶27; *see* BB 52. The source code corroborates this account. Appx6735-6744. Yet, Shark dismisses this evidence because "the testimony fails to explain the process used to determine that an electrical connection has been achieved." RB 44.

This same type of flawed logic plagues Shark's entire response, suggesting that the inventors could not have conceived of the claimed embodiment simply because, for example, not all source code may have been written. *See, e.g.*, RB 36-38 (arguing that the "user.tl" document only showed electrical connection); *id.* at 40-41 (arguing the same for the "Roomba 2 System Design Strategies" document); *id.* at 42-43 (arguing the same for the "Technical Summary" document). But the '423 patent's inventors need not have reduced their ideas fully to practice by June 2003 to show conception of those ideas by June 2003. Thus, even if Shark's assertion that not every technical detail regarding how the conceived-of invention would be accomplished (including source code files) was completed by June 2003 were true, it does not matter for purposes of conception. Conception, not reduction to practice, is at issue.

As this Court's precedents explain, Vu need not have worked out every detail of how the electrical connection is detailed in order show conception of "detecting contact with charging terminals on the base station" and "stopping the

forward movement of the robotic cleaning device in response to detecting contact with the charting terminals on the base station" unless doing so would require extraordinary research and effort—which no one has alleged here. *Burroughs*, 40 F.3d at 1228. Vu's testimony, as corroborated by the source code file, undoubtedly shows conception of the disputed limitations.

### C. This Court Should Reverse the Board's Conception Determination

Reversal of the Board's conception determination is warranted because the only evidence, and only expert testimony, comes from iRobot. The determination therefore is legal—whether iRobot's evidence is sufficient to demonstrate conception by June 2003. BB 37. Shark's brief offers no response to this point.

## II. THIS COURT SHOULD REVERSE THE BOARD'S JUDGMENT AS TO CLAIMS 13-15, 18-23, 25, AND 26 BECAUSE IT RESTS ON IMPERMISSIBLE HINDSIGHT

### A. The Board Erroneously Relied on Hindsight in Its Analysis of the Alleged Motivation To Combine Kim and Everett

The Board legally erred by failing to analyze the motivation to combine Kim and Everett rigorously, as this Court requires. Indeed, the FWD does little more than say the reasoning Shark provided was "sound." *See, e.g.*, Appx55. That reasoning consisted of only five sentences asserting generic, conclusory motivation. Neither the Board nor Shark addressed a reasonable expectation of success at all.

Perhaps recognizing the deficiency of the motivation to combine analysis actually laid out for Kim and Everett in its petition, Shark insists (at 56-57) that the motivation to combine analysis can be found elsewhere in its petition—in a section devoted to ***other references***. iRobot, the Board, and this Court should not be required to follow a maze of convoluted citations in order to find a proper motivation-to-combine analysis in Shark's petition. *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). Furthermore, a "*see also*" cite at the end of a footnote in the FWD, Appx57 n.35, does not satisfy this Court's requirement for a full and thorough analysis of the motivation to combine, *In re Nuvasive, Inc.*, 842 F.3d 1376, 1384 (Fed. Cir. 2016) (establishing requirement).

Even assuming the Board intended to adopt this other section, Shark's explanation is insufficient. In the context of its analysis of other prior art, Shark asserted that a skilled artisan would have been motivated to use a "second velocity" because he would have recognized that vehicles traveling faster require longer stopping distances. Appx114. Before the Board, Shark did not explain why the speed at which Kim's robot normally travels is too fast to allow sufficient stopping—especially given that Kim teaches that the robot needs to go up a ramp and over a holding rail in order to dock fully. Appx1646 (Fig. 10); Appx1656

(8:6-25). Kim itself does not describe any problem with coming to a stop in sufficient time. It is pure hindsight to assume (as Shark did below) that Kim's robot requires additional assistance with stopping. Indeed, Shark did not specifically advance this argument with respect to combining Kim and Everett, Appx160, and thus did not take into account the specific features of Kim that already allow for sufficient stopping.

Shark's other reasons, provided in the context of combining other references, for why a skilled artisan would use a "second velocity" are equally meritless. RB 57. For example, Shark provided no analysis that Kim's robot struggled with aligning the charging contacts (which Kim's device accomplished using magnets, Appx1656 (8:63-9:6)); or that it experienced problems with sharp turns or accurate placement due to its rate of speed. That Shark contends the same motivations can simply be dropped in from one reference to another, without accounting for the differences in the references' teachings, shows they are no more than generic motivations similar to those this Court has rejected. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012). Indeed, it appears that the only "motivation" here is to add unnecessary features to Kim for no reason other than such features are claimed by the challenged patent—the very definition of hindsight. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988).

The rest of Shark's argument attempts to shift the burden to iRobot. Shark claims (at 58) that the Board had no duty to provide detailed motivation-to-combine and reasonable expectation of success analyses because, in its view, iRobot devoted little argument to the point below. Shark, not iRobot, has the burden of providing a sufficient motivation to combine, and Shark's failure to do so cannot be excused by any alleged deficiencies in iRobot's POR. *See Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 66 F.4th 1373, 1379 (Fed. Cir. 2023) ("We have reversed the Board's patentability determination where a petitioner did not adequately present a motivation to combine."); *see also id.* at 1378 (collecting cases). In any event, iRobot's POR provided six pages of detailed analysis specifically directed to the references Shark proposed to combine. Appx333-339.

**B. The Board Erred in Its Consideration of Objective Indicia**

The Board also erred in its analysis of iRobot's objective evidence of non-obviousness. *See* BB 65-69. Mirroring its approach to conception, the Board looked for the language of the claims to be replicated in demonstrations and praise for iRobot's robots that embody the challenged claims, rather than looking to what the claimed features enable.

Shark's response does not address the arguments made in iRobot's opening brief, treating them as nothing more than a disagreement with the Board's factual

findings. Shark acknowledges that its brief ignores the allegations of legal error because (in its view) "there is no legal issue before the Court." RB 60. The legal error was treating the claimed invention as the specific language used in the claims even though "[t]he invention is not the language of the [claims] but the subject matter thereby defined." *Silvestri*, 496 F.2d at 599; *see also* BB 66-67. Because the Board treated the invention as the language of the claims, it failed to give the objective evidence its proper weight. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc).

In response, Shark asserts that the Board simply held iRobot to its legal burden of showing a presumption of nexus. RB 63. However, the Board can apply the correct legal framework for analyzing whether a presumption of nexus exists while simultaneously committing legal error in analyzing the evidence provided to support a claim of nexus under that framework. Such is the case here.

Furthermore, iRobot's arguments regarding the Board's erroneous search for "magic words" include the Board's analysis of the significant evidence of industry praise for the patented features. BB 68. Repeating the Board's legal error, Shark dismisses the industry praise touting iRobot's "auto-charge and resume" functionality because iRobot's evidence does not specifically praise "moving towards the base station at a slower speed in response to detecting a need to charge a battery." RB 67. But such industry publications would naturally not use claim

language. *See* BB 68-69. The claims recite the technical aspects that enable iRobot's "auto-charge and resume" functionality. The evidence iRobot cited does not generically praise any "auto-charge and resume" functionality—it praises iRobot's implementation of it. *See* Appx349-351; *see also, e.g.*, Appx7653 ("[P]erhaps the coolest (or at least the most convenient) feature yet, it self docks when it needs to be recharged."); Appx7729 (touting Roomba's ability to "sense when it's low on batteries and not only find its charging station, but the Roomba will dock itself as well"); Appx7697 ("This robot does a great job of docking."). Citing significant praise for the subject matter of the claim practiced by iRobot's robots is sufficient. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016) (evidence showing "the specific products are embodiments of the claimed invention and that the proffered objective evidence relates to these products [] is sufficient to establish the presumption of nexus" for industry praise).

Shark also urges affirmance for reasons never articulated by the Board. Shark claims that the Board could have dismissed evidence relating to praise of the "auto-charge and resume" functionality because such features were known in the prior art. RB 66. The industry praise offered was not praise for the prior art's implementation of "auto-charge and resume" functionality, but iRobot's patented implementation of it. In any event, the Board never found that the praised features were in the prior art. Indeed, in order to make this argument, Shark cites to a

footnote in the Board's description of the law, Appx32 n.25, and attempts to connect it to a generic statement that the Board "agree[d] with Petitioner that the alleged recognition, praise, and copying is directed to features not recited in claims 1, 13, and 21," Appx34. *See* RB 66-67.

Similarly, Shark argues that the Roomba 900 series robots "travel at the same speed when cleaning or when seeking the base charging station." *Id.* at 63-64. Shark faults iRobot for not addressing this evidence, but the FWD does not mention it. As such, this Court should not entertain it as a reason to affirm the Board's decision. *Chenery*, 318 U.S. at 87. In any event, the video does show the Roomba reducing its velocity as it approaches the base station (such as when it might need to charge), which meets the requirements of the claim. Appx423.

## SHARK'S CROSS-APPEAL

## I. COUNTER-STATEMENT OF THE ISSUES

1. Whether the Board correctly construed the phrase "avoiding . . . the right signal and the left signal" in finding claim 9 of the '423 patent unpatentable.

2. Whether substantial evidence supports the Board's determination that claim 9 of the '423 patent is unpatentable.

## II. COUNTER-STATEMENT OF THE FACTS

Shark cross-appeals the Board's decision to uphold the patentability of claim 9. Claim 9 reads, with the disputed portions shown in emphasis:

> 9. The method of claim 1, further comprising ***avoiding***, by the robotic cleaning device, ***the right signal and the left signal*** while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level.

Appx86 (20:20-24). As recited in claim 1, the "right signal" is "transmitted by the right signal emitter of the base station" and the "left signal" is "transmitted by the left signal emitter of the base station"—tantamount to the red and green colored buoys discussed in iRobot's opening brief. Appx86 (19:38-41); *see also* BB 7-8. The method of claim 1 recites "detecting" these signals and then "controlling forward movement of the robotic cleaning device" to the base station "in relation to the right signal and the left signal." Appx86 (19:42-46). Claim 9, thus, requires "detecting" and then "avoiding" the signals emitted from the base station provided that the robot does not need to charge. *See, e.g.*, Appx319-320; *see also* Appx77 (2:53-57) (explaining that "when the quantity of energy stored exceeds the high energy level, the predetermined task including movement of the robotic device ***away from*** the base station in response to reception, by the signal detector, of a base station avoidance signal).

Before the Board, Shark challenged claim 9 on four grounds: (1) Jeon in view of Everett; (2) Jeon in view of Everett and Abramson; (3) Jeon in view of Everett, and Jones; and (4) Jeon in view of Everett, Abramson, and Jones. *See generally* Appx61. The Board found against Shark on each of these grounds. *See id.* On appeal, though its brief is not entirely clear, Shark now appears to challenge

only the Board's determination on the last three of these grounds (Jeon-Everett-Abramson, Jeon-Everett-Jones, and Jeon-Everett-Abramson-Jones) which it splits up into what it calls the "first set of grounds" (i.e., grounds not including Jones) and the "second set of grounds" (i.e., grounds including Jones). RB 52-54.[2]

iRobot's opening brief discusses Jeon, Everett, and Abramson and, therefore, they are not described here. *See* BB 15-18; BB 20-22.

The Jones reference (Appx1379) is an educational book entitled "Mobile Robots" written to inspire students about robotics. *See* Appx1386-1387. Before the Board, Shark relied on portions of a "Lewis and Clark" project where the book teaches students on how to instruct a robot to "move about and don't get stuck." Appx1546; *see also* Appx143. In particular, the book instructs students about an "Avoid" behavior that "tries to steer the robot away from obstructions." *Id.* Using an infrared detector built into the robot, "Avoid determines if any obstacles are in the robot's path" and "[i]f so, Avoid issues motion commands that will turn the robot so as to avoid hitting the obstacle." *Id.*; *see also* Appx1547 (discussing the "Avoid" function in greater detail). Shark contended that this avoidance behavior taught by Jones is the same as "avoiding" "the right signal and the left signal while

[2] With respect to Shark's proposed combination of Jeon and Everett (without other references), the Board rejected Shark's proposed ground because it had already found the combination failed to teach certain elements of claim 1—a determination Shark does not challenge on appeal. *See* Appx52.

an energy level of the battery of the robotic cleaning device remains above a predetermined energy level" as is recited by claim 9. Appx144-146.

Neither Jones nor any of the other references Shark cites teaches what claim 9 requires, as the Board correctly found. Appx53-54. As to the Jones reference, the Board explained that the "Avoid" behavior in Jones is "based on detecting reflections of IR signals from the robot off of obstacles and ***not*** right and left signals from emitters on the base station"—as claim 9 requires. *Id.* Moreover, the Board found that Shark's arguments for incorporating the "Avoid" behavior to be "too general and conclusory"; but nonetheless the Board noted that incorporating Jones's "Avoid" behavior "would still not include all of the elements recited in claim 9, such as, avoiding signals emitted from the base station." Appx54.

As to the other references, Shark argued that Jeon teaches the claimed avoidance of the left and right signals. Namely, Shark argued that "[a] skilled artisan would recognize that" the IR receivers in Jeon's robot "do not attempt to detect (i.e., avoid) infrared signals transmitted by [Jeon's] base station when [Jeon's] robot is not in charge mode." Appx139. As the Board explained, however, "avoid" in the context of claim 9 and the '423 patent means "avoid" (i.e., "keep away from"). Appx53; *see also* Appx319-320 (citing Appx7168-7170; Appx7171-7173; Appx7174-7176). Accordingly, the Board "conclude[d] that the plain and ordinary meaning of 'avoiding' in the context of the Specification of the

’423 patent requires more than not attempting to detect the signals”—which is all the prior art teaches. *See* Appx53.

Shark now appeals.

## III. SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board’s findings that the prior art combinations fail to teach or suggest the limitation of claim 9. With respect to what Shark calls “first set of grounds,” the Board properly determined that the “plain and ordinary meaning” of the word “avoiding” in the context of the specification of the ’423 patent requires “more than not attempting to detect the signals,” which is all Shark argued that the prior teaches. Appx52-53.

With respect to the combinations that include Jones (which Shark calls “second set of grounds”), substantial evidence—including the clear teachings of the prior art—supports the Board’s findings that (1) the prior art does not disclose a robot detecting and avoiding an infrared signal emitted by a charging base station, (2) Shark’s proposed motivation to combine was “too general and conclusory,” and (3) the combination would not include all the elements recited in claim 9. Appx54.

Because the Board’s decision as to claim 9 rests firmly on substantial evidence, and the Board did not commit any of the legal error Shark alleges, this Court should affirm.

## IV. ARGUMENT

### A. This Court Should Affirm the Board's Judgment as to the Non-Jones Grounds (i.e., Shark's "First Grounds")

With respect to what it calls the "first set of grounds" (i.e., those not including Jones), Shark alleges error in the Board's construction of "avoid." Although Shark did not below and still does not propose its own construction of "avoid," Shark asks this Court to "reverse the Board's construction" and reverse the Board's conclusion as to obviousness. RB 73. This Court should affirm.

#### 1. The Board Correctly Determined that the Plain and Ordinary Meaning of "Avoiding" Requires More Than Not Attempting To Detect Signals, Which Is All the Prior Art Teaches

As an initial matter, contrary to Shark's contention, the Board did not conduct a formal construction of the term "avoid" because, as the Board noted, neither party asked for one. Appx53. Instead, the Board simply found (as iRobot had urged, Appx319-320) that the "plain and ordinary meaning" of the word "avoid" requires more than the prior art teaches. Appx53 (stating "the plain and ordinary meaning of 'avoiding' in the context of the Specification of the '423 patent requires more than not attempting to detect the signals"); Appx52 (noting Shark's contention that Jeon's "infrared receiving units do not attempt to detect the infrared signals from the base station"). Substantial evidence supports this determination, such evidence including a common understanding of the meaning of the word "avoid," testimony from iRobot's expert, and testimony from Shark's

expert admitting that Jeon does not discuss any kind of interaction the robot has with the base station before it needs to charge. Appx6687-6690, ¶¶130-132; Appx7218-7219 (42:21-43:3); Appx7234-7235 (58:21-59:21).

As this Court has recognized, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Moreover, "[w]hen claim language has as plain a meaning on an issue as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning." *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015).

Here, it is difficult to comprehend any reasonable interpretation of the word "avoid" that would encompass the teachings of the prior art—as the Board found. Appx52. "Avoid" is a common English word whose meaning is well-known, to even lay lawyers and judges without any technical knowledge. And, as any lay person could understand, "avoid" means more than "do nothing." For example, a person who simply walks down a hallway without regard to who is in the hallway could not be said to be "avoiding" anyone (as opposed to, for example, someone

who goes out of his way to take a different hallway when he spots the person he is trying to avoid). The Board recognized this meaning, explaining "avoiding in the context of the '423 patent requires more than not attempting to detect the signals." Appx53. Yet, "doing nothing" is all the prior art teaches.

As is undisputed, rather than teaching detecting signals and avoiding them, the prior art does not provide any specific teachings with respect to what happens when a robot detects signals before it needs to charge. *See* Appx7218-7219 (42:21-43:3) (Petitioner's expert Dr. Likachev acknowledging that Jeon "doesn't seem to explicitly talk about any sort of an interaction of the robot with the base station while in its cleaning mode"); *see also* Appx7234-7235 (58:21-59:21). Indeed, "doing nothing" is all Shark even argued the prior art teaches: "A skilled artisan would recognize that" Jeon's robot "do[es] not attempt to detect" the signals when it does not need to charge, i.e., it does nothing. Appx139; *see also* Appx52 (noting Shark's contention that Jeon's "infrared receiving units do not attempt to detect the infrared signals from the base station"). Thus, contrary to Shark's contention, the prior art never teaches "avoiding" signals the robot encounters while otherwise cleaning, as it does not detect the signals at all. *See, e.g.*, Appx6686-6687, ¶129. No reasonable construction of "avoiding" can encompass not avoiding—which is what the prior art here teaches.

#### 2. The Board Did Not Err in Consulting the ’423 Patent’s Specification To Conclude That “Avoiding” Requires More Than Not Attempting To Detect the Left and Right Signals

Nonetheless, the Board did not commit any of the errors alleged by Shark. In Shark’s view (at 71-72), the Board erroneously considered a description of an embodiment, which Shark contends this Court’s precedents prohibit except in two instances: explicit lexicography or disavowal. Shark is wrong on all fronts.

First, this Court’s “case law does not require explicit redefinition or disavowal” to construe a claim term according to the specification’s descriptions of the invention. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). Such an approach “‘improperly restricts the role of the specification in claim construction’ to determining ‘whether the presumption in favor of the dictionary definition of the claim term has been overcome by an explicit definition of the term different from its ordinary meaning, or whether the inventor has disavowed or disclaimed scope of coverage.’” *Id.* (citing *Phillips*, 415 F.3d at 1320). Because claim terms “do not stand alone” and are, instead, “part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims[,] . . . [t]he only meaning that matters in claim construction is the meaning in the context of the patent.” *Id.* (citing *Phillips*, 415 F.3d at 1315) (internal quotation marks omitted). Thus, although it is

improper to read an embodiment into the claims, it is entirely proper (as the Board did here) to read claims in light of the specification.

The Board correctly construed "avoiding" according to its plain and ordinary meaning in the context of the specification. To the extent it was even needed to resolve the dispute between the parties here, the Board properly consulted the specification and found that, when discussing avoidance behavior, the specification always describes the robot's avoiding (i.e., keeping away from) the signals emitted from the base station. *See* Appx53 (citing Appx77 (2:55-57); Appx78 (3:65-4:1); Appx79 (6:17-22); Appx82 (11:62-12:21); Appx68 (FIG. 3)); *see also Phillips*, 415 F.3d at 1315 ("[C]laims must be read in view of the specification, of which they are a part." (internal quotation marks and citation omitted)).

The specification's discussion of Figure 3 is illustrative. Figure 3 (below) shows a 360° avoidance signal 60 transmitted by the base station 10 and detected by the robot 40:




FIG. 3

Appx68; *see also* Appx79 (5:12-16). As the specification explains, "[w]henever a measurable level of IR radiator from the avoidance signal [] strikes the detector [on the robot], the robot's IR avoidance behavior is triggered." Appx82 (12:43-45). "When the detector [] of the robotic device [] receives" the avoidance signal generated by the base station, "the robotic device [] can alter its course, as required, to avoid the base station." Appx82 (12:18-21). In other words, the robot detects the signal and moves away from it (and the base station)—i.e., it "avoids" the signal. *See also, e.g.*, Appx82 (12:45-63) (describing in detail the avoidance behaviors, in all of which the robot "necessarily moves to a region of decreased IR intensity—away from the avoidance signal").

The specification is consistent on this point: "[W]hen the quantity of energy stored exceeds the high energy level, the predetermined task includ[es] movement of the robotic device away from the base station in response to reception, by the signal detector, of a base station avoidance signal." Appx77 (2:52-57); *see also* Appx78 (3:65-4:3) ("[T]he first signal emitter transmits an avoidance signal, thereby restricting a movement of the robotic device to directions away from the base station[.]"); Appx79 (6:17-22) ("The top signal emitter 18 generates a first signal, such as an avoidance signal (FIG. 3), in a diffuse region near the base station 10 to prevent generally the robot from coming into inadvertent direct contact with the base station 10[.]"); Appx82 (11:62-12:21) ("To avoid inadvertent

contact, the base station 10 may generate an avoidance signal 60, as depicted in FIG. 3. . . . When the detector 50 of the robotic device 40 receives the avoidance signal 60 from the emitter 18, the robotic device 40 can alter its course, as required, to avoid the base station 10.”). These portions of the specification indicate that the inventors used the ordinary meaning of the word “avoid”—i.e., to keep away from. *See* Appx319-320 (citing dictionary definitions at Appx7168-7170; Appx7171-7173; Appx7174-7176). Shark points to nothing contrary.

Shark argues that “the claim requires ‘avoiding’ the signals, whereas the Board relied solely on disclosures of avoiding the base station (as opposed to the signals it emits).” RB72. Even if true (it is not—as shown above with respect to the avoidance signal emitted by the base station),[3] this is a distinction without a difference. The specification clearly explains that the way the robot avoids the base station when it does not need to charge is by detecting and avoiding a signal emitted from the base station. *See, e.g.*, Appx82 (11:62-12:21). Indeed, directly following the description of the avoidance behaviors, the specification explains that, for all of the avoidance behaviors, the robot “necessarily moves to a region of decreased IR intensity—away from the avoidance signal.” Appx82 (12:43-63). In

[3] *See, e.g.*, Appx82 (12:12-15) (explaining that the avoidance signal could be “a ***plurality*** of single stationary beams or signals”).

other words, avoiding the signal emitted from the base station ***is*** avoiding the base station itself.

Shark also objects to the Board's failure to give dispositive weight to statements iRobot made during an ITC proceeding. *See* RB 71. The only document Shark cites for this assertion (Appx4031) is iRobot's supplemental response to an interrogatory concerning the conception of each claim of the '423 patent for which iRobot contended an earlier priority date was available. *See* RB 71 (citing Appx4031); *see also* Appx4013; Appx4021; Appx4032. In describing its conception of claim 9, iRobot described a document provided in that case: "when the Roomba's battery level is above a certain threshold, the robot ignores the docking beacons and when the battery falls below a certain threshold, it begins to actively search for the docking beacons." Appx4031. iRobot's conception contention in the ITC case does not support Shark's proposed construction of "avoiding," which was "not attempting to detect the signals," Appx53, because the contention refers to the action of ignoring signals that had been detected.

In any event, "[t]he only meaning that matters in claim construction is the meaning in the context of the patent." *Trustees of Columbia*, 811 F.3d at 1363. As discussed above, whenever the specification discusses "avoiding," it consistently teaches that the robot moves away from the base station or alters its course to avoid the base station, thus embracing the "keep away from" ordinary meaning of

"avoid." Because statements made during written discovery at the ITC fall outside the four corners of the patent, the Board did not err by failing to rely on them. To the contrary, the Board would have erred by giving them more weight than the intrinsic evidence. *Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).

#### 3. This Court Should Affirm the Board's Finding That the Jeon-Everett-Abramson Combination Does Not Invalidate Claim 9

Shark does not challenge the Board's finding that the Jeon-Everett-Abramson combination, or what it calls "the first set of grounds," does not invalidate claim 9 under the Board's construction of "avoiding." Instead, Shark contends only that the Board erred by upholding claim 9's validity because the Board improperly construed "avoiding." *See, e.g.*, RB 73 ("Jeon's robot 'avoid[s] . . . the right signal and the left signal' under plain meaning by not rotating its sensors to detect those signals."). This Court, therefore, can and should affirm without further consideration of Shark's argument once the Board's construction of "avoiding" is affirmed. *See Ethicon LLC v. Intuitive Surgical, Inc.*, No. 2020-1528, 2021 WL 3716397, at *5 (Fed. Cir. Aug. 23, 2021) (non-precedential)

(adopting Board's constructions and affirming where appellant did "not challenge the Board's anticipation findings under the Board's constructions").

Even if this Court were to disturb the Board's construction below, affirmance is still warranted as, under any reasonable construction of the claim, the prior art does not teach what is required, as discussed above. *See* Section IV.A.1, *supra*. Nonetheless, should this Court disturb the Board's construction and believe additional factual development may be required, the Court should remand. As iRobot argued to the Board (Appx320-321), construing the term as would be necessary to encompass the prior art would mean that iRobot had conceived of the claim long before the prior art.

### B. This Court Should Affirm the Board's Finding with Respect to the Grounds Including Jones (i.e., Shark's "Second Ground").

Shark challenges the Board's determination that Jones fails to teach "avoiding . . . the right signal and the left signal while an energy level of the battery of the robotic cleaning device remains above a predetermined energy level." RB 73-76. Because the Board's decision rests firmly on substantial evidence (including the clear teachings of the prior art), and the Board did not commit any of the legal error Shark alleges, this Court should affirm.

Jones clearly and understandably explains the function of the "Avoid" function: "Avoid tries to steer the robot away from obstructions." Appx1546; *see also* Appx6689-6690, ¶¶132-133. In other words, as the Board found, Jones

teaches a robot that sends out IR signals and detects reflections in order to avoid, for example, running into walls or furniture when navigating around a room. *See* Appx53-54. Contrary to Shark's contention in its petition, Jones's avoidance behavior is ***not*** "similar to the avoidance behavior of the '423 patent." Appx144. Instead, Jones simply teaches a conventional way to design a robot to (as Jones explains) "move about and don't get stuck"—as one would expect from a book trying to teach and inspire novices about robotics. *See* Appx1546; Appx6690, ¶133.

In its petition, Shark proposed combining Jeon with Jones. Appx245. As the Board correctly noted, however, simply importing Jones's avoidance system into Jeon would not arrive at claim 9—because (as discussed above) Jones does not teach claim 9's requirements, including avoiding signals emitted from the base station. Appx53.

Rather than propose a straightforward combination, Shark instead attempted to transform the teachings of Jones using obviousness. Namely, Shark recognized that Jeon's robot was programmed to ***move towards*** the base station in response to receiving base station signals, but argued that a skilled artisan would have programmed the robot to do exactly the opposite given Jones's teachings. Or, as Shark's petition says, "[a] skilled artisan would have found it obvious to override" what Jeon teaches "when the robot's battery has sufficient energy for cleaning."

Appx145. Why? Shark offered only two generic reasons: to "conserve battery capacity" and "to save time." *Id.* (None of the reasons explain how or why a skilled artisan would morph what Jones actually teaches into the behavior claim 9 recites.)

Shark now faults the Board (at 75) for summarily dismissing its obviousness argument because, as the Board found, the motivation to combine was "too general and conclusory." Appx54. Notably, the entirety of the motivation to combine argument in Shark's petition consisted of two sentences, arguing only generic reasons why a skilled artisan would combine Jeon with Jones that ***do not take account of either of the specific teachings of Jeon or Jones.*** Appx145. In other words, the only reason to morph and combine the references in the manner Shark contends appears to be because that is what claim 9 requires—a clear example of using improper hindsight. *Grain Processing*, 840 F.2d at 907. This Court has previously rejected reliance on "generic" motivation-to-combine arguments that "bear[] no relation to any specific combination of prior art elements." *ActiveVideo,* 694 F.3d at 1328. The Board did not err in rejecting similarly generic and conclusory reasons here.

Shark also cites to its expert's declaration, RB 75, but the expert provides little more than the two sentences from Shark's petition. Of the "eight paragraphs" Shark identifies (at 75), only one (¶159) actually addresses a motivation to

combine. *See* Appx2243, ¶159. In that paragraph, the expert merely echoes the arguments in the petition without additional analysis. *See id.* There is no more error in the Board's dismissing this testimony than in dismissing the two sentences in Shark's petition.

Finally, Shark faults the Board for not explaining its decision more. However, "[f]rom the Board's opinion, it is clear that it fully considered that potential motivation to combine and found it wanting." *See Apotex Inc. v. Wyeth LLC*, 657 F. App'x 998, 1002 (Fed. Cir. 2016) (non-precedential). Given the Board's extensive discussion of Jones and Jeon, Appx21; Appx53-54, Shark cannot credibly argue that the Board ignored its obviousness evidence, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) (holding that the Board's "failure to explicitly discuss every issue or every piece of evidence does not alone establish that the tribunal did not consider it").

This Court should affirm the Board's Finding that the combinations including Jones do not render claim 9 obvious.

## CONCLUSION

This Court should vacate or reverse the Board's judgments of unpatentability as to claims 1, 3, 4, 6-8, 12, 13-15, 18-23, 25, and 26, and affirm the Board's judgment with respect to claim 9.

Dated: September 13, 2023

Respectfully submitted,

*/s/ Lauren A. Degnan*

Lauren A. Degnan
W. Karl Renner
Rosalynd D. Upton
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

Oliver Richards
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

***Attorneys for Appellant iRobot Corporation***

## CERTIFICATE OF SERVICE AND FILING

I certify that on September 13, 2023, I electronically filed the foregoing **RESPONSE AND REPLY BRIEF** of Appellant iRobot Corporation using the Court's CM/ECF filing system. Counsel for appellees were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The **RESPONSE AND REPLY BRIEF** of Appellant is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The **RESPONSE AND REPLY BRIEF** contains 11,126 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.

Dated: September 13, 2023

*/s/ Lauren A. Degnan*
Lauren A. Degnan